**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITEDHEALTHCARE INSURANCE COMPANY, *et al.*,<br><br>      Plaintiffs,<br><br>  v.<br><br>THOMAS E. PRICE, M.D., in his official capacity as Secretary of the Department of Health and Human Services, *et al.*,<br><br>      Defendants. | No. 1:16-cv-00157-RMC |

**UNITED'S MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD**

 Plaintiffs UnitedHealthcare Insurance Company, et al. (collectively, "United") respectfully move this Court to supplement the administrative record in this case with two additional documents. *See* Exs. B & C to Meron Declaration. These documents—the "FFS Adjuster Documents"—were produced in the course of Freedom of Information Act (FOIA) litigation before another judge in this District. They were authored by senior staff at the Centers for Medicare & Medicaid Services (CMS) and presented to, and reviewed by, senior officials of that agency, and they bear directly on issues at the heart of this case. CMS directly or indirectly considered the FFS Adjuster Documents in the course of issuing the 2014 Overpayment Rule United challenges in this case, and these documents thus are properly part of the administrative record and should have been included in the government's compilation of that record.[1]

---

[1] Pursuant to Civil Local Rule 7(m), United has met and conferred with Defendants' counsel concerning this motion. Defendants oppose the motion.

## BACKGROUND

United provides insurance to individuals eligible for Medicare through the Medicare Advantage (MA) program. Under that program, insurers like United assume the responsibility for providing healthcare for Medicare beneficiaries, and in exchange the federal government (through CMS) provides a fixed monthly payment for each enrolled beneficiary. In order to ensure that MA plans are paid more for enrollees who are sicker on average (and are likely to incur greater healthcare costs) and less for those who are healthier on average, CMS modifies each enrollee's payment through a system of risk adjustment.

In brief, CMS's risk adjustment system works as follows: CMS selects a sample of individuals who received care under traditional, fee-for-service (FFS) Medicare. It examines the various medical diagnoses that were coded on those beneficiaries' healthcare claims in a given year and then determines what those same beneficiaries' healthcare costs were the following year. From that information CMS derives a risk factor for selected diagnoses that corresponds to the estimated incremental costs associated with each diagnosis. Once CMS has determined the risk factors based on its own FFS data, it then applies those risk factors to the MA beneficiaries on the basis of the diagnoses coded on their claims. An MA beneficiary with more diagnostic codes, or codes for more serious medical conditions, will wind up with a higher risk score (the sum of the risk factors applicable to that beneficiary), which will trigger a larger payment; those with fewer and less serious diagnosis codes will trigger a lower payment.

United filed this suit to challenge a CMS rule, the Overpayment Rule, that was finalized in May 2014. *See* Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 79 Fed. Reg. 29,844, 29,920-24 (May 23, 2014). As part of that rulemaking, CMS announced that any time an MA plan receives a risk adjustment payment based on a code that is not substantiated by the

underlying medical records, that plan has received an "overpayment," which could trigger onerous liability under the False Claims Act. *See id.* at 29,921. United believes that interpretation is incorrect because, *inter alia*, it ignores the fact that the FFS claims data on which the risk adjustment model is calibrated (and MA plan payments are calculated) *also* contains diagnostic codes that are not substantiated by the underlying medical records. Requiring MA plans to make a repayment for such codes, without accounting for the fact that CMS's data contains similar codes, will actually leave those plans *underpaid* and will make MA plan beneficiaries who are *identical* to Medicare FFS beneficiaries look artificially healthier, and less costly to insure, than their identical counterparts. In short, United's position is that CMS cannot determine (and plans cannot identify) whether the unsupported diagnostic code of an MA beneficiary has led to an overpayment until it accounts for the unsupported codes in the FFS data that it is using for purposes of comparison.

