# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITEDHEALTHCARE INSURANCE )
COMPANY, *et al.*, )
         )
        Plaintiffs, )
         )
        v. )
         )    Case No. 16-cv-157 (RMC)
ERIC D. HARGAN, )
Acting Secretary of Health and Human )
Services, *et al.*, )
         )
        Defendants. )
_____ )

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

The Secretary audits Medicare Part C insurers to be certain that they are reporting accurate information, and claiming payment only where those claims are supported by the underlying medical records—obligations that exist independent of the auditing process. In 2012, the Secretary announced that he would perform a study and then make an appropriate adjustment to the amounts recovered by these audits. He described this adjustment in four brief sentences at the end of a white paper, leaving all of the details to be elaborated at a later date. The Secretary has continued to study the issue but, in the more than five years since that white paper was published, he has said nothing more about it. When the Overpayment Rule (the subject of this litigation) was being promulgated in 2014, some insurers requested that an adjustment also be applied to limit any overpayments that they might otherwise be obligated to return outside of the auditing process. The Secretary declined to do so, and UnitedHealthcare Insurance Company ("United") now challenges that Rule.

United seeks to supplement the administrative record with two internal briefing documents—one a slideshow presentation and the other an untitled set of bullet points—prepared by agency staff around the time that the methodology for the audits was being finalized.  United says that these documents, which contain many statements that the Secretary has never publicly endorsed, nonetheless accurately convey the agency's reasoning and analysis, and must have been considered in the course of issuing the Overpayment Rule more than two years later.  United is wrong on both counts: the documents do not appear in the administrative record because they were not considered in that rulemaking and, even if they had been, they contain only the views of their authors at the time the documents were drafted and not the position of the agency.  Such deliberative documents are not an appropriate basis for judicial review, which instead "should be based on an agency's stated justifications."  *Ad Hoc Metals Coal. v. Whitman*, 227 F. Supp. 2d 134, 143 (D.D.C. 2002)

## BACKGROUND

### A.  Risk Adjustment in Medicare Advantage

Part C of the Medicare statute, 42 U.S.C. §§ 1395w-21 to 1395w-29, codifies the program now known as Medicare Advantage ("MA"), which allows people to receive their Medicare benefits through a private health insurance plan.  Participating insurers are paid a pre-determined sum for each person they cover, *id.* § 1395w-23(a)(1)(A), based in part upon the characteristics of the beneficiary.  By statute, the payment to the insurer depends on "such risk factors" as the age, gender, and "health status" of that individual.  *Id.* § 1395w-23(a)(1)(C)(i).  Insurers are paid more for providing benefits to older and sicker beneficiaries, and less for younger and healthier ones.

To determine the costs associated with each risk factor, the Secretary has built a complex regression model.[1]  The inputs to this model are data from Medicare beneficiaries who receive their benefits through the traditional Medicare system.[2]  The output of this model is a set of multipliers—that is, "coefficients"—that are added together and then computed against a base rate.  For example, a 72-year-old woman living independently, without a disability, is assigned a coefficient of 0.374.  *Id.* at 78.  If she has diabetes without complications, another 0.104 is added to that number; multiple sclerosis adds another 0.441.  *Id.* at 79–80.  Summing these coefficients, our hypothetical beneficiary has a total risk score of 0.919: the risk adjustment model predicts that a person with these characteristics will be 91.9% as costly to treat as the average beneficiary.  An insurer that enrolled this woman in a Medicare Advantage plan would therefore be paid 91.9% of its base rate (which is keyed to the average beneficiary) for doing so.

