**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITEDHEALTHCARE INSURANCE COMPANY, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ERIC D. HARGAN, in his official capacity as Acting Secretary of the Department of Health and Human Services, *et al.*, <br><br> Defendants. | No. 1:16-cv-00157-RMC |

**MEMORANDUM IN SUPPORT OF**
**UNITED'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 4

    A.     Medicare Advantage And Risk Adjustment ................................................ 4

    B.     The Proxy For Predicting Future Costs: Diagnosis Codes ..................... 7

    C.     CMS's Risk Adjustment Methodology ..................................................... 9

    D.     The Impact of Diagnosis Coding Discrepancies .................................... 11

    E.     The Coding Intensity Adjustment and the RADV FFS Adjuster ......... 12

          1.     The Coding Intensity Adjustment ............................................ 13

          2.     The RADV FFS Adjuster ......................................................... 15

    F.     The 2014 Overpayment Rule ................................................................... 17

          1.     The Overpayment Statute .......................................................... 17

          2.     The Overpayment Rule .............................................................. 18

ARGUMENT ..................................................................................................................... 20

I.     The Overpayment Rule Is Unlawful Because It Establishes Inconsistent
     Validation Criteria For CMS and MA Plan Data ................................................ 22

    A.     The Overpayment Rule's Embrace Of A Validation Standard For MA Plan
          Data That Is Different From The Standard CMS Applies To Its Own Data
          Violates The Statutory Requirements For Risk Adjustment ................................. 22

          1.     In Order To Ensure Actuarial Equivalence Between MA And
               Traditional Medicare, Congress Required CMS To Measure Risk
               Profiles Of MA And Traditional Medicare Beneficiaries Using The
               Same Criteria ............................................................................ 22

          2.     The Overpayment Rule Violates The Statutory Requirement Of
               Actuarial Equivalence Because It Calculates Payments To Plans
               Using A Different Methodology Than CMS Uses To Calibrate Its
               Risk Adjustment Model ............................................................. 29

      B.      CMS Acted Arbitrarily And Capriciously In Departing From Its Prior Recognition Of The Need For Consistency Between CMS And MA Plan Data ................................................................................................................. 32

            1.      CMS's Interpretation Of "Overpayment" Is Inconsistent With The Rationale For The RADV Fee-For-Service Adjuster ............................... 34

            2.      CMS's Interpretation Of "Overpayment" Is Inconsistent With The Rationale For The Coding Intensity Adjustment ....................................... 36

            3.      CMS's Interpretation Of "Overpayment" Is Inconsistent With The Implementation Standard CMS Indicated It Would Utilize When It Adopted The CMS-HCC Risk Adjustment Model .................................... 37

      C.      CMS's Stated Rationales For Requiring Different Validation Standards Lack Merit ................................................................................................. 38

            1.      CMS's Legitimate Concerns About Accuracy Do Not Justify Using A Different Validation Standard For Data Submitted By MA Plans ................................................................................................... 38

            2.      Industry Guidelines Relating to Medical Record Documentation Do Not Support Application Of Different Documentation Standards ................................................................................................ 41

II.      The Overpayment Rule Unlawfully Treats An MA Plan As Having "Identified" An Overpayment If The MA Plan Negligently *Failed* To Identify The Overpayment ................................................................................................... 42

CONCLUSION ................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allina Health Services v. Sebelius*,
  746 F.3d 1102 (D.C. Cir. 2014) .............................................................................44

*Association of Battery Recyclers, Inc. v. U.S. EPA*,
  208 F.3d 1047 (D.C. Cir. 2000) .............................................................................44

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984) ......................................................................................42, 43

*First Amercian Discount Corp. v. Commodity Futures Trading Commission*,
  222 F.3d 1008 (D.C. Cir. 2000) .............................................................................44

*Hindo v. University of Health Sciences/The Chicago Medical School*,
  65 F.3d 608 (7th Cir. 1995) ..................................................................................44

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987).............................................................................................43

*Motor Vehicle Manufactures Association of the United States, Inc. v. State Farm
  Mutual Automobile Insurance Co.*,
  463 U.S. 29 (1983)...............................................................................................40

*Republic Airline Inc. v. United States Department of Transportation.*,
  669 F.3d 296 (D.C. Cir. 2012) .............................................................................34

*Transitional Hospitals Corp. of Louisiana, Inc. v. Shalala*,
  222 F.3d 1019 (D.C. Cir. 2000) ..............................................................................8

*United States v. Science Applications International Corp.*,
  626 F.3d 1257 (D.C. Cir. 2010) .............................................................................44

*Utility Air Regulatory Group v. EPA*,
  134 S. Ct. 2427 (2014).........................................................................................39

## STATUTES AND REGULATIONS

5 U.S.C. § 706(2)(C)...........................................................................................................32

31 U.S.C. § 3729(a) ...........................................................................................................18

31 U.S.C. § 3729(a)(1)(G) .................................................................................................18

31 U.S.C. § 3729(b) ......................................................................................................18, 44

31 U.S.C. § 3729(b)(1) ...........................................................................................43

42 U.S.C. § 1320a-7k(d)(1) ....................................................................................17

42 U.S.C. § 1320a-7k(d)(2) ...............................................................................4, 42

42 U.S.C. § 1320a-7k(d)(2)(A) ..............................................................................17

42 U.S.C. § 1320a-7k(d)(3) ....................................................................................18

42 U.S.C. § 1320a-7k(d)(4)(A) ..............................................................................18

42 U.S.C. § 1320a-7k(d)(4)(B) ..............................................................................18

42 U.S.C. § 1395c *et seq.* ........................................................................................4

42 U.S.C. § 1395j *et seq.* .........................................................................................4

42 U.S.C. § 1395w-21 *et seq.* ..................................................................................4

42 U.S.C. § 1395w-23.................................................................................5, 23, 33

42 U.S.C. § 1395w-23(a)(1)(B) ..........................................................................5, 23

42 U.S.C. § 1395w-23(a)(1)(B)(i) ..........................................................................24

42 U.S.C. § 1395w-23(a)(1)(B)(ii) ...........................................................................6

*42 U.S.C. § 1395w-23(a)(1)(C)(i) ................................................................. *passim*

42 U.S.C. § 1395w-23(a)(1)(C)(ii) .........................................................................15

42 U.S.C. § 1395w-23(a)(1)(E) ................................................................................6

42 U.S.C. § 1395w-23(b).........................................................................................24

42 U.S.C. § 1395w-23(b)(1)(B)(i) .............................................................................5

*42 U.S.C. § 1395w-23(b)(4) ....................................................................2, 23, 27, 29

42 U.S.C. § 1395w-23(b)(4)(B) ..............................................................................26

42 U.S.C. § 1395w-23(b)(4)(D) ..............................................................................27

42 U.S.C. § 1395w-24(a)(6)(A) ................................................................................6

42 U.S.C. § 1395w-24(b)(1)(C) ................................................................................6

42 U.S.C. § 1395w-24(b)(2)(A)(ii) ...........................................................................6

Pub. L. No. 109-171, 120 Stat. 4 (2006) ...................................................................14

Pub. L. No. 111-148, 124 Stat. 119 (2010) ..................................................17, 43

42 C.F.R. § 422.254(b)(1) ...........................................................................................6

42 C.F.R. § 422.254(b)(5) ...........................................................................................7

42 C.F.R. § 422.326 .....................................................................................................18

42 C.F.R. § 422.326(c) ................................................................................................42

42 C.F.R. § 422.504(*l*) ................................................................................................20

42 C.F.R. § 422.504(*l*)(2) ...................................................................................38, 39

42 C.F.R. § 424.32(a)(2) .............................................................................................41

76 Fed. Reg. 21,432 (Apr. 15, 2011) .........................................................................5

82 Fed. Reg. 9131 (Feb. 3, 2017) ............................................................................18

## ADMINISTRATIVE RECORD

2009 Proposed RADV Rule, 74 Fed. Reg. 54,634 (Oct. 22, 2009), AR2406 .............................15

2010 RADV Rule, 75 Fed. Reg. 19,678 (Apr. 15, 2010), AR2817 ...................................... *passim*

Advance Notice of Methodological Changes for CY 2004 Part C Rates
    ("2004 Advance Notice"), AR3888 ....................................................................10, 37

Advance Notice of Methodological Changes for CY 2008 Part C Capitation Rates
    ("2008 Advance Notice"), AR4158 ...........................................................................28

Advance Notice of Methodological Changes for CY 2009 Parts C and D Rates
    and Policies ("2009 Advance Notice"), AR4220 ...........................................14, 36

Advance Notice of Methodological Changes for CY 2011 Parts C and D Rates
    and Policies ("2011 Advance Notice"), AR4357 .................................................29

Advance Notice of Methodological Changes for CY 2014 Parts C and D Rates
    and Policies ("2014 Advance Notice"), AR4752 ............................................9, 10

American Academy of Actuaries, Actuarial Review of the Health Status Risk
    Adjustor Methodology, AR11340 ......................................................................8, 28

Announcement of CY 2000 Part C Rates ("2000 Rate Announcement"), AR3822.......................7

Announcement of CY 2009 Parts C and D Rates and Policies
("2009 Rate Announcement"), AR4256 ..................................................................27

*Announcement of CY 2010 Parts C and D Rates and Policies
("2010 Rate Announcement"), AR4316 ......................................................... *passim*

Announcement of CY 2014 Parts C & D Rates and Policies
("2014 Rate Announcement"), AR4829 ....................................................15, 28, 39

Evaluation of the CMS-HCC Risk Adjustment Model, AR11880 ..................................10, 33, 37

GAO, *Medicare Advantage: Substantial Excess Payments Underscore Need for
CMS to Improve Accuracy of Risk Score Adjustments*, AR12039 ..........................................28

ICD-9-CM Official Guidelines for Coding and Reporting, AR11429 .........................................41

Medicare Advantage RADV Notice of Payment Error Calculation Methodology
for Part C Organizations Selected for Contract-Level RADV Audits
("Proposed RADV Methodology"), AR5020 .............................................................16, 32, 33

*Notice of Final Payment Error Calculation Methodology for Part C Medicare
Advantage RADV Contract-Level Audits ("Final RADV Methodology"),
AR5311 ...............................................................................................15, 17, 34, 35

*Overpayment Rule, 79 Fed. Reg. 29,844 (May 23, 2014), AR1235 .................................. *passim*

Gregory C. Pope et al., *Risk Adjustment of Medicare Capitation Payments Using
the CMS-HCC Model*, AR11857 .................................................................................9, 10, 11

Proposed Overpayment Rule, 79 Fed. Reg. 1918 (Jan. 10, 2014), AR1 ................................18, 44

Public Comments of Aetna on the 2009 Proposed RADV Rule, AR2609 ..................................16

Public Comments of Aetna on the Proposed RADV Methodology, AR5036 ........................16, 17

Public Comments of AHIP on the 2009 Proposed RADV Rule, AR2718 ..................................16

Public Comments of American Academy of Actuaries on the Proposed RADV
Methodology, AR5235 ...............................................................................................16, 32, 33

Public Comments of Blue Cross Blue Shield Association on the Proposed
Overpayment Rule, AR562...........................................................................................19, 45

Public Comments of Humana on the Proposed Overpayment Rule, AR865 ..............................19

Public Comments of Humana on the Proposed RADV Methodology, AR5102....................16, 17

Public Comments of United on the Proposed RADV Methodology, AR5193.............................16

Public Comments of United on the Proposed Overpayment Rule, AR1009 ................................16

Report to Congress: Proposed Method of Incorporating Health Status Risk
    Adjusters Into Medicare+Choice Payments ("1999 Report to Congress"),
    AR11212 ..........................................................................................................................9, 25