In other contexts, CMS already has recognized that this "apples-to-apples" principle is correct. As relevant to this motion, CMS recognized it in the context of its "risk adjustment data validation" (RADV) audits—audits in which CMS looks at the medical records of a sample of MA enrollees to see if they substantiate the diagnostic codes that have been submitted. In 2010, CMS proposed taking the rate of unsupported codes for the sampled beneficiaries, extrapolating it to all of a plan's beneficiaries, and using that extrapolation to determine whether a plan had received an overpayment. Numerous commenters pointed out that this proposal was flawed because it failed to account for the rate of unsupported codes in the FFS claims data used to calibrate the risk adjust model. *See, e.g.*, Ex. C at 2 (noting that "Plans have raised the concern that we are holding them to a standard of perfection for diagnosis coding but that physician

3

claims in FFS Medicare often include diagnoses that aren't supported in the medical record").[2] Heeding those comments, in 2012, CMS announced that in determining whether a plan had been overpaid, it would apply a so-called "FFS Adjuster." This adjuster would "account[] for the fact that the documentation standard used in RADV audits to determine [an MA plan's] payment error (medical records) is different from the documentation standard used to develop the [MA] risk-adjustment model (FFS claims)." CMS, *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits* 4-5 (Feb. 24, 2012), *available at* http://tinyurl.com/RADV2012. The inconsistency between CMS's recognition of the need for the RADV FFS Adjuster and its proposed Overpayment Rule was expressly brought to CMS's attention in the course of the 2014 rulemaking that is under review here. *See* 79 Fed. Reg. at 29,921-22.

The documents that are the subject of this motion are critical to understanding United's challenge to the Overpayment Rule. The two FFS Adjuster Documents were produced in response to a FOIA request for "documents concerning . . . Medicare Advantage RADV audit outcomes" possessed by or presented to three of the most senior officials at CMS at the time the Overpayment Rule was adopted. *See* Meron Decl. ¶¶ 3-4, 9; Joint Status Report ¶ 5(b), *Schulte v. U.S. Dep't of Health & Human Servs.*, No. 14-cv-887-JDB (D.D.C. Jan. 15, 2016), ECF No. 30 (hereinafter "Schulte Status Report"). Specifically, the documents that CMS released there concerned "(i) meeting materials dated after January 1, 2012 of only Cheri Rice, Jon Blum, . . . and Marilyn Tavenner; and (ii) all correspondence, email, and other documents concerning the Medicare Advantage RADV audit outcomes of only Cheri Rice, Jon Blum, . . . and Marilynn Tavenner." Schulte Status Report ¶ 5(b). At the time these documents were created in 2012,

---

[2] The comments themselves are also contained in the administrative record to this case, and will be described in more detail in United's forthcoming motion for summary judgment.

Marilyn Tavenner was the Acting Administrator of CMS; by the time the Overpayment Rule was adopted in 2014, she had been confirmed as CMS Administrator. *See* Meron Decl. ¶ 10. Both in 2012 and 2014, Cheri Rice was the Director of the Plan Payment Group in the Center for Medicare. *See id.* ¶ 12. And Jonathan Blum was CMS Deputy Administrator in 2012 and Principle Deputy Administrator in 2014. *See id.* ¶ 11.[3]

The FFS Adjuster Documents explain the reasons why CMS decided to adopt the RADV Fee-For-Service Adjuster in response to the concerns about the prevalence of unsupported diagnosis codes in the FFS data that had been used to calibrate the payment model.

The first document is a slideshow, prepared by the director and staff of the Division of Payment Validation (DPV) of the Center for Medicare's Plan Payment Group, that explains clearly and simply how failing to account for coding errors in the FFS claims data would lead to the underpayment of MA plans—and thus the need for an FFS Adjuster (or "Model Calibration Factor," as the slideshow sometimes calls it). *See* Ex. B. First, it acknowledged that the commenters had identified a valid problem, stating that, in the absence of an offset, "[i]n RADV audits, we expect coding perfection from MA plans," but that "[i]n FFS Medicare, some portion of diagnoses on FFS claims are not documented in medical records." *Id.* at 6. That meant that "[u]nder RADV, plans are being held to a different (higher) standard for diagnoses." *Id.* Second, the presentation answered the question, "Why Does FFS Diagnosis Error Matter?" *Id.* at 7. It explained that "CMS uses diagnosis and cost information from FFS claims to assign values to each condition category for MA payment purposes." *Id.* "Inclusion of [these] undocumented diagnoses," it went on, "tends to reduce risk adjustment values." *Id.* The