### B.  Audits of Risk Adjustment Data

A necessary consequence of this risk adjustment model is that Medicare Advantage insurers have a strong financial incentive to identify every medical diagnosis that can be claimed for an enrolled beneficiary, because more diagnoses lead to higher payments.  In 2008, the Secretary announced that he would begin to audit the diagnosis data submitted by such insurers,

---

[1] For a description of the model, see Gregory C. Pope, et al., *Risk Adjustment of Medicare Capitation Payments Using the CMS-HCC Model*, Health Care Financing Review, Vol. 25, No. 4 at 119 (Summer 2004), *available at* http://www.cms.gov/Research-Statistics-Data-and-Systems/Research/HealthCareFinancingReview/Downloads/04summerpg119.pdf.

[2] *See* CMS, Dep't of Human & Health Servs., *Announcement of Calendar Year (CY) 2017 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter* at 3 (Apr. 4, 2016), https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2017.pdf.

through Risk Adjustment Data Validation ("RADV") audits, to ensure that they were accurately reporting the medical condition of their beneficiaries.[3]

A statistical methodology for these audits was proposed in December 2010 and finalized in February 2012.[4]  Under this methodology, the Secretary chooses a contract to audit, selects a sample of beneficiaries associated with that contract, and examines their medical records.  He determines whether any diagnoses claimed by the insurer are unsubstantiated in the sample beneficiaries' medical records and, if some diagnoses are unsubstantiated, calculates an error rate that compares the risk scores claimed for the sample beneficiaries to the risk scores supported by their medical records.  After accounting for statistical uncertainty—and giving the insurer the benefit of the doubt within the range of that uncertainty—this error rate is then extrapolated to the contract as a whole.  An extrapolated error rate of 5%, for example, suggests that the Secretary paid 5% too much to cover the Medicare Advantage beneficiaries on that contract.

When the RADV audit sampling methodology was proposed, several insurers argued that it would be unfair for the Secretary to recover the full amount suggested by this error rate.  Their theory was that, because the data on which the risk adjustment model relied was itself unaudited, that data contained errors, and those errors made the model's risk scores incompatible with the more accurate diagnosis data produced by the RADV audits.  This theory had several odd features, most prominent of which was the fact that the insurers did not seem to be claiming that

---

[3] See CMS, Dep't of Human & Health Servs., *Announcement of Calendar Year (CY) 2009 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter* at 22 (Apr. 7, 2008), https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2009.pdf.

[4] *See* CMS, *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits* (Feb. 24, 2012) ("RADV Methodology"), https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/recovery-audit-program-parts-c-and-d/Other-Content-Types/RADV-Docs/RADV-Methodology.pdf.

the risk scores produced by the risk adjustment model were arbitrary and capricious—to the contrary, participating insurers had all agreed to be paid on the basis of the published coefficients—but rather suggesting that the risk scores properly calculated the expected medical costs of a beneficiary so long as they were fed unaudited data about his health status, and only went haywire when they were computed using audited (*i.e.*, more accurate) data.

Nonetheless, the Secretary agreed to study this problem, and to publish an adjustment factor that would "account[] for the fact that the documentation standard used in RADV audits to determine a contract's payment error (medical records) is different from the documentation standard used to develop the Part C risk-adjustment model (FFS claims)." RADV Methodology at 4–5. Because the risk adjustment model is based solely on data from individuals who receive their benefits through traditional "fee-for-service" (that is, "FFS") Medicare, the adjustment factor for the unaudited nature of that data became known as the "FFS Adjuster." *Id.* at 4. The Secretary did not explain how he expected to calculate this adjustment factor, saying only that it would "be calculated . . . based on a RADV-like review of records submitted to support FFS claims data." *Id.* at 5. The Secretary said nothing at all about what he expected the value of this FFS Adjuster to be. He did explain that, if the payment error rate calculated by the RADV audits was smaller than the adjustment factor that resulted from his study, then nothing would be recouped on the audited contract; if the payment error rate was larger than the FFS Adjuster, then the difference would be recovered.[5] *Id.* at 4. Since the Secretary made these statements in February 2012, he has said nothing more about the FFS Adjuster.