## OTHER AUTHORITIES

152 Cong. Rec. 511 (2006) ......................................................................................................15, 27

Actuarial Standards Board, Actuarial Standard of Practice No. 45 § 3.2 (2012),
    http://www.actuarialstandardsboard.org/asops/use-health-status-based-risk-
    adjustment-methodologies ......................................................................................................37

H.R. 3200, 111th Cong. (2009)......................................................................................................43

H.R. 3590, 111th Cong. (2010)......................................................................................................43

Richard Kronick & W. Pete Welch, *Measuring Coding Intensity in the Medicare
    Advantage Program*, 4 Medicare & Medicaid Res. Rev., Vol. 4, No. 2 (2014),
    https://www.cms.gov/mmrr/Downloads/MMRR2014_004_02_a06.pdf .....................9, 13, 28

*New Oxford American Dictionary* (3d ed. 2010)..........................................................................42

Kimberly J. O'Malley et al., *Measuring Diagnoses: ICD Code Accuracy*, 40
    Health Servs. Res. 1620 (2005) ...............................................................................................8

*Webster's II New Collegiate Dictionary* (3d ed. 2005) ...............................................................42

**INTRODUCTION**

This Administrative Procedure Act suit challenges the validity of a 2014 rule—the "Overpayment Rule"—promulgated by the Centers for Medicare and Medicaid Services ("CMS"). The Rule relates to the Medicare Advantage ("MA") program's process of risk adjustment, whereby CMS is required to ensure that insurance providers who offer MA plans are paid appropriately based on the level of actuarial risk their patients present relative to an average Medicare beneficiary. If the plan's patients present lower-than-average risk—*i.e.*, are expected to incur lower healthcare costs—the plan is paid less, and if the plan's patients present higher-than-average risk, the plan is paid more. A patient's risk is determined in large part by what diagnosis codes—codes meant to reflect a patient's health conditions—have been submitted by physicians on claims forms.

In the Overpayment Rule, CMS determined that an MA plan receives an "overpayment" if even a single diagnosis code submitted by a physician to the plan and transmitted by the plan to CMS is insufficiently documented in the underlying medical charts. The Rule requires a plan to delete any such codes it has identified and return any associated payments. CMS imposed this requirement even though similarly unsupported codes are prevalent in the claims data for its own traditional Medicare beneficiaries (sometimes called "fee-for-service," or "FFS," beneficiaries), which CMS uses to compute the relative health status of plan beneficiaries and adjust the plan's payments accordingly. By failing to account for the prevalence of undocumented codes in CMS's own data, the Rule makes MA plan members appear artificially healthier and less costly to insure than FFS beneficiaries who are in fact identical and pose identical actuarial risk.

Congress designed the MA reimbursement system to prevent just such distortions. In adjusting MA plan payments based on the level of risk their patients pose, CMS is required by statute to ensure "actuarial equivalence"—*i.e.*, ensure that payments to plans are adjusted using

an apples-to-apples comparison of the risk assumed by a plan in insuring a beneficiary and the risk that CMS incurs for an identical FFS beneficiary.  42 U.S.C. § 1395w-23(a)(1)(C)(i).  To accomplish that objective, Congress also requires CMS to compute the risk scores—the numerical measure of the risk of providing health insurance—for both groups using the "same methodology."  *Id.* § 1395w-23(b)(4).  The Overpayment Rule violates both of those statutory requirements by measuring the health status of MA plan beneficiaries using one measure (diagnoses recorded in medical charts) and the health status of FFS beneficiaries using another (diagnosis codes in claims data), in a manner that produces different assessments of risk for identical patients based simply on the program (MA or FFS) in which they are participating.

These statutory provisions, and the apples-to-apples principle they demand, are fundamental to the entire reimbursement scheme.  Congress, the Government Accountability Office, officials in the Department of Health and Human Services, outside actuarial experts consulted by Congress and CMS, and even CMS itself have long recognized that in order for the system to work as designed, beneficiaries whose demographic and health status characteristics are identical must have identical risk scores, even if one is an MA plan beneficiary and the other is a traditional Medicare beneficiary.  In departing from CMS's own past pronouncements on this issue without any reasoned explanation, the Overpayment Rule violates not only the Medicare Act's requirements but also the APA's fundamental prohibition on arbitrary and capricious agency action.  For example, the Overpayment Rule's interpretation of an "overpayment" cannot be reconciled with CMS's earlier recognition, in the context of developing its methodology for calculating overpayments during agency-run audits of MA plans, that whether a plan has been overpaid depends on whether the plan's data contains a *relatively* higher rate of unsupported codes than CMS's own data.  Having accepted that the prevalence of

unsupported codes in CMS's own data must be considered in *that* context, there is no rational basis for refusing to consider it in *this* one.

In the face of all of this, CMS justified its Rule on one primary ground: that MA plans are required to attest to the "accuracy" of the data they submit, and that codes that are not supported by medical charts are not "accurate."  That simplistic response ignores CMS's own prior recognition that because risk adjustment is based on a comparison between an MA plan's patient population and that of traditional Medicare, "MA organizations are coding 'accurately' when they are coding in a manner similar to fee-for-service coding used on the beneficiaries to whom MA plan enrollees are being compared."  2010 Rate Announcement, AR4335.  An interpretation of accuracy that resulted in plans and CMS having different coding patterns, CMS reasoned, would result in inaccurate and invalid comparisons of CMS and MA plan populations, with MA plans having risk scores that are not equivalent to those of FFS beneficiaries.  *Id.*  By requiring MA plans to attest that they believe their data to be accurate, CMS simply has confirmed that to the best of their knowledge MA plans' data reflects the same coding patterns (*i.e.*, the same proportion of unsupported codes) as CMS's own data.  And to the extent that CMS intended the Overpayment Rule to adopt implicitly a different interpretation of the accuracy attestation, that interpretation would render the attestation *itself* unlawful:  Because CMS may not directly require MA plans to delete provider-submitted diagnosis codes that lack medical record documentation without making a corresponding adjustment in its own data or accounting for the difference, neither can it indirectly accomplish that result by requiring MA plans to attest that their data contain no such unsupported codes.

Finally, the Overpayment Rule's separate interpretation of "identified" also is unlawful, because it squarely conflicts with the language Congress adopted.  Congress directed that an MA

plan has an obligation to return an overpayment within 60 days of when the overpayment "was identified." 42 U.S.C. § 1320a-7k(d)(2). But CMS construed that statutory provision to set the 60-day clock running from when the overpayment *should have been identified*—eliminating the statutory requirement that the overpayment actually "*was* identified" and substituting in its place a new regulatory negligence standard under which MA plans must exercise reasonable diligence to find overpayments at pain of treble-damages liability under the False Claims Act. *Id.* (emphasis added). There is no textual, logical, or historical support for CMS's new standard, and it should be set aside as well.

## BACKGROUND

### A.    Medicare Advantage And Risk Adjustment

The Medicare Act establishes a federal health insurance program for disabled and elderly individuals. Parts A and B of the Act create the traditional Medicare program. *See* 42 U.S.C. § 1395c *et seq.*; *id.* § 1395j *et seq.* Beneficiaries enrolled in traditional Medicare receive healthcare from a network of healthcare providers, including doctors, hospitals, and other medical professionals, whom CMS reimburses for each service rendered. For this reason, traditional Medicare beneficiaries are often referred to as fee-for-service (FFS) beneficiaries.

Part C of the Medicare Act creates the Medicare Advantage program.[1] *See id.* § 1395w-21 *et seq.* Medicare Advantage allows individuals eligible for traditional Medicare to receive healthcare benefits through private insurance plans instead. Under the MA program, private insurers like United are responsible for covering at least the same level of benefits that traditional Medicare offers, and for ensuring that providers are paid for their services. In return, CMS

---

[1] Medicare Advantage was previously known as Medicare+Choice (or M+C). United refers to it as Medicare Advantage (or MA) throughout this brief. United likewise uses CMS to include both the Centers for Medicare & Medicaid Services and its predecessor agency, the Health Care Financing Administration.

makes fixed, per-member-per-month payments to the MA plans—effectively insurance premiums. *See generally id.* § 1395w-23.

Among other benefits, Medicare Advantage allows the government to offload risk to private insurers. The healthcare needs of particular individuals cannot be perfectly predicted. A person in seemingly perfect health on Monday could be struck by a car on Tuesday or contract a debilitating disease on Wednesday, yielding enormous unforeseen medical costs. If these costs befall a traditional FFS Medicare beneficiary, the government is responsible for the full amount of those consequences. If they befall an MA beneficiary, on the other hand, the MA plan must cover that additional cost. The MA program thus lets CMS shift the risk of unpredictable costs to MA plans in exchange for a set monthly payment.

In order for the program to be viable, the monthly payments must, in the aggregate and on average, accurately reflect the relative risk a plan assumes in insuring the expected healthcare costs of its members—otherwise, private insurers would not participate. The statutory scheme is designed to ensure that this occurs by adjusting the per-member-per-month payments based on an assessment of the relative risk CMS itself would bear, in terms of expected healthcare costs, if it remained responsible for providing healthcare to those same beneficiaries. That process begins each spring, when CMS announces a "benchmark" rate for the following payment year for each county in the United States. 42 U.S.C. § 1395w-23(b)(1)(B)(i). This benchmark effectively represents the highest monthly payment that CMS will make to an MA plan the following year for providing healthcare to an *average* Medicare beneficiary. *Id.* § 1395w-23(a)(1)(B). The precise formula CMS uses to determine these benchmark rates is complex, but it is based on CMS's actual costs for providing healthcare to an average FFS beneficiary in each county. *See* 76 Fed. Reg. 21,432, 21,484 (Apr. 15, 2011) (noting that a county's benchmark "will be set at

some percentage of the county's average FFS expenditure").  Then, by June, MA plans submit bids that include, in relevant part, the estimated per-member monthly payment the plan would require to provide the same level of benefits offered by traditional Medicare to an identical beneficiary (*i.e.*, the average Medicare beneficiary for whom CMS has published its costs).  *See* 42 U.S.C. § 1395w-24(a)(6)(A); *see also* 42 C.F.R. § 422.254(b)(1) (bid is for "beneficiary with a national average risk profile").[2]

Calculating an MA plan's monthly payments thus begins with a figure calibrated to the revenue needed for an *average* Medicare beneficiary's care.  But, of course, not every Medicare beneficiary is an average one.  Some are healthier and will wind up having below-average healthcare costs.  Some are sicker and will wind up having above-average healthcare costs.  If MA plans were simply paid the estimated cost for the average Medicare beneficiary, regardless of a particular member's particular risk, they would have an incentive to enroll only healthy individuals.  To ensure that MA plans are willing to cover all individuals and are paid appropriately for doing so, the statute requires CMS to adjust the payment for each MA beneficiary in light of "such risk factors as age, disability status, gender, institutional status, and . . . health status . . . , so as to ensure actuarial equivalence."  42 U.S.C. § 1395w-23(a)(1)(C)(i). This process of risk adjustment—increasing or decreasing the per-member payments to MA plans to account for the differences in expected healthcare expenditures—is at the heart of this case.

---

[2] To encourage plans to be more efficient than CMS, CMS sets each MA plan's unadjusted per-member monthly payment by comparing the plan's bid with the benchmark rate.  For plans whose bids are at or above the benchmark, their payments are initially set at the benchmark rate. 42 U.S.C. § 1395w-23(a)(1)(B)(ii).  Any additional needed revenue must be collected from their members in the form of premiums.  *Id.* § 1395w-24(b)(2)(A)(ii).  For plans whose bids are under the benchmark, payments are initially set at the bid amount,  plus a portion of the difference between the benchmark and the bid amount, which the plans must use to provide additional benefits or lower premiums.  *Id.* § 1395w-23(a)(1)(B)(i), (a)(1)(E); *id.* § 1395w-24(b)(1)(C).  More efficient plans are thus able to increase their membership by offering more attractive plans to potential members.