---

[3]   The request also covered documents possessed by or presented to Andy Slavitt, who succeeded Marylin Tavenner as Acting Administrator of CMS in 2015. Slavitt was not employed at CMS at the time the FFS Adjuster Documents were produced or presented in 2012. *See* Meron Decl. ¶ 13.

presentation then offered an example, in which the FFS data reflected diabetes diagnosis codes for four beneficiaries and showed that the total additional cost for caring for those four beneficiaries had been $12,000. *See id.* at 8. Dividing the $12,000 by the four beneficiaries would produce a "Diabetes Value for MA payment" of $3,000, which CMS would then use to estimate a plan's diabetes-related expected incremental costs for payment purposes—even though, in reality, CMS's actual costs for treating the three of the four beneficiaries whose diabetes codes were reflected in their medical charts were $4,000 per beneficiary. *See id.* If CMS, through RADV, then forced plans to delete any diagnostic codes that were not supported with medical record documentation, those plans would be underpaid relative to the FFS program unless CMS made an adjustment to reflect the fact that its MA payment value had been set without corresponding deletions. Specifically, the presentation gave the example of an MA plan with five patients who had diabetes diagnostic codes, only three of whom had support for those codes in their charts. *Id.* at 9. If CMS required the plan to delete the two unsupported codes, and paid it the unadjusted $3,000 payment value for the three patients who did have support for the diabetes code in their medical charts, then the plan would receive just $9,000 in risk adjustment payments for those patients—even though CMS's equivalent FFS expenditure, and the plan's expected costs, would be $12,000 ($4,000 for each of the three patients). *Id.* Finally, the presentation explained that the "Model Calibration Factor (aka 'FFS Adjustor') takes into account how CMS payments would change if [the] perfection standard that is applied under RADV was also used when calculating risk adjustment model values." *Id.* at 10. This would, it concluded, "[e]nsure[] that RADV and MA payments are on [the] same documentation standard." *Id.*

The second document is a briefing memorandum, presented to one or more of the senior leaders noted above, which likewise explains the reasons CMS staff was recommending adoption of the FFS Adjuster—a recommendation CMS leadership accepted. *See* Ex. C. It notes the concern raised by MA plan commenters that "we are holding them to a standard of perfection for diagnosis coding" even though "physician claims in FFS Medicare often include diagnoses that aren't supported in the medical record." *Id.* at 2. It then explains that the use of "two different documentation standards—one for MA and one for FFS"—"wouldn't matter except that we use FFS claims data to develop our risk adjustors for Medicare Advantage." *Id.* But using FFS claims data that "include[s] diagnoses for beneficiaries who don't actually have the disease, or for whom the medical record documentation is not clear, . . . tends to reduce the estimated average cost of various conditions and therefore our risk adjustment factors." *Id.* (In terms of the example from the slide presentation, it suggests that the incremental cost of care for a diabetes patient is $3,000, when in reality it is $4,000.) To "address this issue," the memorandum goes on, "we are proposing to develop a model calibration factor that estimates how much higher the plan's payment would be if our risk adjustment model had been built using perfect data." *Id.* "[T]his approach makes sense," it explained, "and from a technical point of view is the right thing to do." *Id.*

On July 14, 2017, the government served United with the materials it deemed to comprise the administrative record in this case. *See* Index to the Rulemaking Record, ECF No. 40-2. The record as served consists of more than 12,000 pages of materials. It contains documents from as far back as 1998. It contains journal articles. It contains training slideshows presented to MA organizations in the mid-2000s. But it does not contain the FFS Adjuster Documents.

**ARGUMENT**

**A.     Legal Standard**

Judicial review of agency action under the Administrative Procedure Act "is to be based on the *full* administrative record that was before the [agency] at the time [it] made [its] decision." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (emphasis added); *see also Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992). The full administrative record "include[s] all documents and materials that the agency directly or indirectly considered and nothing more nor less." *Animal Legal Def. Fund v. Vilsack*, 110 F. Supp. 3d 157, 159 (D.D.C. 2015) (citation and alterations omitted). The record is not limited to formal publications or public-facing documents. "If the relevant agency decisionmakers considered, even indirectly, any internal guidelines, memoranda, manuals or other materials in reaching its decision, those materials should be included in the record." *Bimini Superfast Operations LLC v. Winkowski*, 994 F. Supp. 2d 103, 105 (D.D.C. 2014) (citations omitted). Courts must review all materials considered by the agency because "[r]eviewing less than the full administrative record might allow a party to withhold evidence unfavorable to its case, while reviewing more than the information before the agency at the time of its decision risks requiring administrators to be prescient or allowing them to take advantage of post hoc rationalizations." *Univ. of Colo. Health at Mem'l Hosp. v. Burwell*, 151 F. Supp. 3d 1, 12 (D.D.C. 2015) (citations omitted).