---

[5] For example, if the payment error rate was 5%, and the FFS Adjuster was 6%, then nothing would be recovered on the audit. If the FFS Adjuster was 1%, then the final recovery would be 4%; if it was 0.1%, the final recovery would be 4.9%. And if the Secretary were to calculate an FFS Adjuster that was zero or lower (*i.e.*, negative), then the final recovery would be 5%.

### C.  The Overpayment Rule

In May 2014, the Secretary promulgated the Overpayment Rule challenged here, which incorporated the "long-standing . . . requirement that a diagnosis submitted . . . by an MA organization for payment purposes must be supported by medical record documentation." Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 79 Fed. Reg. 29,844, 29,921–22 (May 23, 2014).  This requirement was applied over the objection of insurers which believed that "an overpayment cannot exist for a particular MA contract unless CMS' payments as a whole to the MA organization pursuant to the contract are inaccurate in light of an appropriate FFS Adjuster applied to the entire contract."  *Id.* at 29,921.  Again, these commenters' theory appeared to be that the published risk scores accurately calculated the expected medical costs of a Medicare Advantage beneficiary so long as no one examined the accuracy of the diagnoses assigned to her, but became unreliable the moment any attempt at verification was made.

United raises a similar argument.  According to United, the only way to know whether an insurer that was paid on the basis of an inaccurate diagnosis—for example, an insurer paid extra because it reports diabetes for someone who does not have the disease—has received an overpayment is to calibrate the payment model with an FFS Adjuster.  *See* United Mot. to Supp. at 3 (asserting that, without an FFS Adjuster, "CMS cannot determine (and plans cannot identify) whether the unsupported diagnosis code of an MA beneficiary has led to an overpayment").  Unless and until an FFS Adjuster is applied, United says, the Secretary cannot require an insurer to return such a payment.

### D.  The FOIA Documents

United has moved to supplement the administrative record with two documents that, it says, illuminate the Secretary's sparse public statements about the FFS Adjuster that he will apply to audited Medicare Advantage contracts.  One is an 11-page slideshow presentation, ECF No. 44-3, and the other is a 6-page set of bullet points, ECF No. 44-4; both were disclosed by the agency in response to a Freedom of Information Act request seeking "meeting materials" or "documents concerning the Medicare Advantage RADV audit outcomes" that were in the possession of certain HHS officials.  Joint Status Report ¶ 5(b), *Schulte v. U.S. Dep't of Health & Human Servs.*, No. 14-cv-887 (D.D.C. Jan. 15, 2016), ECF No. 30.  Each document discusses issues under consideration by the agency at the time that the RADV audit sampling and extrapolation methodology was being developed.  United asserts that these documents "explain the reasons why CMS decided to adopt the RADV Fee-For-Service Adjuster."  United Mot. to Supp. at 5.  To the contrary: these documents were prepared by agency employees for presentations to their supervising officials, and the thoughts expressed in the documents have not been publicly adopted by the Secretary.

## LEGAL STANDARD

When a court reviews an agency's action under the APA, it must "review the whole record or those parts of it cited by a party."  5 U.S.C. § 706; *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("[R]eview is to be based on the full administrative record that was before the Secretary at the time he made his decision.").  A reviewing court "should have before it neither more nor less information than did the agency when it made its decision."  *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997) (quoting *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984)).  "Agencies

bear the responsibility of compiling the administrative record, which must include all of the information that the agency considered 'either directly or indirectly.'" *Univ. of Colo. Mem'l Hosp. v. Burwell*, 151 F. Supp. 3d 1, 12 (D.D.C. 2015) (quoting *Marcum v. Salazar*, 751 F. Supp. 2d 74, 78 (D.D.C. 2010)). "The record that an agency produces 'is entitled to a strong presumption of regularity.'" *Id.* at 12–13 (quoting *Marcum*, 751 F. Supp. 2d at 78); *accord District Hosp. Partners v. Sebelius*, 971 F. Supp. 2d 15, 20 (D.D.C. 2013).