### B.      The Proxy For Predicting Future Costs: Diagnosis Codes

Because the goal of risk adjustment is "to pay [MA plans] more accurately based on a model which predicts future expenditures," creating a successful risk adjustment methodology requires identifying data that serves as a useful proxy for future healthcare costs.  2000 Rate Announcement, AR3834.  Demographic factors offer some such proxies—older individuals tend to have higher health costs than younger individuals, for example, so age serves as a rough proxy for healthcare expenditures.   As explained in more detail below, however, CMS also uses diagnoses of certain medical conditions as a more accurate (though still imperfect) proxy in its risk adjustment methodology.  The basic idea is that an individual diagnosed with, say, severe pneumonia is very likely to have healthcare costs in the coming year that are higher than those of an otherwise similar individual who has received no medical diagnoses—but lower than those of an otherwise similar individual diagnosed with lung cancer.

There are at least two different sets of data that can be used to identify medical diagnoses. The first is a patient's medical chart—the record of diagnosis and treatment prepared directly by the doctor (or other healthcare provider) who treated the patient.  Medical records can of course have errors—a doctor can misdiagnose a patient or misrecord a correct diagnosis on the chart. But the larger problem with using medical charts as the proxy data is the burden and cost of doing so.  In a 1999 study of MA risk adjustment commissioned by Congress, the American Academy of Actuaries[3] deemed it "nearly impossible" to assemble diagnostic information directly from medical charts, whose form can vary from provider to provider, noting that the "data-gathering cost" of such a model would be "prohibitive."  American Academy of Actuaries,

---

[3] The American Academy of Actuaries is a nonprofit, nonpartisan public policy organization for actuaries of all specialties.  Its expertise concerning MA risk adjustment is recognized by CMS, which both selected the Academy to undertake the 1999 study and also requires every MA plan bid to be certified by a member of the Academy.  *See* 42 C.F.R. § 422.254(b)(5).

Actuarial Review of the Health Status Risk Adjustor Methodology, AR11367.

The second set of data—the set that CMS actually decided to use in MA risk adjustment—is *diagnosis codes*.  *See, e.g.*, 2010 RADV Rule, AR2824 ("The risk adjustment methodology uses diagnosis codes as a proxy for higher costs associated with a particular diagnosis.").  Diagnosis codes are numerical codes used by the healthcare industry on claims and other forms to designate a particular medical diagnosis.  The source of these codes is the International Classification of Diseases (ICD), a classification system whose latest edition contains over 100,000 codes.  Kimberly J. O'Malley et al., *Measuring Diagnoses: ICD Code Accuracy*, 40 Health Servs. Res. 1620, 1621 (2005).

Doctors can, and sometimes do, assign these codes themselves, but often a doctor's billing staff review a patient's medical chart and assign the corresponding codes.  Inevitably, some diagnosis codes included in claims forms do not match the diagnostic information in the medical chart.  *See generally id.* at 1627-32.  Even assuming that the doctor has correctly diagnosed the patient and correctly recorded that diagnosis on the patient's medical chart, coders will sometimes omit the corresponding diagnosis code or, alternatively, include a code that is not fully substantiated by the chart.[4]  The prevalence of these diagnosis coding discrepancies varies by provider type.  It is relatively low in hospitals because, under traditional Medicare, reimbursement for inpatient care has long been based in part on the nature of a patient's diagnoses, not just the services provided, and hospitals therefore have extensive departments devoted to ensuring that their diagnosis codes and charts line up correctly.  *See Transitional*

---

[4] In addition, doctors sometimes fail to document existing conditions in the medical charts but include the correct (albeit unsupported) diagnosis code in the claim form.  The fact that a code is unsupported, therefore, does not necessarily mean that it falsely represents a patient's actual condition.  However, for purposes of this brief, United (like CMS) assumes that medical charts represent a patient's actual medical conditions more faithfully than do diagnosis codes.

*Hosps. Corp. of La., Inc. v. Shalala*, 222 F.3d 1019, 1021 (D.C. Cir. 2000); 1999 Report to Congress, AR11234 ("The implementation of prospective payment for hospitals vastly improved the diagnostic information available on hospital bills.").   By contrast, diagnostic coding discrepancies are fairly common in doctors' offices, which have little (or no) incentive to code diagnoses completely and accurately because their payments generally are based on services provided, not diagnoses.   *See, e.g.*, Gregory C. Pope et al., *Risk Adjustment of Medicare Capitation Payments Using the CMS-HCC Model*, AR11867 (noting that in doctors' offices "diagnoses have not [historically] affected payment, and recording of diagnoses is less rigorously practiced than in hospitals"); Richard Kronick & W. Pete Welch, *Measuring Coding Intensity in the Medicare Advantage Program*, 4 Medicare & Medicaid Res. Rev., Vol. 4, No. 2, E1, E3 (2014), https://www.cms.gov/mmrr/Downloads/MMRR2014_004_02_a06.pdf.

> C.   **CMS's Risk Adjustment Methodology**

Since 2004, CMS has used diagnosis codes to determine the appropriate risk adjustment for MA beneficiaries' payments through application of the CMS Hierarchical Condition Categories (CMS-HCC) model.  The CMS-HCC model is a prospective risk adjustment model designed to predict the relative incremental risk (in the form of additional expected healthcare costs) that a beneficiary with a particular condition would impose on an MA plan.  It does so by calculating how much more costly an identical beneficiary would be for CMS itself to insure compared to an average CMS beneficiary.

The model identifies a range of diagnosis codes (corresponding to various health conditions) that CMS has found to be good predictors of future healthcare costs.  *See* 2014 Advance Notice, AR4814-20 (listing the conditions).  To assess the predicted added healthcare costs associated with these diagnosis codes, CMS analyzes the claims data of traditional FFS beneficiaries.  CMS identifies FFS beneficiaries with the diagnosis codes in a base year,

determines those beneficiaries' actual healthcare costs the following year, and then uses regression analysis to estimate how much the various diagnoses, as well as demographic factors (such as age and sex), contribute to costs.[5]  2004 Advance Notice, AR3895-96 & n.1.  In short, it correlates diagnosis codes to incremental costs.  *See generally* Pope et al., *Risk Adjustment*, AR11857-79; Evaluation of the CMS-HCC Risk Adjustment Model, AR11892-902.  These estimates are converted into a numerical risk coefficient.  The model is designed so that a beneficiary with average healthcare costs has a risk score of 1.0.  A condition that would be expected to increase that average beneficiary's costs by, say, 20% is therefore assigned a risk coefficient of 0.20.  2004 Advance Notice, AR3896.

Having established the value of the various risk coefficients based on the FFS data, CMS then applies those same coefficients in the same way to MA beneficiaries.  2004 Advance Notice, AR3903.  An MA plan submits to CMS "risk adjustment data" that includes the diagnosis codes its beneficiaries received in a given year.  (CMS already has the beneficiaries' demographic information.)  CMS assigns the relevant risk coefficients for each diagnosis and demographic characteristic and adds them up to arrive at total risk score for each beneficiary.  Those risk scores are then used to adjust the plan's payments.  An MA beneficiary with a risk score of 2.00, for instance, would trigger an MA payment that is twice the standard payment.[6]

---

[5] CMS initially calibrated the model using a sample of 5% of FFS claims data from 1999 (diagnoses) and 2000 (costs).  2004 Advance Notice, AR3896.  It has since recalibrated using more recent and complete FFS data.  *See, e.g.*, 2014 Advance Notice, AR4768.

[6] An example illustrates how risk adjustment under the CMS-HCC model works.  *See* Evaluation of the CMS-HCC Risk Adjustment Model, AR11900-02 (using 2011 risk coefficient values).  Imagine a female MA beneficiary who is 76 years old and in the prior year received diagnosis codes reflecting acute myocardial infarction (AMI), chronic renal failure, and an ankle sprain.  The baseline risk coefficient for a female, age 75 to 79, is 0.457.  AMI carries a risk coefficient of 0.359.  Chronic renal failure adds another 0.368.  The ankle sprain (a transient injury that is not predictive of future expenditures) is not one of the conditions in the model and therefore does not impact the score.  Adding up the risk coefficients leads to a total risk score of 1.184.  For this

D.        **The Impact of Diagnosis Coding Discrepancies**

As noted earlier, diagnosis codes submitted with claims—including FFS claims—do not always perfectly correspond with patients' medical charts or actual conditions.  When CMS calibrates the CMS-HCC risk adjustment model, it does not attempt to correct for those discrepancies by auditing the FFS claims data to confirm that the diagnosis codes are properly supported by medical records.  As a result, the authors of the CMS-HCC model acknowledged that there would be coding discrepancies in the data used to calibrate the model—*i.e.*, that the model would treat some FFS beneficiaries as having conditions (because they had the associated code) even though there was no support for those conditions in their medical charts.  *See* Pope et al., *Risk Adjustment*, AR11867; 2010 RADV Rule, AR2826.

By design and effect, the existence of beneficiaries whose provider assigned them a particular diagnosis code but who do not actually have the associated condition is built into the model.  Beneficiaries who do not actually have a condition obviously are unlikely to incur healthcare costs associated with the condition.  The existence of these "zero cost" beneficiaries therefore affects the overall average, incremental risk coefficient that the model calculates for a particular condition.  Consider a simplified hypothetical scenario:  Suppose that when it calibrates the model, CMS identifies four FFS beneficiaries with the diagnosis code for diabetes and determines that the aggregate incremental healthcare costs for the four beneficiaries the following year were $12,000.  CMS therefore concludes that the average per-patient cost associated with diabetes is $3,000, and it sets the diabetes risk coefficient accordingly.  But suppose further that one of these diagnosis codes was a false positive; the beneficiary did not in fact have diabetes.  That means that the $12,000 was in reality attributable to just three

---

beneficiary, then, the MA plan would receive a payment 1.184 times the payment it would receive for someone with the characteristics of an average Medicare beneficiary (a 1.0).

beneficiaries, such that the true per-patient cost of diabetes was actually $4,000 ($12,000 ÷ 3 beneficiaries).  By averaging the cost over the four beneficiaries with the diagnosis code, rather than just the three beneficiaries who actually have diabetes, CMS's model produces a lower average incremental cost (and associated risk coefficient) than it would have done if the diagnosis codes in the FFS data had been perfectly accurate.

The impact of no-cost beneficiaries on the risk coefficients will not necessarily make risk adjustment payments to MA plans inaccurate, however.  Suppose for instance that an MA plan also has four beneficiaries with the diagnosis code for diabetes.  Applying the risk coefficient derived from the FFS data, CMS would pay the plan an incremental total of $12,000 ($3,000 × 4) for the diabetes diagnoses.  If all four beneficiaries actually have diabetes, this payment will undercompensate the plan for its presumptive incremental costs, which would be $16,000 ($4,000 per beneficiary who actually has diabetes).  If only two beneficiaries actually have diabetes, the payment will *over*compensate the plan for its presumptive incremental costs ($8,000).   But if the proportion of beneficiaries among the MA plan's population who do not have the condition is the same as in the FFS population, such that three of the beneficiaries actually have diabetes, then the total payment of $12,000 equals the plan's expected costs ($4,000 × 3).  Thus, in assessing whether the MA risk adjustment system is paying plans appropriately, the *relative* accuracy of diagnostic coding in FFS and MA claims must be taken into account.

### E.     The Coding Intensity Adjustment and the RADV FFS Adjuster

Both Congress and CMS have acknowledged the importance of considering the *relative* accuracy of MA and FFS diagnostic coding when assessing whether MA plans have been paid appropriately.  Two different aspects of the MA risk adjustment process make this clear: (1) Congress's enactment and CMS's implementation of a statutory "Coding Intensity Adjustment,"

and (2) CMS's recognition of the need for an "FFS adjuster" as part of its audit procedures.