Although "the agency enjoys a presumption that it properly designated the administrative record," that presumption is rebuttable, and supplementation is proper if certain "unusual circumstances" exist. *Lee Mem'l Hosp. v. Burwell*, 109 F. Supp. 3d 40, 47 (D.D.C. 2015). The D.C. Circuit has identified "at least three" such unusual circumstances: (1) where the agency deliberately or negligently excluded documents that may have been adverse to its decision; (2)

8

where background information is needed to determine whether the agency considered all the relevant factors; and (3) the agency failed to explain administrative action so as to frustrate judicial review. *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008); *accord Lee Mem'l Hosp.*, 109 F. Supp. 3d at 47. A party seeking to supplement the record "must identify the materials allegedly omitted from the record with sufficient specificity, as opposed to merely proffering broad categories of documents and data that are 'likely' to exist." *Lee Mem'l Hosp.*, 109 F. Supp. 3d at 47 (citation omitted). It must also "introduce concrete evidence to prove that the specific documents allegedly missing from the record were before the actual decisionmaker involved in the challenged agency action." *Id.* (citation and internal quotation marks omitted).

### B. The FFS Adjuster Documents Should Be Added To The Record

The grounds for supplementing the administrative record in this case are as clear as they ever come. United has identified specific, publicly available materials that were omitted from the record as compiled by CMS. CMS has acknowledged through its own prior court filings in the *Schulte* FOIA case that those documents were possessed by senior CMS officials involved in promulgating the Overpayment Rule. The other documents CMS has included in the administrative record here—including hundreds of pages of comments submitted in connection with the RADV auditing methodology that these FFS Adjuster Documents were developed in response to, and the agency rulemaking document in which it indicated that it would adopt the very FFS Adjuster that these documents describe—make it absurd to suggest that CMS did not directly, or at least indirectly, consider these documents. And, finally, these excluded documents are plainly adverse to the agency's decision and reveal that it did not consider all the relevant factors, because they show the agency's own prior recognition that MA plans will be underpaid if they are held to a "perfection" standard that CMS does not apply to its own data—exactly the result that the Overpayment Rule's interpretation of "overpayment" produces. These unusual

9

circumstances justify supplementing the record, and CMS's only argument to the contrary—that these are internal "deliberative" materials—is unpersuasive.

### 1. United Has Identified Specific Materials

United clearly has "identif[ied] the materials allegedly omitted from the record with sufficient specificity." *Lee Mem'l Hosp.*, 109 F. Supp. 3d at 47. Far from "merely proffering broad categories of documents and data that are 'likely' to exist," *id.*, United has identified two specific documents. The authenticity of these documents has not and cannot be questioned, and the Court is not forced to speculate about their contents and potential relevance to the Overpayment Rule.

### 2. CMS Considered the FFS Adjuster Documents

There also is "concrete evidence" that the FFS Adjuster Documents "were before the actual decisionmaker involved in the" Overpayment Rule. *Id.*

To start, it is clear that these documents were possessed by senior CMS officials involved in promulgating the Overpayment Rule. As explained earlier, the framing of the FOIA request that produced these documents reveals that they were possessed by or presented to at least one of the three most senior relevant CMS officials: Marilyn Tavenner, the Administrator of CMS in 2014; Jonathan Blum, the Principal Deputy Administrator of CMS in 2014; and Cheri Rice, the head of CMS's Medicare Plan Payment Group in 2014. The government cannot dispute that all three were deeply involved in approving the Overpayment Rule.