A party may seek to supplement the record produced by the agency, however, if "the agency 'did not include materials that were part of its record.'" *Univ. of Colo. Mem'l Hosp.*, 151 F. Supp. 3d at 13 (quoting *Marcum*, 751 F. Supp. 2d at 78). To overcome the presumption of regularity, "a plaintiff must do more than simply assert 'that materials were relevant or were before an agency when it made its decision.'" *Id.* (quoting *Marcum*, 751 F. Supp. 2d at 78). "Instead, the plaintiff 'must identify reasonable, *non-speculative grounds* for its belief that the documents were *considered* by the agency and not included in the record.'" *Id.* (emphases in original) (quoting *Marcum*, 751 F. Supp. 2d at 78, in turn quoting *Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 6 (D.D.C. 2006)).

When compiling the administrative record, "an agency generally may exclude material that reflects internal deliberations," even if that material was considered by the agency. *Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188, 196 (D.D.C. 2006); *accord Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 197 (D.D.C. 2005) (same); *Amfac Resorts, L.L.C. v. U.S. Dept. of Interior*, 143 F. Supp. 2d 7, 13 (D.D.C. 2001) (explaining that "deliberative intra-agency memoranda and other such records . . . need not be included in the record"). Such pre-decisional materials are not part of the administrative record because "the reasonableness of the agency's action is judged in accordance with its stated reasons." *In re Subpoena Duces Tecum*, 156 F.3d 1279, 1279 (D.C.

Cir. 1998). "Agency deliberations not part of the record" are therefore "deemed immaterial." *Id.*; *see Ad Hoc Metals*, 227 F. Supp. 2d at 143 ("Judicial review of agency action should be based on an agency's stated justifications, not the predecisional process that led up to the final, articulated decision.").

**ARGUMENT**

This motion to supplement the administrative record should be denied for two separate reasons. First, United has not met its burden of showing that the documents it would introduce were considered, either directly or indirectly, by the Secretary in the course of promulgating the Overpayment Rule. Second, even if the Secretary had considered the documents that United seeks to introduce here, they still would not be part of the record, because they are deliberative materials reflecting the views of their authors and not the authoritative position of the agency. Such deliberative documents are never part of the administrative record, even if they have been previously disclosed.

> **A.**      **United has not demonstrated that these documents were considered by the Secretary while he was promulgating the Overpayment Rule.**

When the Secretary designates an administrative record, he does so with the understanding that the reviewing court "should have before it neither more nor less information than did the agency when it made its decision." *IMS, P.C.*, 129 F.3d at 623 (quoting *Heckler*, 749 F.2d at 792). He therefore includes "all of the information that the agency considered 'either directly or indirectly.'" *Univ. of Colo. Mem'l Hosp.*, 151 F. Supp. 3d at 12 (quoting *Marcum*, 751 F. Supp. 2d at 78). The record that he produces is "entitled to a strong presumption of regularity," *id.* at 12–13, which a party seeking to supplement the record must overcome by providing "reasonable, non-speculative grounds for its belief that the [specified] documents were considered by the agency and not included in the record," *id.* at 13 (internal quotations and

emphases omitted).  This strong presumption of regularity applies whether or not the plaintiff

would seek to characterize the disputed documents as "adverse" to the agency's position.  *See id.*

at 13–14.  United has failed to provide adequate grounds for the belief it advances here.

United asserts that the documents it would introduce "explicitly set out the principles

CMS has adopted" in deciding to apply an adjustment factor to any recoveries made pursuant to

the RADV audits.  United Mot. to Supp. at 11.  That is simply not so.  The only relevant

principles that CMS actually adopted were set out in its announcement of the RADV sampling

methodology.  *See* RADV Methodology at 4-5.  What these documents contain are the views of

certain agency staff at the time that methodology was being developed, many of which have not

been endorsed by CMS.