*1.      The Coding Intensity Adjustment*

Because the MA risk adjustment system is based on diagnosis codes, MA plans have an incentive "to find and report as many diagnoses as can be supported by the medical record"—to code with high "intensity."   Kronick & Welch, *supra*, at E3-E4.   For example, MA plans sometimes arrange for additional, after-the-fact reviews of their patients' medical charts to look for diagnoses documented in the charts that the provider failed to code.   By contrast, as noted earlier, reimbursement under traditional FFS Medicare generally is not tied to diagnoses, so the incentive for comprehensive coding is weaker.   *See id.* at E3.   These divergent incentives can lead to different coding patterns that can skew risk adjustment payments.

To see why, suppose that an MA plan's beneficiaries are identical to the sample of FFS beneficiaries used to calibrate the risk adjustment model.   Because the two sets of beneficiaries have the same medical conditions, they have the same expected future costs and should have the same risk scores.   If, however, some documented diagnoses were not coded for the FFS beneficiaries but were coded for the MA beneficiaries, the MA beneficiaries will wind up with higher risk scores.   That is, even though the MA beneficiaries' diagnosis codes are perfectly accurate in the absolute sense (*i.e.*, are supported by the medical charts), because they are more complete than those of their FFS counterparts, the MA plan will artificially appear to have taken on more risk, and will therefore be overpaid.

For this reason, Medicare experts have long recognized that "for the purposes of creating an equitable MA payment system, the relevant question is whether MA risk scores are systematically *different* than those risk scores would be in FFS, and not which set of scores is more *accurate*" in an absolute sense.   *Id.* at E4 (emphasis added).   And not long after the adoption of the CMS-HCC model, Congress perceived that the incentives for higher coding

13

intensity among MA plans had heightened the risk of such differentials.  Accordingly, in the

Deficit Reduction Act of 2005, Congress instructed CMS to analyze any "differences in coding

patterns between Medicare Advantage plans and providers under part A and B [*i.e.*, traditional

FFS Medicare]."  Pub. L. No. 109-171, § 5301(b)(2), 120 Stat. 4, 51 (2006).  Congress further

said that, "to ensure payment accuracy," CMS should adjust MA beneficiaries' risk scores in

light of those different coding patterns.  *Id.*

After its analysis confirmed higher coding intensity among MA plans, CMS began

imposing such a downward adjustment to MA plans' risk scores in 2010, calculated to replicate

the risk score-adjusted payments that would have resulted had plans not engaged in the different

coding activities.  2010 Rate Announcement, AR4334.  In doing so, CMS rejected commenters'

argument that a downward adjustment would be appropriate only if MA plans were submitting

*unsupported* codes.  CMS recognized that MA plans might simply "be coding more completely

than FFS," 2009 Advance Notice, AR4231, and was careful to say that it had not concluded that

MA plans had engaged in any "improper coding," *id.*; 2010 Rate Announcement, AR4335.  But

even if none of a plan's codes were "incorrect," the mere fact that the plan's coding "differs from

FFS" coding was sufficient to require the adjustment.  2010 Rate Announcement, AR4341.  The

agency observed that, because the MA risk adjustment model is calibrated on FFS data,

> MA plans must code the way Medicare Part A and B providers do in order for risk
> adjustments to be valid. *This means that MA organizations are coding
> "accurately" when they are coding in a manner similar to fee-for-service coding
> used on the beneficiaries to whom MA plan enrollees are being compared.*  In this
> sense, "differences" in coding patterns, regardless of the source, would make the
> MA plan coding "inaccurate" for purposes of implementing risk adjustment.

*Id.*, AR4335 (emphasis added).  CMS noted that several members of Congress had expressly

recognized this relative notion of accuracy.  Senator Grassley, for instance, had explained that

the intensity adjustment provision was intended to address "coding that is inaccurate or

incomplete for the purpose of establishing risk scores that are consistent across both fee-for-service and Medicare Advantage settings, *even if such coding is accurate or complete for other purposes*." *Id.*, AR4336 (emphasis added) (quoting 152 Cong. Rec. 511 (2006)).

As is now required by statute, CMS has applied the Coding Intensity Adjustment in every payment year since 2010.  42 U.S.C. § 1395w-23(a)(1)(C)(ii).  CMS has never found that higher coding intensity in MA plans reflects the inclusion of codes that are inaccurate in an absolute sense (*i.e.*, unsupported by medical records); to the contrary, it has said the data "fail[] to show a systematic correlation between coding pattern differences and errors in the reporting of documented coding."  2010 Rate Announcement, AR4337.  But CMS continues to recognize that "to ensure payment accuracy," it must account for "*differential* coding patterns in MA and FFS." 2014 Rate Announcement, AR4865 (emphasis added).

### 2.    The RADV FFS Adjuster

CMS also has acknowledged that payment accuracy requires accounting for FFS coding errors in the context of determining whether an MA plan has been overpaid through "risk adjustment data validation" (RADV) audits.  CMS began conducting these audits of selected MA plans shortly after adopting the CMS-HCC model.  When a plan is chosen for a RADV audit, CMS selects a sample of the plan's enrollees for the audited year, requires the plan to submit those enrollees' medical records, and then assesses whether those records adequately support the enrollees' diagnosis codes.  Final RADV Methodology, AR5312-13.  After an initial grace period, CMS began requiring MA plans to make repayments when a RADV audit revealed that a beneficiary's diagnosis was not supported by the medical records.

Because CMS originally sought repayment with respect only to the particular beneficiaries in the sample found to have unsubstantiated codes, the financial impact on MA plans was "very small," 2009 Proposed RADV Rule, AR2409, and went unchallenged.  In 2008,

however, CMS announced that it would eventually start requiring "contract-level payment adjustments" based on its RADV audit findings: that is, it would extrapolate the results from the sample of audited beneficiaries to all of a plan's enrollees and calculate an estimated payment adjustment rate for the plan's entire contract with CMS for the audited payment year.  *Id.*

That announcement prompted a multi-year conversation with MA plans about what would need to be taken into account in performing that calculation.  By 2010, CMS remained committed to requiring contract-level repayment based on extrapolated rates of unsupported codes.  *See* 2010 RADV Rule, AR2819.  At the same time, however, it acknowledged a possible problem with defining "overpayment[s]" to include payments resulting from *all* unsupported diagnosis codes submitted by MA plans—namely, that the FFS data used to calibrate the risk adjustment model indisputably contained coding discrepancies of its own.  *See id.*, AR2826.  As commenters pointed out, CMS needed to assess the discrepancy rate in the FFS data and compare it to the discrepancy rate of a given MA plan before it could determine whether the plan had been overpaid.  *See, e.g.*, AR2627 (Aetna); AR2744-45 (AHIP).  CMS acknowledged that there was "potential merit" in this concern and said it was "currently studying this issue."  2010 RADV Rule, AR2826.

The issue received intensified scrutiny after CMS proposed a RADV sampling and adjustment-calculation methodology that did not account for coding discrepancies in the FFS data.  Proposed RADV Methodology, AR5020-22.  Numerous commenters pointed out that this omission was a serious flaw.  *See, e.g.*, AR5053-57 (Aetna); AR5105-08 (Humana); AR5205-07 (United).  Among them was the American Academy of Actuaries, which stated that it was inappropriate to develop risk coefficients "with FFS data that . . . were not validated or audited for accuracy" but then "apply those factors only to MA data that are validated."  AR5235-36.

Multiple commenters also noted that this approach would violate the statutory requirement that risk adjustment ensure "actuarial equivalence." *See, e.g.*, AR5053-54 (Aetna); AR5114 (Humana); *see also* 42 U.S.C. § 1395w-23(a)(1)(C)(i).

CMS acknowledged that the commenters were right. When it published a revised sampling and error-calculation methodology in February 2012, CMS said that in determining any contract-level payment adjustments, it would apply a "FFS adjuster." Final RADV Methodology, AR5314. "The FFS adjuster," CMS explained, would "account[] for the fact that the documentation standard used in RADV audits to determine [an MA] contract's payment error (medical records) is different from the documentation standard used to develop the Part C risk-adjustment model (FFS claims)." *Id.*, AR5314-15. CMS had not yet determined the "actual amount of the adjuster," but said it would "be calculated by CMS based on a RADV-like review of records submitted to support FFS claims data." *Id.*, AR5315.

### F.     The 2014 Overpayment Rule

It is against this backdrop that the Overpayment Rule at issue here was adopted.

#### 1.     The Overpayment Statute

As part of the Patient Protection and Affordable Care Act, Congress enacted Section 1128J of the Social Security Act. Pub. L. No. 111-148, § 1128J, 124 Stat. 119, 753-56 (2010) (codified at 42 U.S.C. § 1320a-7k). Subsection 1128J(d), entitled "Reporting and returning of overpayments," requires any person, including an MA plan, who has "received an overpayment" in the context of Medicare or Medicaid to report and return it to the relevant entity and to notify that entity of the reason for the overpayment. 42 U.S.C. § 1320a-7k(d)(1). As relevant here, the overpayment must be reported and returned within "60 days after the date on which the overpayment was identified." *Id.* § 1320a-7k(d)(2)(A).

The statute defines "overpayment" as "any funds that a person receives or retains under

[Medicare or Medicaid] to which the person, after applicable reconciliation, is not entitled." *Id.* § 1320a-7k(d)(4)(B).  The statute does not define the term "identified," which triggers the start of the 60-day clock.  It does define what "[t]he terms 'knowing' and 'knowingly'" mean "[i]n this subsection"—although those terms are not in fact used anywhere in the subsection.  *See id.* § 1320a-7k(d)(4)(A).  The statute gives these absent terms the same meaning they have in 31 U.S.C. § 3729(b), a provision of the False Claims Act (FCA).

The statute makes the requirement to return overpayments enforceable through the FCA. The continued retention of an overpayment beyond the 60-day deadline after the overpayment is "identified" constitutes an "obligation" under the FCA.  42 U.S.C. § 1320a-7k(d)(3).  The FCA, in turn, authorizes the United States, or a private citizen acting on its behalf, to bring suit against "any person who . . . knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).  The FCA is a fraud statute that permits the recovery of treble damages and imposes a civil penalty between roughly $11,000 and $22,000 per obligation avoided or decreased.  *See id.* § 3729(a); 82 Fed. Reg. 9,131, 9,133 (Feb. 3, 2017).

### 2.   *The Overpayment Rule*

In January 2014, CMS proposed regulations to implement these new statutory provisions for the Medicare Advantage program.  Proposed Overpayment Rule, AR79-82.  One proposed regulation, 42 C.F.R. § 422.326, was intended to "clarify the statutory definition of overpayment."  *Id.*, AR80.  Among other things, CMS proposed to define "funds" as any payment that an MA plan has received "based on data that these organizations submitted to CMS for payment purposes for which they have responsibility for the accuracy, completeness, and truthfulness of such data under existing [regulations]," including a plan's risk adjustment data. *Id.*  And it proposed that an MA plan has "identified" an overpayment when "it has actual

knowledge of the existence of the overpayment or acts in reckless disregard or deliberate ignorance of the existence of the overpayment." *Id.*, AR81.