Moreover, there is concrete evidence that the FFS Adjuster Documents were not just possessed but were actually *considered*, directly or indirectly, by the agency decisionmakers—namely, the materials the agency *has* included in the record here. Those materials include CMS's December 2010 request for comments on its proposed payment-error calculation methodology for RADV audits; the nearly 300 pages of comments it received on that proposal;

and its February 2012 announcement of its final payment-error calculation methodology, in which it included the FFS Adjuster. *See* Index to the Rulemaking Record at 5, ECF No. 40-2. By including those materials in the administrative record here, CMS has admitted that it considered those materials in the course of promulgating the Overpayment Rule in 2014. *See Lee Mem'l Hosp.*, 109 F. Supp. 3d at 47 (observing that the administrative record contains nothing less than all records the agency considered but also "nothing more") (alteration omitted).

It was perfectly appropriate—indeed, necessary—for CMS to have considered these materials during the 2014 rulemaking. One of the primary arguments commenters raised with respect to the Overpayment Rule was that "applying the principles adopted by CMS in the RADV audit context, an overpayment cannot exist for a particular MA contract unless CMS' payments as a whole to the MA organization pursuant to the contract are inaccurate in light of an appropriate FFS Adjuster applied to the entire contract." Overpayment Rule, 79 Fed. Reg. at 29,921. In that context, *of course* the agency considered the comments originally submitted about this point in the RADV audit rulemaking, and therefore correctly included them in the administrative record here. The FFS Adjuster Documents, which explicitly set out the principles CMS had adopted in response to, and in recognition of, those comments, were likewise directly or indirectly considered by the agency. It is simply not credible to suppose that in 2014 CMS reviewed the public comments concerning the FFS Adjuster but not its own senior staff analysis of those comments and the recommendations they made in response to those comments—unless it did not *want* to see that analysis, which would raise its own reasons for concern.

      3.     *The FFS Adjuster Documents Are Adverse to CMS's Decision*

The FFS Adjuster Documents were thus "negligently excluded" from the administrative record and "may have been adverse to [the agency's] decision." *Lee Mem'l Hosp.*, 109 F. Supp.

3d at 47.  Indeed, they are certainly adverse to CMS's decision and directly support arguments that United has made throughout this litigation.

The first of these documents is the slideshow presented by the Division of Payment Validation.  As noted above, *see supra* at 5-6, CMS there acknowledged that it "uses diagnosis and cost information from FFS claims to assign values to each condition category for MA payment purposes"—in other words, it uses FFS data to calibrate the MA risk adjustment model—and that "some portion of diagnoses on FFS claims are not documented in medical records."  Ex. B at 6-7.  Accordingly, without an FFS Adjuster, plans would be "held to a different (higher) standard for diagnoses" than CMS applies to its own FFS data.  *Id.* at 6.  And because the CMS payment model builds in the existence of undocumented diagnoses (beneficiaries whose incremental cost for a condition is zero), paying a plan appropriately requires that it be paid for unsubstantiated diagnoses as well.  (A plan with a population identical to the CMS population hypothesized on slide 8 of Exhibit B would need to be paid the $3,000 payment for all 4 members in order to recover its plan costs of $12,000.)  The solution to this problem was the "Model Calibration Factor (aka 'FFS Adjustor')," which "offset[s] recovery amounts under RADV" by accounting for "how CMS payments would change if [the] perfection standard that is applied under RADV was also used when calculating risk adjustment model values."  *Id.* at 10.

That recognition of a problem, and of the need for a solution, is irreconcilable with the interpretation of "overpayment" that CMS took in the Overpayment Rule at issue here.  In the Overpayment Rule context, CMS is demanding exactly what it concluded it could *not* demand in the RADV audit context: that plans return payments they receive for unsupported diagnosis

codes, *without any offsetting adjustment* for the fact that the FFS data CMS used to set the payment values also contain unsupported codes.