From its faulty premise, United reasons that the agency must have reviewed these

documents two years later, when it was determining whether to incorporate an FFS Adjuster into

the Overpayment Rule.  Noting that CMS did consider its publications about the RADV audit

methodology as well as public comments submitted in response to those publications, United

considers it "simply not credible" that the agency would have failed to look up a two-year-old

PowerPoint presentation and an informal set of bullet points from the same period of time.

United Mot. to Supp. at 11.  It is not clear why United believes that these two documents were

the best source of the agency's "senior staff analysis of [the public] comments and the

recommendations . . . made in response to those comments," such that it is "simply not credible"

that the agency would have failed to review them.  *Id.*  As United acknowledges, many of the

same CMS staff members were involved in the creation of the RADV sampling methodology

and the Overpayment Rule.  If the agency wanted the views of its senior staff as to issues

involved in the earlier proceeding and their bearing on the later proceeding, it could have just

asked them.  There is no reason to think that any recourse to out-of-date briefing documents would have been necessary.  What the agency could not obtain by direct consultation with its senior staff was its public statements about the FFS Adjuster, and the public comments that had been submitted in support of it, which are included in the record.  United has entirely failed to overcome the "strong presumption of regularity" that attaches to the Secretary's certification of the completeness of that record.  *Univ. of Colo. Mem'l Hosp.*, 151 F. Supp. 3d at 13.

      **B.**      **These documents are deliberative materials that are categorically excluded from the administrative record.**

Even if the agency had considered these documents in promulgating the Overpayment Rule (which it did not) they still would not be part of the administrative record, because they reveal agency deliberations rather than agency decisions.  A document forms "a direct part of the deliberative process" if it "makes recommendations or expresses opinions on legal or policy matters," which these documents certainly do.  *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975); *see, e.g.*, ECF No. 44-4 at 3 (offering an opinion as to what is "from a technical point of view the right thing to do").  Deliberative documents include "those which would inaccurately reflect . . . the views of the agency, suggesting as agency position that which is . . . only a personal position."  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).  The "agency generally may exclude material that reflects" such "internal deliberations" from the administrative record.  *Maritel*, 422 F. Supp. 2d at 196; *Fund for Animals*, 391 F. Supp. 2d at 197; *Amfac Resorts*, 143 F. Supp. 2d at 13 (explaining that "deliberative intra-agency memoranda and other such records . . . need not be included in the record").

United's arguments that these deliberative documents should nonetheless be included in the record all rest upon the proposition that "they reflect the agency's avowed, settled view" of the subjects they discuss.  United Mot. to Supp. at 16.  As explained above, that is false.  The

agency's "avowed, settled view" about RADV audits and the FFS Adjuster is expressed in the agency's official pronouncements.  United would like to use this motion to put words in the Secretary's mouth, glossing his terse public statements—which may well have been so concise because they were all that the agency was willing to commit itself to at the time they were issued—by reference to more expansive discussions that he chose not to endorse.  United's reasoning seems to be that, since the Secretary was provided with the views contained in these documents, when he chose to say much less, he must really have meant to adopt everything that had been presented to him.  That makes no sense, and runs entirely counter to "the settled principle that '[u]p to the point of announcement, agency decisions are freely changeable, as are the bases of those decisions.'"  *PLMRS Narrowband Corp. v. FCC*, 182 F.3d 955, 1001-02 (D.C. Cir. 1999) (quoting *Checkosky v. SEC*, 23 F.3d 452, 489 (D.C. Cir. 1994), in turn quoting *Pan Am. World Airways, Inc. v. CAB*, 684 F.2d 31, 36 n. 12 (D.C. Cir. 1982) (per curiam)).  The Secretary may be bound by what he has chosen to say, but he certainly is not bound by any inference from his decision not to comment publicly on these briefing documents or the views contained therein.