In response to the proposed regulation, commenters asked CMS to clarify further what it would consider an "overpayment" based on inaccurate risk adjustment data. One commenter, for example, asked the agency to clarify that "an overpayment cannot exist for an MA organization's particular contract unless CMS's payments to the [plan] as a whole are inaccurate in light of an appropriate Fee-for-Service Adjuster that is applied to the entire contract." AR907 (Humana). Similarly, United observed that, "[u]nder the Proposed Rule, [MA plans] will be undercompensated for the relative risk of their membership if they delete diagnosis codes from claims that are unsupported in a medical record and CMS does not simultaneously account for the equivalent diagnoses in FFS data." AR1041. It noted that such a skewed payment system would violate "the statutory mandate that [MA plans] be paid appropriately for the health status of their members relative to costs incurred in [FFS Medicare] for similar beneficiaries." *Id.*

Commenters also argued that CMS's proposed definition of "identified" was too broad, pointing out that the term "knowing," from which CMS had drawn its willful blindness and reckless disregard standard, was "not actually used in the overpayment standard set forth in [the statute]." AR613 (Blue Cross Blue Shield). Instead, United and others suggested that "an identified overpayment should be limited to actual knowledge of an overpayment." AR1040.

CMS published the final Overpayment Rule on May 23, 2014. Overpayment Rule, AR1236. Despite the commenters' requests, it did not clarify that determining whether an MA plan has received an overpayment requires accounting for the rate of coding discrepancies in the FFS data. To the contrary, in the preamble to the Final Rule, CMS expressly "disagree[d]" with this interpretation of the regulatory scheme. *Id.*, AR1313. Instead, CMS announced that *any*

inadequately documented diagnosis code would result in an overpayment to a Medicare Advantage plan: "[A] risk adjustment diagnosis that has been submitted for payment but is found to be invalid because it does not have supporting medical record documentation *would result* in an overpayment." *Id.* (emphasis added).

As to the commenters' claim that the Overpayment Rule was inconsistent with CMS's recognition of the need for the RADV FFS adjuster, CMS offered no explanation of why the two contexts (RADV and the Overpayment Rule) warranted different treatment.  Instead, it simply pointed to a contractual requirement that MA plans "certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the risk adjustment data they submit to CMS." *Id.*; *see* 42 C.F.R. § 422.504(*l*).  It also asserted that the agency had a "long-standing risk adjustment data requirement that a diagnosis submitted to CMS by an MA organization for payment purposes must be supported by medical record documentation." Overpayment Rule, AR1314.

With respect to the meaning of "identified," CMS not only refused to narrow its broad proposed definition of "identified," it made it *broader*.  CMS stated it was "revising [its] definition of an identified overpayment to state that an MA organization . . . has identified an overpayment when it has determined, *or should have determined through the exercise of reasonable diligence*, that the MA organization . . . has received an overpayment." *Id.*, AR1315 (emphasis added).  CMS refused to specify what reasonable diligence would require in "all factual scenarios," but indicated that "at a minimum, reasonable diligence would include proactive compliance activities conducted in good faith by qualified individuals to monitor for the receipt of overpayments." *Id.*

## ARGUMENT

This suit challenges two distinct aspects of the Overpayment Rule.

*First*, it challenges the interpretation of "overpayment" that CMS adopted in the Final Rule.  This Court has already held that "[u]nder the CMS Rule, any inadequately documented diagnostic code not supported by underlying medical documentation will result in an overpayment."  Mem. Op. 6, ECF No. 25 ("MTD Order") (citing Overpayment Rule, AR1313).  As construed by CMS, the Rule requires an MA plan to delete any provider-submitted diagnosis code (and forgo the payments such a code would generate) that the plan knows lacks support in the patient's medical charts—even though CMS uses unsupported codes in evaluating the actuarial risk posed by traditional Medicare patients and in calibrating the payment model for MA plans.  That application of different methodologies for calculating risk—one to MA plan participants, and another to traditional Medicare beneficiaries—is unlawful, because it results in identical patients being assigned different risk scores based on which program they participate in.  CMS's contrary interpretation should be set aside as inconsistent with the statutory mandates that it use a common methodology for risk calculation across both programs, and that it ensure actuarial equivalence between traditional Medicare and the MA program.  Moreover, even if CMS's interpretation could be reconciled with the Medicare Act, it is also inconsistent with CMS's own past acknowledgments that risk adjustment must be based on apples-to-apples comparisons between the plan's patients and traditional Medicare patients that ensure identical patients are given identical risk scores.  At the very least, therefore, the Overpayment Rule should be vacated as arbitrary and capricious agency action.

*Second*, and independently, this suit also challenges the Overpayment Rule's interpretation of the statutory phrase "was identified."  CMS effectively has interpreted that provision to mean that an overpayment must be reported and returned within 60 days after the date on which the overpayment *should have been* identified with reasonable diligence—

replacing the actual identification requirement that Congress adopted with a negligence-based standard Congress never even contemplated.   Under that interpretation, MA plans have to exercise reasonable diligence to identify and delete unsupported codes submitted by medical providers, even though CMS makes no comparable effort in connection with codes it receives in the traditional Medicare program.   That requirement is directly contrary to the statutory text, and also exacerbates the distortions created by CMS's definition of "overpayment":   If plans are required actively to seek out unsupported codes for deletion, while CMS takes no comparable measures, the divergence becomes even greater between the risk calculation methodologies CMS is applying to the MA program and the traditional Medicare program.[7]

## I.   THE OVERPAYMENT RULE IS UNLAWFUL BECAUSE IT ESTABLISHES INCONSISTENT VALIDATION CRITERIA FOR CMS AND MA PLAN DATA

### A.   The Overpayment Rule's Embrace Of A Validation Standard For MA Plan Data That Is Different From The Standard CMS Applies To Its Own Data Violates The Statutory Requirements For Risk Adjustment

*1.   In Order To Ensure Actuarial Equivalence Between MA And Traditional Medicare, Congress Required CMS To Measure Risk Profiles Of MA And Traditional Medicare Beneficiaries Using The Same Criteria*

Congress established the framework for determining payments to Medicare Advantage plans in Section 1853 of the Social Security Act, codified at 42 U.S.C. § 1395w-23.   That

---

[7] United plainly has standing to challenge both aspects of the Overpayment Rule.   As this Court recognized in denying the government's motion to dismiss, "there is ordinarily little question that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated."   MTD Order 9 (citation omitted).   Here, "the CMS Rule's affirmative obligations establishes an injury-in-fact upon" United.   *Id.* at 11.   Specifically, as the accompanying affidavit shows, (1) in the years since promulgation of the Overpayment Rule, United has deleted millions of dollars' worth of diagnosis codes it had identified as unsupported by medical charts, depriving United of revenue to which it is otherwise entitled under a proper understanding of the law, and (2) the Rule imposes new, proactive obligations to search for unsupported codes that cost millions of dollars to undertake.   *See* Declaration of Karen Erickson, ¶¶ 3-5.   There thus is no reason to depart from this Court's determination at the pleading stage that "Plaintiffs have established Article III standing."   MTD Order 13.

framework is organized around a comparison between, on the one hand, the predicted average annual expenditure that traditional Medicare would incur for a patient with a given actuarial risk profile, and, on the other, the amount that an MA plan predicts it will expend in caring for a patient with that same actuarial risk profile.

The comparison begins with the bid amount the plan submits, and the Secretary reviews and approves, each year. *See* 42 U.S.C. § 1395w-23(a)(1)(B). To facilitate the preparation of those bids, Congress requires CMS to publish not only its benchmark rates for the coming year, *see supra* at 5-6, but also (1) its average per capita cost (healthcare expenditures) under the traditional Medicare program in a given county, (2) its computation of the average risk score of the traditional Medicare program's patient population in that county, and (3) the methodology it used to calculate that risk score. *See id.* § 1395w-23(b)(4). Using that information as well as their own cost estimates, MA plans can assess whether they will need more, less, or the same amount of money as the traditional Medicare program to care for an average beneficiary—a beneficiary with a risk score of 1.0.[8] For example, if an MA plan believes that it will cost the same amount to insure a patient on its plan as it would to insure the same patient through traditional Medicare, and Medicare calculates its cost of insuring an average beneficiary (with a risk score of 1.0) in that county as $10,000, then the MA plan would submit a bid of $10,000.[9]

_____

[8] As noted, the Chief Actuary is required to calculate and publish the per capita health costs for traditional Medicare in a given county, as well as the "average risk factor" in that county. 42 U.S.C. § 1395w-23(b)(4)(B), (D). Dividing the former figure by the latter figure produces the per capita cost for a patient with a 1.0 risk score in that county.

[9] If the MA plan believes it can provide identical coverage for a patient with that same risk score more cheaply than traditional Medicare does, it would submit a bid for a lower figure, and would then be able to use a portion of the difference to provide supplemental services that make its plan more attractive to potential members. *See supra* at 6 n.2. And if the plan believes that it will cost it *more* than traditional Medicare to provide those same services, its payment from CMS is nevertheless capped at a percentage of the traditional Medicare program's expected costs, and

Even at this very first step, one can see that it is essential that MA plans and CMS use the same standards for evaluating actuarial risk:  Because the bid amount reflects an MA plan's projection of its own cost for an average Medicare beneficiary, and its bid is capped at a percentage of traditional Medicare's costs for a beneficiary who presents an identical degree of risk, *see supra* at 5-6 & n.2, the MA plan and CMS must calculate risk in the same way.  To illustrate this point, imagine that there are two identical patients, one using traditional Medicare (Tom) and one enrolled in a Medicare Advantage plan (Andy).  Tom and Andy have the same demographics and the same health conditions, and each has three (identical) diagnosis codes, only two of which are supported by (identical) medical charts.  CMS uses the diagnosis codes and demographic information to calculate a risk score of 1.0 for Tom, and establishes—based on historical claims data from the traditional Medicare program for people with similar risk scores—a benchmark rate of $10,000 for his care in the coming year.  Accordingly, if the MA plan has submitted a bid for 100 percent of the benchmark rate, then it should receive $10,000 for its coverage of Andy, because it is taking on exactly the same amount of actuarial risk.  *See* 42 U.S.C. § 1395w-23(a)(1)(B)(i).

If Andy's risk score is calculated using a different methodology than Tom's, however, the MA plan's actual payment could be different.  For example, if the MA plan (unlike traditional Medicare) is required to delete any diagnosis codes that lack medical chart support, then Andy's risk score—and the resulting payment—would be artificially lower.  With just two diagnosis codes instead of three, his risk score might be calculated as a 0.9, meaning that the MA plan would be paid just $9,000 even though CMS had accepted its bid of $10,000 for a patient presenting an identical degree of risk.  Using different methodologies to assess the risk presented

---

the plan must generate its extra revenue by charging additional premiums.  *See id.*  The analysis that follows in the text applies equally in those scenarios, too.

by MA and traditional Medicare patients, therefore, results in different risk scores for identical patients, and discrepancies between MA plan bids and MA plan payments even for patients who *should* qualify as one of the average beneficiaries whom the bid amount tracks perfectly.

For the system that Congress devised to work properly, moreover, it is not enough just to ensure that identical patients are scored identically.  It is also essential to ensure that *different* patients are scored *differently*, in a way that accurately captures the actuarial risk they pose to the entity responsible for their care (whether traditional Medicare or an MA plan).  As CMS itself put it nearly two decades ago, "[t]he goal is to pay Medicare [Advantage] organizations based on better estimates of their enrollees' health care utilization *relative to the fee-for-service (FFS) population*."  1999 Report to Congress, AR11228 (emphasis added).  "If payments are not adjusted for the health status of managed care enrollees relative to those remaining in FFS, plans can be over or underpaid." *Id.*, AR11215.