The charts that CMS included in the slideshow are, if anything, even *more* adverse to CMS's position here. Those charts, as described above, illustrate a hypothetical scenario regarding the cost of diabetes that clearly demonstrates how the imposition of that "different (higher) standard" would result in an MA plan being substantially underpaid. *Id.* at 8-9. United's complaint in this case—though filed long before United's counsel was aware of these FFS Adjuster Documents—set out a remarkably similar hypothetical to illustrate the same principle. *See* Complaint ¶¶ 82-85, ECF No. 1. In its motion to dismiss, CMS dismissed that hypothetical as "simplify[ing] away, among other things, the fact that [CMS's payment value calibration] process utilizes statistical regression to assign relative weights to diagnoses (and other predictors of costs)." U.S. Motion to Dismiss at 9, ECF No. 12-1. This slideshow, however, demonstrates that CMS itself found that identical simplifications were helpful in appreciating the implications of applying different standards to the two sets of data, and that the Director of the Division of Payment Validation understood perfectly well that those simplifications did not affect the validity of the analysis.

The second document makes the same basic points. Like the slide presentation, it acknowledges MA plans' concerns that CMS was "holding them to a standard of perfection for diagnosis coding but that physician claims in FFS Medicare often include diagnoses that aren't supported in the medical record." Ex. C at 2. And it recognized that to the extent the FFS data "include diagnoses for beneficiaries who don't actually have the disease, or for whom the medical record documentation is not clear, this tends to reduce the estimated average cost of various conditions and therefore our risk adjustment factors." *Id.* By contrast, if the "risk

adjustment model had been built using perfect data," then MA plans' payments would be "higher." Using a calibration factor to "reduce the estimated RADV overpayments due from the plan," therefore, not only "makes sense," but was also, "from a technical point of view[,] the right thing to do." *Id.*

Here again, CMS's acknowledgment that the FFS Adjuster was necessary in order to account for unsupported codes in its own FFS data is irreconcilable with CMS's decision, two years later, to forgo any such adjustment in the Overpayment Rule.

### 4. The Exception for "Deliberative" Documents Is Inapplicable

At the parties' meet-and-confer regarding this motion, the government indicated that it opposed supplementation of the record with the FFS Adjuster Documents on the ground that they constitute "deliberative documents." This theory is unpersuasive.

It is true that, generally, "materials reflecting an agency's internal deliberations should not be part of an administrative record." *Lee Mem'l Hosp.*, 109 F. Supp. 3d at 48 (citation omitted). That is "because, when a party challenges agency action as arbitrary and capricious, the reasonableness of the agency's action is judged in accordance with its stated reasons." *Oceana, Inc. v. Pritzker*, 217 F. Supp. 3d 310, 318 (D.D.C. 2016) (citation omitted). If an "agency's final considered judgment" could be impugned on the basis of the record of its deliberations, "any slip of the tongue during an agency's decisionmaking process could be fatal, contrary to the settled principle that up to the point of announcement, agency decisions are freely changeable, as are the bases of those decisions." *PLMRS Narrowband Corp. v. FCC*, 182 F.3d 995, 1001-02 (D.C. Cir. 1999) (citation omitted). Excluding deliberative documents from the record thus serves to "ensure open communication between subordinates and superiors, [to] prevent premature disclosure of policies before final adoption, and to avoid public confusion if grounds for policies that were not part of the final adopted agency policy happened to be exposed

14

to the public." *Lee Mem'l Hosp.*, 109 F. Supp. 3d at 48 (citation omitted).  None of these rationales, however, justifies excluding the FFS Adjuster Documents from the record here.

To start, even assuming the FFS Adjuster Documents are deliberative in some sense, they do not reflect CMS's deliberations regarding the *Overpayment Rule*.  That is the agency action United is challenging in this case.  United does not dispute that the permissibility of the Overpayment Rule must be "judged in accordance with [CMS's] stated reasons" for promulgating it.  *Oceana, Inc.*, 217 F. Supp. 3d at 318.  But the Court's consideration of the FFS Adjuster Documents is no more inconsistent with that principle than is its consideration of, say, the 2011 public comments on the same subject—comments that the government acknowledges are part of the record.