United nonetheless makes several arguments for the inclusion of these documents in spite of their deliberative nature.  First, United argues that, even if the documents are deliberative, they record deliberations about the RADV audit methodology and not the Overpayment Rule.  This argument misses the point: what the Secretary meant when he adopted the FFS Adjuster for RADV audits must be "judged in accordance with" what he said in adopting it.  *Oceana, Inc. v. Pritzker*, 217 F. Supp. 3d 310, 318 (D.D.C. 2016) (collecting cases).  Deliberative materials are excluded from the administrative record "to protect against confusing the issues and misleading the public by . . . suggesting reasons and rationales for a course of action that were not in fact the

ultimate reasons for the agency's action." *Coastal States*, 617 F.2d at 866; *see Norris & Hirshberg, Inc. v. SEC*, 163 F.2d 689, 693 (D.C. Cir. 1947) (explaining that "internal memoranda made during the decisional process . . . are never included in a record"). To include these documents in the administrative record as though they were the agency's "avowed, settled view" would confuse the issues and mislead the public (and this Court) about the reasoning behind the Secretary's decision to incorporate an FFS Adjuster into the RADV audit methodology. It does not matter that this case involves the Overpayment Rule: the Secretary was free to refer to his record of prior deliberations over the RADV audit methodology without fear that, in doing so, he would give a reviewing court an inaccurate picture of that earlier decision by introducing evidence of pre-decisional deliberations into this administrative record.

Second, United argues that these documents should be included in the record because they "memorialize[] or evidence[] the policy the agency ultimately adopt[ed]." *Colorado Wild Horse & Burro Coal., Inc. v. Kempthorne*, 571 F. Supp. 2d 71, 75 (D.D.C. 2008) (internal quotation marks omitted). As explained above, they do not. The policy actually adopted by the agency is memorialized in its official publications, *see* RADV Methodology at 4–5, and not in its internal briefing documents.

Third, United suggests that the release of these documents in FOIA requires their inclusion in the record here. The only court that the Secretary is aware of having confronted this question directly held the opposite. *Delaware Dep't of Nat. Res. v. U.S. Army Corps of Eng'rs*, 722 F. Supp. 2d 535, 544-45 (D. Del. 2010) (explaining that "the FOIA production of the documents at issue did not result in a waiver of [the deliberative process] privilege transforming these deliberative materials into proper constituents of the administrative record"); *see also North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1054, 1055 n.31 (D.N.D. 2015) (refusing to find the

deliberative process privilege waived as to "two clearly pre-decisional and deliberative

interagency memoranda" that "came to be in the public domain"); *cf. Banner Health v. Sebelius*,

2013 WL 11241368, at *6 (D.D.C. July 30, 2013) (disclaiming the theory that an agency's

waiver of the deliberative process privilege resulted in the *per se* inclusion of documents

otherwise excludable from the administrative record).  And for good reason: "Judicial review of

agency action should be based on an agency's stated justifications, not the predecisional process

that led up to the final, articulated decision."  *Ad Hoc Metals*, 227 F. Supp. 2d at 143.  The fact

that some elements of that pre-decisional process have become public does not make them part

of the record.

## CONCLUSION

United's motion to supplement the administrative record should be denied, because the

documents it would add were not considered by the Secretary in promulgating the Overpayment

Rule, and in any case are deliberative materials protected from inclusion in the record.


Respectfully submitted,

> CHAD A. READLER
> Acting Assistant Attorney General
>
> JESSIE K. LIU
> United States Attorney
>
> JOEL McELVAIN
> Assistant Branch Director
> Federal Programs Branch
>
>   /s/ *James Bickford*
> JAMES BICKFORD
> New York Bar No. 5163498
> Trial Attorney, Federal Programs Branch
> Civil Division, U.S. Department of Justice
> 20 Massachusetts Ave., NW

Washington, DC 20530
(202) 305-7632
James.Bickford@usdoj.gov

Dated: October 16, 2017                    *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of October, 2017, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing, and served on counsel registered to receive CM/ECF notifications in this case.

*/s/ James Bickford*
James Bickford