For that reason, Congress directed CMS to employ a second step in its payment process, during which it takes the payment amount indicated in an MA plan's bid—based on patients with a 1.0 risk score—and adjusts it to reflect the higher or lower actuarial risk presented by the plan's actual patient population.  *See* 42 U.S.C. § 1395w-23(a)(1)(C)(i).  And here again, as with the original bid amounts, an accurate comparison requires measuring risk in the same way on both sides of the ledger.  To return to the diabetes example offered above, *see supra* at 12, imagine that an MA plan had four patients who were identical in every way to the four traditional Medicare patients used to calibrate CMS's risk adjustment model with respect to diabetes payments—same true health condition, same medical charts, same diagnosis codes.  Because the populations are identical, the true actuarial risk they present is identical as well.  But if CMS and the MA plan used different standards in calculating that actuarial risk, it would again create

artificial differences. CMS, relying on diagnosis codes, would assign the incremental actuarial risk associated with diabetes to each of the four beneficiaries (all of whom have the diagnosis code). Reflecting CMS's average incremental per capita cost of $3,000 for those beneficiaries, and assuming that insuring a beneficiary with a risk score of 1.0 is anticipated to cost $10,000, that would mean that each of those four beneficiaries would have his or her risk score increased by 0.3. Meanwhile, if the MA plan was required to instead rely on medical charts, it would assign the increased actuarial risk associated with diabetes to only three of its beneficiaries (excluding the one who had a diagnosis code that was not supported in the charts). The risk scores for those three beneficiaries would be increased by 0.3, while the risk score for the fourth beneficiary would not increase at all. The result would be that the MA plan population would *appear* to present lower actuarial risk (an average of 0.225) than the traditional Medicare population (an average of 0.3) even though the populations were in fact identical.

The principle that accurate comparisons between beneficiaries or plan populations depend on the use of consistent criteria is so fundamental to the entire reimbursement scheme that Congress enshrined it directly in the statute itself. It did so in two ways. *First*, Congress required that when CMS (through its Chief Actuary) calculates and publishes each year the average risk score of CMS beneficiaries in a given county (used to determine the benchmark rate in that county), it must "us[e] the same methodology as is expected to be applied in making payments" to MA plans. 42 U.S.C. § 1395w-23(b)(4). *Second*, Congress mandated that when CMS risk adjusts an MA plan's payment amount, it must do so in a manner that will "ensure actuarial equivalence," *i.e.*, ensure that adjustments in payment amount reflect an apples-to-apples comparison of the risk assumed by a plan in insuring a beneficiary and the relative risk (in the form of expected costs) that CMS would incur for an identical beneficiary. 42 U.S.C.

§ 1395w-23(a)(1)(C)(i).

These statutory provisions reflect Congress's longstanding recognition that in order for the statutory reimbursement scheme to work, identical patients must be assigned identical risk scores regardless of whether they are participating in the MA or traditional Medicare program. During floor proceedings about the changes to Medicare Advantage implemented in the Deficit Reduction Act of 2005, for example, all three of the relevant committee chairs—Senator Grassley, Representative Barton, and Representative Thomas—emphasized that the statutory risk adjustment methodology requires "establishing risk scores that are consistent across both fee-for-service and Medicare Advantage settings."   152 Cong. Rec. 511 (2006) (statement of Sen. Grassley); *see also id.* at 558 (statement of Rep. Barton) (same); *id.* at 567 (statement of Rep. Thomas) (same).   As Representative Thomas explained, doing so is necessary to "ensure that traditional fee-for-service and Medicare Advantage plans are being compared and paid accurately."   *Id.* at 567.

CMS itself repeatedly has embraced that understanding of the statutory risk adjustment system's "purpose of establishing risk scores that are consistent across both fee-for-service and Medicare Advantage settings."   2010 Rate Announcement, AR4336; *see also* 2009 Rate Announcement, AR4275 (citing the three floor statements described above).   It has explained that "[g]iven the fact that the MA payment methodology is based on fee-for-service payments, and that the risk adjustment methodology is designed to compare the risk scores of MA plan enrollees to other plan enrollees and beneficiaries not enrolled in MA plans, for this comparison to be valid, MA plans must code the same way Medicare Part A and B does."   2009 Rate Announcement, AR4275.   Because CMS uses "a model based on FFS costs and diagnoses patterns," it has recognized that "differences in MA coding, relative to FFS coding patterns,

27

results in relative risk that is *measured incorrectly*." 2014 Rate Announcement, AR4858 (emphasis added). Specifically, "MA coding patterns that differ from patterns in fee-for-service may result in risk scores that are not equivalent to the risk scores of the FFS beneficiaries used to calculate the county rates." 2008 Advance Notice, AR4165.

The Government Accountability Office (GAO) and others have understood the statutory scheme the same way. The GAO has explained that "[r]isk scores for beneficiaries with the same diagnoses and characteristics should be identical, regardless of whether the beneficiaries are in an MA plan or Medicare FFS." GAO, *Medicare Advantage: Substantial Excess Payments Underscore Need for CMS to Improve Accuracy of Risk Score Adjustments*, AR12043. Similarly, senior HHS officials explained in an article in an official CMS journal that "the implicit assumption in the design of the MA payment system" is that if "Jane Doe would have a risk score of 1.0 if she were in FFS," then "she would have the same risk score of 1.0 if she were enrolled in MA." Kronick & Welch, *supra*, at E4; *see also id.* ("Suppose, for example, that average expenditure per FFS beneficiary is $10,000/year, and that the average risk score for all FFS beneficiaries is 1.0. The goal of the payment system is to assure that—if all of those beneficiaries were to enroll in MA—the average payment to MA plans would be approximately $10,000 per beneficiary."). And the American Academy of Actuaries likewise recognized in a 1999 report ordered by Congress that the objective of MA risk adjustment is to "ensure that for each county, the new reimbursement rates utilizing health status risk adjusters . . . produce the same total payments for the fee-for-service populations as the current approach if every Medicare FFS member in a county were enrolled in" an MA plan. American Academy of Actuaries, Actuarial Review of the Health Status Risk Adjustor Methodology, AR11345.

2.   *The Overpayment Rule Violates The Statutory Requirement Of Actuarial Equivalence Because It Calculates Payments To Plans Using A Different Methodology Than CMS Uses To Calibrate Its Risk Adjustment Model*

The Overpayment Rule's interpretation of "overpayment" is entirely inconsistent with these statutory requirements, producing a system in which otherwise identical MA and traditional Medicare beneficiaries will be assigned different risk scores.

"Under the [Overpayment] Rule, any inadequately documented diagnostic code not supported by underlying medical documentation will result in an overpayment." MTD Order at 6; *see also* Overpayment Rule, AR1313. In effect, then, the Rule bases the methodology for determining risk scores of MA plan patients on medical records—*i.e.*, charts—rather than diagnosis codes: Unless an MA plan patient's risk score can be validated with his or her charts, under the Rule it cannot provide the basis for risk adjustment payments. The Rule made no corresponding adjustment, however, to account for the fact that CMS calibrates its risk adjustment model using unverified data from FFS beneficiaries. As to those beneficiaries and calculations, CMS's methodology depends entirely on diagnosis codes submitted by providers, without regard to whether they are supported by medical charts. *See, e.g.*, 2011 Advance Notice, AR4370 ("CMS calibrates the CMS-HCC model using FFS data, and the relative factors reflect the FFS pattern of coding."); 2010 RADV Rule, AR2826.

This use of a chart-based methodology to determine the actuarial risk posed by MA plan patients, and a different, diagnosis code-based methodology to determine the actuarial risk posed by traditional Medicare beneficiaries, is incompatible with the statute's requirement that CMS use the "same methodology" to calculate risk scores for both populations. 42 U.S.C. § 1395w-23(b)(4). And by failing to employ the same methodology, CMS has also failed to "ensure actuarial equivalence" between the MA and traditional Medicare programs. *Id.* § 1395w-23(a)(1)(C)(i). To return again to the diabetes example offered above, *see supra* at 12, if CMS

evaluates the risk scores of the four traditional Medicare beneficiaries with diabetes diagnosis codes using only the diagnosis codes, but requires that an MA plan evaluate the risk scores of its identical four patients using the chart-based methodology adopted in the Overpayment Rule (resulting in upward risk adjustment for only three of the patients), then the two populations will appear to present different actuarial risk even though in fact they are identical.  Moreover, because the payment amounts the MA plan receives based on the risk scores of its patients (calculated using charts) are determined using values calibrated with data from traditional Medicare (based on diagnosis codes), the plan will be underpaid for the risk it has assumed:  It will receive just $9,000 for the diabetes conditions, even though the projected diabetes expenditure for that population in traditional Medicare is $12,000 (and the MA plan has, in this hypothetical, submitted a bid for 100 percent of the benchmark rate).

CMS had several options available to it to achieve actuarial equivalence between the two populations—and avoid inaccurate payment calculations.

*First*, it could have adopted, prospectively, a chart-based standard for calculation of risk scores in the traditional Medicare population, just as it has done for MA plans.  In that case, only the three traditional Medicare beneficiaries whose charts reflected a diabetes diagnosis would see their risk scores increased; the fourth traditional Medicare beneficiary, with the unsupported diagnosis code, would not.  Requiring plans to delete (or not submit) an unsupported code then would result in the CMS population having an average risk score identical to the MA plan's (identical) population: Three beneficiaries with heightened risk scores, and one without.  Further, in calibrating payment amounts for the risk adjustment model, CMS would have divided its $12,000 cumulative added cost for patients with diabetes by three instead of four, resulting in an incremental risk adjustment payment of $4,000 rather than $3,000 for patients with the relevant

indicator for diabetes.  The MA plan would then receive an incremental payment of $4,000 for each of its three patients whose charts reflected a diabetes diagnosis—producing the identical $12,000 risk adjustment payment that the "actuarial equivalence" standard requires.

*Second*, if CMS was committed to using a diagnosis-based standard for calculating risk scores in the FFS population, then it could have used that same diagnosis code-based standard for calculating MA plan payments as well.  In that scenario, the risk scores of all four MA plan patients would reflect that they shared the relevant proxy for diabetes (a diagnosis code), and the average risk score for both the MA plan and the traditional Medicare program would again be identical.  Moreover, because all four MA plan patients would have that higher risk score, the MA plan would receive the full $12,000 in incremental risk adjustment payments (this time, a $3,000 payment for each of the four beneficiaries)—again equivalent to the expected expenditure under traditional Medicare for a population with identical actuarial risk.

*Third*, if CMS was concerned that the rate of unsupported codes might be higher in data submitted by MA plans than in the traditional Medicare program, it could have adopted an adjuster to account for that difference, as commenters urged.  *See* Overpayment Rule, AR1313. As with the fee-for-service adjuster that it has recognized is necessary in connection with its RADV methodology, *see supra* at 15-17, CMS could have provided plans with a method to offset the proportion of unsupported codes in an MA plan's submission by the proportion of unsupported codes in a sample of the traditional Medicare data.   Under that approach, "overpayments" would only exist if—and to the extent that—a given MA plan's rate of unsupported codes was higher than that of traditional Medicare.

By failing to employ any of those available options (or any other option) to ensure actuarial equivalence, the Overpayment Rule violates the statutory requirements set out in 42

U.S.C. § 1395w-23.  This Court should thus "hold unlawful and set aside" the Overpayment

Rule as "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(C).

> **B.** **CMS Acted Arbitrarily And Capriciously In Departing From Its Prior Recognition Of The Need For Consistency Between CMS And MA Plan Data**

Beyond violating the statutory requirements of using the same methodology and ensuring

actuarial equivalence, the Overpayment Rule's interpretation of "overpayment" also is invalid

because it is arbitrary and capricious.

At the most basic level, it is inherently arbitrary and irrational to calibrate a payment

model using one type of data and then operate the model using a different type of data—like

building an engine to work with gasoline, then filling it with diesel.  The American Academy of

Actuaries has made this precise point, recognizing that "[a]n underlying principle of risk-

adjustment systems is that there needs to be consistency in the way the model was developed and

how it is used."  Comments on Proposed RADV Methodology, AR5235.  It would be actuarially

improper to "apply the risk-adjustment model in a way that is inconsistent with the way it was

developed" by calibrating it with one set of data—"FFS data that . . . were not validated or

audited for accuracy"—and then applying it to a different set of data—consisting of "only . . .