In any event, a document "may lose its [deliberative] status because it memorializes or evidences the policy the agency ultimately adopts on an issue or because the agency used the document in its dealings with the public."  *Colorado Wild Horse & Burro Coal., Inc. v. Kempthorne*, 571 F. Supp. 2d 71, 75 (D.D.C. 2008) (citation omitted).  That has happened here.  The FFS Adjuster Documents memorialize and evidence the policy CMS ultimately adopted in February 2012—namely, the policy of applying an FFS Adjuster before requiring contract-wide repayments in a RADV audit.  To put the point another way, the FFS Adjuster Documents do *not* "inaccurately reflect or prematurely disclose the views of the agency, suggesting as agency position that which is as yet only a personal position."  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (describing the types of deliberative documents that

should be shielded). Instead, they reflect the agency's avowed, settled view about RADV audits.[4]

There is no danger that including these documents in the administrative record could "discourage candid discussion with the agency." *Lee Mem'l Hosp.*, 109 F. Supp. 3d at 49. After all, the documents already have been made public. If CMS thought that they contained records of deliberations that if exposed would undermine agency candor, it could have withheld them from disclosure under the deliberative process exemption of FOIA. *See* 5 U.S.C. § 552(b)(5). In fact, CMS *did* redact portions of the second document for precisely this reason. The fact that it allowed the remainder of the two documents to be released forecloses it from now arguing that disclosure will be harmful.[5]

Finally, even if these documents did qualify as genuinely deliberative documents and had not been publicly released, it would still be appropriate to add them to the record. "[S]upplementation, including with deliberative documents, may be required upon a 'prima facie showing that the agency excluded from the record evidence adverse to its position . . . .'" *Banner Health v. Sebelius*, No. CV 10-01638 (CKK), 2013 WL 11241368, at *6 (D.D.C. July

---

[4] Although CMS announced the FFS Adjuster in 2012, it still has not settled on the *amount* of the adjuster. But it has never reversed its decision that an adjuster of *some* amount is necessary.

[5] During a meet-and-confer on discovery issues in *United States ex rel. Swoben v. Secure Horizons*, No. 2:09-cv-05013 (C.D. Cal.), a False Claims Act case involving United, the government indicated that the CMS FOIA office may seek to claw back the FFS Adjuster Documents and assert the deliberative process privilege over them, and asked United whether it would agree to sequester or return these documents, even though United did not obtain them from the government. United asked the government for any authority imposing an obligation on a party to destroy and not use documents that the government had publicly released under FOIA to multiple parties, and which the party had not received from the government. The government has not responded to that request. In the meet-and-confer in this case, government counsel did not assert executive privilege over these documents nor did it indicate that they should be filed under seal. United thus is filing them publicly. United notes that the documents were first released to an investigative journalist approximately two years ago and at this point have been disseminated to, and read by, numerous industry participants.

30, 2013) (quoting *Deukmejian v. Nuclear Regulatory Comm'n*, 751 F.2d 1287, 1327 (D.C. Cir. 1984)).  United has made more than a prima facie showing.  For the reasons explained earlier, *see supra* at 11-14, the FFS Adjuster Documents are clearly adverse to CMS's position on the Overpayment Rule.  "This consideration alone calls for supplementation of the record" with the FFS Adjuster Documents.  *Id.*  And these documents likewise shed critical light on "whether the agency considered all of the relevant factors" in making the challenged decision.  *Lee Mem'l Hosp.*, 109 F. Supp. 3d at 47.  For that reason, too, they should be included in the record.

## CONCLUSION

For the foregoing reasons, the Court should supplement the administrative record with the FFS Adjuster Documents.  Because the Court will not have had an opportunity to resolve this motion before United's opening summary judgment motion is due, United will not cite or advert to the FFS Adjuster Documents in that opening motion, though it may do so in its combined opposition and reply if the Court has by then ruled in its favor.  If the Court grants this motion to supplement, United respectfully requests that the Court consider the points made here in conjunction with points United will raise in its summary judgment briefing.

October 2, 2017                                                   Respectfully submitted,

                                                                                             /s/ Daniel Meron
                                                                                             Daniel Meron (D.C. Bar No. 450419)
                                                                                             Benjamin W. Snyder (D.C. Bar No. 1020481)
                                                                                             LATHAM & WATKINS LLP
                                                                                             555 Eleventh Street, NW
                                                                                             Suite 1000
                                                                                             Washington, DC 20004
                                                                                             Telephone:  (202) 637-2200
                                                                                             Facsimile:  (202) 637-2201
                                                                                             daniel.meron@lw.com

                                                                                             *Attorneys for Plaintiffs*