MA data that are validated."  *Id.*, AR5235-36.

The reason is straightforward:  The proxy for expected costs on which CMS has chosen

to rely is unverified diagnosis codes, and by using unverified diagnosis codes from the traditional

Medicare program along with historical expenditure data from that program, the calculations that

CMS's model produces are calculations of the average incremental cost associated with *having*

*that diagnosis code*.  *See, e.g.*, 2010 RADV Rule, AR2824 ("The risk adjustment methodology

uses diagnosis codes as a proxy for higher costs associated with a particular diagnosis.").  As in

any insurance system, many (indeed most) of the people with the relevant proxy will incur lower

32

expenses in a given year than that average figure.  *See, e.g.*, Evaluation of the CMS-HCC Risk Adjustment Model, AR11891.[10]  *Why* those costs are lower will vary from person to person—some traditional Medicare beneficiaries with unverified codes might have a given disease but be in remission, others might be managing their symptoms well, and still others will incur lower-than-average costs because they simply do not have the disease.  But that reality is built into the model itself:  FFS beneficiaries whose incremental expenses are zero because they have the diagnosis code but not the disease reduce the average incremental cost associated with having the diagnosis code, producing a calculation of CMS's costs that is lower than it would have been if CMS had used a different proxy for true disease state (such as medical charts).  *See supra* at 11-12.

That lower figure associated with unverified diagnosis codes cannot predict what the higher expected incremental cost associated with a *verified* code would be, at least without adjustment.  As the American Academy of Actuaries put it, if "lower-cost enrollees no longer are considered diabetic [because their codes are unverified] but would have been considered diabetic in the FFS data used to develop the risk scores, then the payment for diabetic members . . . could be inadequate," leading to "systematic underpayment."  Comments on Proposed RADV Methodology, AR5236.  "[T]he risk score factor associated with diabetes would be understated relative to the factor that would have resulted from using only substantiated diagnoses, because the lower-cost patients would have lowered the average spending amounts among those identified as diabetics in the FFS data."  *Id.*  By contrast, "[w]hen that factor"—*i.e.*, the risk

---

[10]  *See also id.*, AR11891-92 ("As with any insurance product, the system is intended to be accurate at the group level.  At the individual level, predicted medical costs can be lower or higher than actual medical costs, but at the group level, below-average predicted costs balance out above-average predicted costs. . . . It is important to understand that the underlying risk assessment is designed to accurately explain the variation at the group level, not at the individual level, because risk adjustment is applied to large groups.").

coefficient developed using unverified FFS data—"is applied to similarly non-validated data, the total payments for those with diabetes would be adequate." *Id.*[11]

In addition to being inherently irrational and inconsistent with the purpose of risk adjustment, the Overpayment Rule's interpretation of "overpayment" is also arbitrary and capricious because it represents an unexplained and unjustified departure from CMS's own past positions. "One of the core tenets of reasoned decision-making is that 'an agency [when] changing its course . . . is obligated to supply a reasoned analysis for the change.'" *Republic Airline Inc. v. U.S. Dep't of Transp.*, 669 F.3d 296, 299 (D.C. Cir. 2012) (alterations in original) (citation omitted). Here, CMS did not even acknowledge—let alone explain—the inconsistency between its prior positions on the need to use a consistent standard for measuring risk and the contrary interpretation of "overpayment" it was now adopting. Specifically, the Rule is inconsistent with three prior CMS pronouncements.

1. *CMS's Interpretation Of "Overpayment" Is Inconsistent With The Rationale For The RADV Fee-For-Service Adjuster*

The first inconsistency relates to the RADV Fee-For-Service Adjuster. *See supra* at 15-17. The objective of the RADV program is "to recover the overpayments identified during the RADV audit." 2010 RADV Rule, AR2819. In order to "account[] for the fact that the documentation standard used in RADV audits to determine [an MA] contract's payment error (medical records) is different from the documentation standard used to develop the Part C risk-adjustment model (FFS claims)," CMS has acknowledged the need to apply a "FFS adjuster" when making those overpayment determinations. Final RADV Methodology, AR5314-15. The

---

[11] CMS cannot rationally calculate lower per-code payments using FFS beneficiaries with unsupported codes, then pay that lower amount only for the subset of MA beneficiaries whose diagnoses are documented in charts. That would be akin to calculating a per-*capita* food subsidy but paying it on a per-*household* basis: the payment would be inadequate.

FFS adjuster will be based on "a RADV-like review of records submitted to support FFS claims data." *Id.*, AR5315.

In the RADV context, therefore, CMS recognized that if it was going to determine whether a plan has received an overpayment by considering only those diagnosis codes submitted by the MA plan that could be verified through review of medical charts, it had to calibrate its *own* model using the same standard. *Id.* If the proportion of unsupported diagnosis codes in the traditional Medicare data exceeded the proportion of unsupported codes in the MA plan's data, then the plan would not have been overpaid. *Id.*, AR5314 ("If the FFS Adjuster amount is greater than the preliminary recovery amount, the final recovery amount is equal to zero."). Meanwhile, if the proportion of unsupported codes in the MA plan's data is higher, then CMS is entitled to recovery—but only after offsetting the proportion of unsupported codes in the MA plan's data by the proportion of unsupported codes in the traditional Medicare data. Thus, if an audit determined that 20 percent of a plan's risk adjustment payment had been based on unsupported codes, and that the equivalent payment error in the data from traditional Medicare was 15 percent, then CMS would be entitled to recover only the 5 percent difference.

The Overpayment Rule cannot be reconciled with that approach. Under the Overpayment Rule, the full 20 percent of the risk adjustment payments that were based on unsupported diagnosis codes would qualify as overpayments, which the MA plan would be required to return. The result is that when CMS itself performs an audit, it treats a plan as having been overpaid only if, and to the extent that, the rate of unsupported codes in the plan's data is higher than in the traditional Medicare data—but if the MA plan audits itself, it is required to use a different definition of overpayment that provides for no such offset. There is no plausible reason for this divergent treatment.

35

2. *CMS's Interpretation Of "Overpayment" Is Inconsistent With The Rationale For The Coding Intensity Adjustment*

CMS's adoption of the Coding Intensity Adjustment likewise was based on a recognition that risk scores of an MA plan's beneficiaries need to be calculated using the same methodology that is employed in calibrating the payment model with data from traditional Medicare.  In that case, CMS recognized that MA plans were employing coding practices that CMS itself does not engage in, such as retroactive chart reviews in which expert coders identify additional codes that could have been, but were not, submitted based on the information in a patient's charts.  *See, e.g.*, 2009 Advance Notice, AR4229 ("MA plans may be finding and diagnosing disease at a higher rate than FFS providers."); *id.*, AR4231 ("CMS understands that MA plans have made efforts to identify enrollees' conditions and may be coding more completely than FFS.").  In CMS's view, the one-sided application of those coding activities, while not itself improper or unlawful, *see id.*, AR4231 (noting that these efforts do not represent "improper coding"), had the effect of increasing the risk scores of MA plan populations relative to the traditional Medicare population.  That would produce improper payment amounts, CMS concluded:  Because "MA payment methodology is based on fee-for-service payments," it follows that "MA plans must code the way Medicare Part A and B providers do in order for risk adjustments to be valid." 2010 Rate Announcement, AR4335.

In justifying the Coding Intensity Adjustment, CMS recognized that to the extent MA plans engage in activities (such as reviewing charts to code them more completely) that CMS itself does not engage in, the effect of which is to *increase* a plan's risk scores, CMS must impose an offsetting adjustment to ensure that risk adjustment comparisons remain valid.  That logic applies equally in reverse: To the extent that CMS requires MA plans to engage in activities (such as identifying and deleting diagnosis codes that are not supported by medical

36

charts) that CMS itself does not engage in, the effect of which is to *decrease* a plan's risk scores, CMS must likewise impose an offsetting adjustment to ensure that risk adjustment comparisons remain valid.  The Rule cannot be reconciled with CMS's rationale for the Coding Intensity Adjustment.

> **3.    CMS's Interpretation Of "Overpayment" Is Inconsistent With The Implementation Standard CMS Indicated It Would Utilize When It Adopted The CMS-HCC Risk Adjustment Model**

Finally, CMS's interpretation of "overpayment" in the Rule is inconsistent with the position CMS took when it originally adopted the CMS-HCC risk adjustment model in 2004.  At the time, CMS indicated that it would "implement the CMS-HCC risk adjustment model following the approach used to estimate the model."  2004 Advance Notice, AR3903.  "In determining a risk score for a beneficiary," it wrote, "we will determine the status of each variable included in the model based on the same definitions used to estimate the model," including "diagnoses."  *Id.* That commitment was essential, under basic actuarial principles, to making the CMS-HCC model a valid basis for risk adjustment.  Indeed, the Actuarial Standards of Practice, a set of industry guidelines published by the Actuarial Standards Board,[12] *require* that "[t]he type of input data that is used in the application of risk adjustment . . . be reasonably consistent with the type of data used to develop the model."  Actuarial Standards Board, Actuarial Standard of Practice No. 45 § 3.2 (2012), http://www.actuarialstandardsboard.org/asops/use-health-status-based-risk-adjustment-methodologies/.

Without any explanation, however, the Overpayment Rule departed from that prior commitment.  Under the Overpayment Rule, CMS no longer determines the status of each

---

[12] The Actuarial Standards of Practice are analogous to the Generally Accepted Accounting Principles (GAAP) published by the Financial Accounting Standards Board.

variable in determining a risk score using the same definition it used in estimating the model: The definition of "diagnosis" CMS uses in estimating relative costs under its model is still keyed to the presence of a diagnosis code in claims data, but the definition of "diagnosis" CMS now uses for determining overpayments is the presence of a diagnosis in a medical chart.

### C.    CMS's Stated Rationales For Requiring Different Validation Standards Lack Merit

In the preamble to the Overpayment Rule, CMS identified two supposed justifications for its refusal to account for its own unsupported codes in interpreting the term "overpayment." First, it pointed to the annual attestation of accuracy signed by MA plans.  Overpayment Rule, AR1313.  And second, it pointed to a "long-standing risk adjustment data requirement that a diagnosis submitted to CMS by an MA organization for payment purposes must be supported by medical record documentation."  *Id.*  Neither point provides support for the Rule.

#### 1.    *CMS's Legitimate Concerns About Accuracy Do Not Justify Using A Different Validation Standard For Data Submitted By MA Plans*

Every MA plan is required by regulation to "certify (based on best knowledge, information, and belief) that the data it submits . . . are accurate, complete, and truthful."  42 C.F.R. § 422.504(*l*)(2).  Pointing to that requirement, CMS reasoned in the Overpayment Rule that an MA plan is not entitled to payment unless its diagnosis codes are supported with medical record documentation.  Overpayment Rule, AR1313.

That argument ignores the interpretation of "accuracy" that CMS itself has long used in evaluating MA plan payments and that undergirds the entire relative reimbursement methodology.  Because risk adjustment is based on a comparison between an MA plan's patient population and that of the traditional Medicare program, CMS has explained that "*MA organizations are coding 'accurately'* when they are coding in a manner similar to fee-for-service coding used on the beneficiaries to whom MA plan enrollees are being compared."  2010

Rate Announcement, AR4335 (emphasis added).   "'[D]ifferences' in coding patterns, regardless of the source, would make the MA plan coding 'inaccurate' for purposes of implementing risk adjustment."   *Id.*   And that is true "even if such coding is accurate or complete for other purposes."   *Id.*, AR4336 (quoting floor statement by Senator Grassley).   As CMS put the point the year before promulgating the Rule, "[t]he goal of risk adjusted payments is to pay accurately using the appropriate relative risk for a beneficiary. . . .   As long as we have a model based on FFS costs and diagnoses patterns, differences in MA coding, relative to FFS coding patterns, results in relative risk that is measured incorrectly." 2014 Rate Announcement, AR4858

Under that longstanding understanding of "accuracy," the fact that MA plans certify to the "accuracy" of their data is not a reason for holding them to a different (chart-based) documentation standard than CMS uses with respect to its FFS data.   To the contrary, in light of CMS's understanding that the accuracy at issue is *relative* accuracy, a plan's data are accurate if the proportion of unsupported codes in its data is no greater than in CMS's data.   The fact that MA plans are required to certify to the accuracy of their data is thus yet another reason that CMS cannot require plans to implement a perfection standard that it does not apply to its own data, undermining rather than supporting the Overpayment Rule.

To the extent that the Overpayment Rule implicitly adopted a different interpretation of "accuracy" in the Section 422.504(*l*)(2) attestation, moreover, it would render the attestation itself unlawful.   It is well-settled that "an agency interpretation that is 'inconsisten[t] with the design and structure of the statute as a whole,' does not merit deference."   *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2442 (2014) (alteration in original) (citations omitted).   By law, CMS cannot calculate the actuarial risk of an MA plan's patient population using a methodology that is different than the one it used to calculate the benchmark from the traditional Medicare

population.  *See supra* at 26-28.  It cannot circumvent that requirement by demanding that MA

plans attest to the "accuracy" of the data they submit under a different validation methodology

than it itself applies.  Doing so would simply be another way of requiring MA plans to use a

different methodology—calculating risk scores with verified diagnosis codes, rather than (as

with traditional Medicare) unverified ones—and would therefore itself violate the "actuarial

equivalence" and "same methodology" requirements discussed above.

This does not mean, of course, that CMS is powerless to address discrepancies between

diagnosis codes and medical records.  CMS has suggested that MA plans are incentivized to

increase the number of diagnosis codes of their patients in ways that traditional Medicare

providers are not.  *See, e.g.*, U.S. Mem. in Supp. of Mot. to Dismiss 6, ECF No. 12-1.  Assuming

that those incentives do, in fact, lead to the submission of a higher rate of unsupported codes—

something that CMS's own data suggest is not true[13]—CMS is free to address that concern.  In

doing so, however, CMS is *not* free to ignore other "important aspect[s] of the problem" before

it.  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983) ("Normally, an agency rule would be arbitrary and capricious if the agency . . . entirely

failed to consider an important aspect of the problem . . . .").  Instead, any solutions it adopts to

address its concerns about unsupported codes must also take account of the requirement—

embodied both in the statute itself and also in the agency's own past pronouncements on the

subject—that risk be measured consistently across the MA and traditional Medicare programs.

For example, it could begin paying plans based on a model calibrated with validated codes from

the FFS program, in which case requiring MA plans to validate their data using charts, too,

---

[13] *See, e.g.*, 2010 Rate Announcement, AR4336-37 (describing "[t]he results of the medical record audits" that "fail[ed] to show a systematic correlation between coding pattern differences and errors in the reporting of documented coding").

would accomplish rather than frustrate actuarial equivalence.  Alternatively, CMS could decide prospectively that an MA plan is being overpaid to the extent that the proportion of unsupported diagnosis codes in its data submission is higher than in the data from the traditional Medicare population used to calibrate the payment model (which presumably is unaffected by any alleged incentives to upcode).  If the MA plan's rate of unsupported diagnosis codes is 20 percent, and the rate in the traditional Medicare program is 15 percent, then there is a 5 percent "inaccuracy" in the MA plan's data.  That is the route CMS took with respect to the RADV Fee-For Service Adjuster.  *See supra* at 15-17.  But if the MA plan's rate of unsupported codes is 15 percent, identical to the rate in traditional Medicare, then the plan's data are "accurate" for purposes of risk adjustment.  And in either case, identifying which specific individual beneficiaries within the group are the ones who have an unsupported code is completely irrelevant in determining whether the plan is paid appropriately.

2.      *Industry Guidelines Relating to Medical Record Documentation Do Not Support Application Of Different Documentation Standards*

CMS can draw no support, either, from guidelines stating that diagnosis codes should reflect diagnoses documented in medical charts.  That principle is not a regulatory requirement applicable uniquely to MA plans—it is an industry-wide standard, codified in the ICD-9 Coding Guidelines.  *See* ICD-9-CM Official Guidelines for Coding and Reporting, AR11429.  It applies equally to providers in *both* the MA and traditional Medicare programs.  *See, e.g.*, 42 C.F.R. § 424.32(a)(2) ("A [FFS] claim for physician services . . . must include appropriate diagnostic coding for those services using ICD-9-CM.").  And in *both* programs, providers are far from perfect at meeting it.  Invoking this principle thus merely raises—it does not answer—the relevant question:  Given the reality that many providers submitting claims in both the MA and traditional Medicare programs do not consistently document their diagnosis codes in the medical

41

charts, is it consistent with the statutory requirements and CMS's prior pronouncements to impose obligations on MA plans with respect to those undocumented diagnosis codes that CMS does not impose on itself?  The *answer*, as already explained, is that doing so is not consistent with either the statute or the agency's past positions.

## II.     THE OVERPAYMENT RULE UNLAWFULLY TREATS AN MA PLAN AS HAVING "IDENTIFIED" AN OVERPAYMENT IF THE MA PLAN NEGLIGENTLY *FAILED* TO IDENTIFY THE OVERPAYMENT

In addition to adopting an interpretation of "overpayment" that is inconsistent with both statutory requirements and CMS's own past practice, the Overpayment Rule also is unlawful in a second, independent respect:  It embraces an impermissibly expansive understanding of when an overpayment has been "identified" by an MA plan.   Specifically, it interprets the statutory requirement that an "overpayment . . . be reported and returned . . . [within] 60 days after the date on which the overpayment *was identified*,"  42 U.S.C. § 1320a-7k(d)(2) (emphasis added), to require reporting and return even when the overpayment *has not* in fact been identified, so long as it "*should have*" been, 42 C.F.R. § 422.326(c) (emphasis added).   As this Court has already recognized, CMS's new definition essentially imposes a negligence standard.  *See* MTD Order 13.  That definition is flatly inconsistent with—or at minimum is an unreasonable reading of—the statutory text and must be set aside.  *See generally Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

First, the statutory phrase "was identified" unambiguously indicates actual knowledge, not negligence.  *See id.* at 842-43 (courts "must give effect to the unambiguously expressed intent of Congress").  To "identify" is to "establish," "indicate," or "determine" the identity of something.  *See, e.g.*, Identify, *New Oxford American Dictionary* (3d ed. 2010) ("to establish or indicate who or what (someone or something) is"); Identify, *Webster's II New Collegiate Dictionary* (3d ed. 2005) ("to establish the identity of" or "to determine the classification of").

No one would think, nor does any dictionary suggest, that something has been "identified" if it merely *should have* been established, proved, or determined.  If, for example, a judge told her clerk to print a copy of every case a party's brief had "identified" as relevant, no one would expect the clerk to provide not only the cases the party had cited, but also those it *should have* cited.  So too here, an overpayment has not been "identified" until an MA plan has actually determined that it exists.  CMS's contrary definition flouts the plain, unambiguous meaning of the statutory text.

Second, even if the statutory text had any ambiguity, CMS's interpretation is unreasonable.  *See Chevron*, 467 U.S. at 844-45.  The legislative history shows that Congress intended "identify" to be even *stricter* than recklessness or willful blindness, not *looser*.  The initial version of the statute introduced in the House of Representatives in 2009 included a provision that an overpayment had to be reported within sixty days after it was *known*.  H.R. 3200, 111th Cong. § 1641 (as introduced by the House, July 14, 2009).  It specified that the meaning of "known" would be the same as the FCA's knowledge standard, which includes recklessness and deliberate ignorance.  *See* 31 U.S.C. § 3729(b)(1).  But Congress instead adopted the Senate version of the bill, which substituted "identified" for "known."  Pub. L. No. 111-148, § 6402(a), 124 Stat. at 755 (enacting H.R. 3590, 111th Cong. (2010)).  A court must give effect to this sort of legislative choice.  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." (citation omitted)).  When it rejected the use of "known" and chose "identified," Congress specifically did not even include *recklessness*, let alone negligence.

This makes sense, because the failure to return an overpayment can lead to punitive False

Claims Act liability.  Under CMS's new definition, MA plans potentially are subject to this punitive liability based on merely negligent *inaction* (*i.e.*, failing to proactively search for and find overpayments)—a stark departure from the normal rule that the False Claims Act does *not* allow liability based only on negligence.  *See, e.g.*, *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1274-77 (D.C. Cir. 2010) (emphasizing that the False Claims Act does not allow a court to "impose liability for what is essentially negligence or mistake by another name"); *Hindo v. Univ. of Health Scis./The Chicago Med. Sch.*, 65 F.3d 608, 613-14 (7th Cir. 1995) ("negligence is not actionable" under the False Claims Act).

In addition to being substantively untenable, CMS's definition of "identified" must also be set aside because of an independent procedural defect: it was not a "logical outgrowth" of the proposed rule.  "[A]gencies may not 'pull a surprise switcheroo on regulated entities.'"  *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1108 (D.C. Cir. 2014) (citation omitted).  Therefore, an agency's rule only satisfies the APA's notice and comment obligation if "a reasonable commenter 'should have anticipated that such a [rule]' would be promulgated" or the proposed rule "was 'sufficient to advise interested parties that comments directed to the' controverted aspect of the final rule should have been made."  *First Am. Discount Corp. v. Commodity Futures Trading Comm'n*, 222 F.3d 1008, 1015 (D.C. Cir. 2000) (citations omitted); *see also Ass'n of Battery Recyclers, Inc. v. U.S. EPA*, 208 F.3d 1047, 1058-59 (D.C. Cir. 2000).

Here, CMS initially proposed that an MA plan has "identified" an overpayment when "it has actual knowledge of the existence of the overpayment or acts in reckless disregard or deliberate ignorance of the existence of the overpayment."  Proposed Overpayment Rule, AR81. CMS explained that this definition was drawn from the definition of "knowing" and "knowingly" in the False Claims Act, 31 U.S.C. § 3729(b), despite the fact that those terms are

not used in the relevant section of the Affordable Care Act.  In response, commenters argued that CMS's definition of "identified" was too broad for a statute that could potentially trigger punitive damages under the False Claims Act.  As United explained, "it is unreasonable to require Plans to report and return an overpayment based on the broad definition proposed." AR1040.  Instead, United and others suggested that "an identified overpayment should be limited to actual knowledge of an overpayment."  *Id.*; *see also, e.g.*, AR613-14 (Blue Cross Blue Shield Association).  But instead of addressing these comments and narrowing the scope of "identified," CMS instead made the definition even *broader*, to include negligent *failure* to identify.  CMS provided no notice to commenters that it was considering a negligence standard, and, unsurprisingly, no commenters addressed such a standard.  The Final Rule's surprise adoption of negligence was precisely the sort of "switcheroo" that the APA forbids.

## CONCLUSION

For all of these reasons, the Court should declare unlawful and set aside the Overpayment Rule.

October 17, 2017

Respectfully submitted,

 /s/ *Daniel Meron*
Daniel Meron (D.C. Bar No. 450419)
Benjamin W. Snyder (D.C. Bar No. 1020481)
Graham E. Phillips (D.C. Bar No. 1035549)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201
daniel.meron@lw.com

*Attorneys for Plaintiffs*