UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITEDHEALTHCARE INSURANCE COMPANY, *et al.*,<br><br>               Plaintiffs,<br><br>      v.<br><br>ERIC D. HARGAN, in his official capacity as Acting Secretary of the Department of Health and Human Services, *et al.*,<br><br>               Defendants. | No. 1:16-cv-00157-RMC |

**UNITED'S REPLY IN SUPPORT OF ITS MOTION
TO SUPPLEMENT THE ADMINISTRATIVE RECORD**

It is worth noting at the outset several things the government does *not* say in its Brief in Opposition ("Opposition") to United's Motion to Supplement the Administrative Record ("Motion"). The government does not challenge the authenticity of the FFS Adjuster Documents. It does not deny that those documents were possessed by or presented to at least one of three senior CMS officials deeply involved in the promulgation of the Overpayment Rule. It does not contend that the analysis in those documents is substantively incorrect. And it does not dispute United's conclusion that the documents are adverse to CMS's decision to promulgate the Overpayment Rule. In light of these concessions, it is clear that the FFS Adjuster Documents should be added to the record.

In resisting that conclusion, the government begins by trying to downplay the significance of the final RADV payment error calculation methodology CMS adopted in 2012 ("Final RADV Methodology"). At one point even dismissively calling the Final RADV Methodology a mere "white paper," the government tries to suggest it said little of substance

about the FFS Adjuster. Opposition at 1. That is nonsense. The Final RADV Methodology was a formal agency pronouncement issued after notice and comment, not a white paper. And it definitively adopted an FFS Adjuster as part of the RADV audit process, even if it did not determine the amount of that adjuster. The government cannot and does not ultimately deny this fact. *See id.* at 12 (acknowledging that CMS "adopted the FFS Adjuster for RADV audits"). As United has explained, CMS's adoption of an FFS Adjuster is inconsistent with the position it took in adopting the Overpayment Rule. *See* Motion at 3-4; Memorandum in Support of United's Motion for Summary Judgment 15-17, 34-35, ECF No. 47-1 ("United S.J. Mem."). The FFS Adjuster Documents make that conclusion especially obvious and should therefore be considered in connection with this challenge to the Overpayment Rule.

In addition to trying to minimize the Final RADV Methodology, the government offers two main arguments for why the FFS Adjuster Documents should not be added to the record. The government first argues that there is no proof that CMS considered these documents in adopting the Overpayment Rule. To get the views of the senior staff who prepared these documents, the government says, CMS decisionmakers would have simply spoken to them, not reviewed these documents. But it is hard to take seriously the idea that these detailed, contemporaneous writings would not at least have received *indirect* consideration, which does not require that the documents themselves have been read, only that their content was considered. *See infra* at 3-6. The government also argues that, in any event, these are deliberative documents of the sort not included in the record. In making this argument, the government repeatedly stresses that CMS never "endorsed"—or at least "never publicly endorsed"—the contents of these documents. But it is readily apparent that these documents reflect the reasons behind CMS's adoption of the RADV FFS Adjuster, so they have lost any

deliberative status. And even if not, they should still be considered because they are adverse to CMS's adoption of the Overpayment Rule. *See infra* at 6-8.

Not only does the government's Opposition fail to offer a sufficient basis for keeping the FFS Adjuster Documents out of the record, it actually illustrates why the Court *should* consider them. *See infra* at 8-16. The Opposition calls the argument for the FFS Adjuster "odd," and implies that United's parallel argument against the Overpayment Rule is comparably meritless. Opposition at 4-6. In doing so, the Opposition demonstrates a fundamental misunderstanding of the basic nature of the CMS risk adjustment model—a model designed to calculate an appropriate payment based on the *average* relative costs associated with the presence of a diagnosis code in claims data (not the costs associated with diagnoses in medical charts). The FFS Adjuster Documents are extremely useful in understanding why the government is wrong, suggest that CMS did not consider all the relevant factors in promulgating the Overpayment Rule, and are clearly "adverse" to the agency's definition of "overpayment" in that rule—as even the government itself does not ultimately dispute.

### A.   CMS Considered The FFS Adjuster Documents

As the government recognizes (Opposition 8), it is proper to supplement the administrative record if "the agency did not include materials that were part of its record, whether by design or accident." *Univ. of Colorado Health at Mem'l Hosp. v. Burwell*, 151 F. Supp. 3d 1, 13 (D.D.C. 2015) (citation omitted). The plaintiff "must identify reasonable, *non-speculative grounds* for its belief that the documents were *considered* by the agency and not included in the record." *Id.* (citation omitted). It is important to recognize, however, as many courts have, that "[a] document need not literally pass before the eyes of the final agency decisionmaker to be considered part of the administrative record." *Clairton Sportsmen's Club v. Pa. Tpk. Comm'n*, 882 F. Supp. 455, 465 (W.D. Pa. 1995); *accord, e.g.*, *Wildearth Guardians v.*

3

*U.S. Forest Serv.*, 713 F. Supp. 2d 1243, 1255 (D. Colo. 2010); *Merritt Parkway Conservancy v. Mineta*, 424 F. Supp. 2d 396, 403 (D. Conn. 2006). No one supposes, for instance, that the top decisionmakers at CMS actually read all of the 12,000+ pages in the record CMS has designated here, such as the hundreds of pages of comments submitted by private parties on the RADV payment methodology that the FFS Adjuster Documents analyze. *See* Index to the Rulemaking Record 5, ECF No. 40-2. The record includes "all documents and materials directly *or indirectly* considered" by the agency. *Lee Mem'l Hosp. v. Burwell*, 109 F. Supp. 3d 40, 46 (D.D.C. 2015) (emphasis added) (citation omitted).

In its Motion (at 10-11), United explained why the standard for supplementation is met here: CMS has admitted (through the materials it *has* included in the record) that in promulgating the Overpayment Rule it considered the 2010 proposed payment-error calculation methodology for RADV audits ("Proposed RADV Methodology"), the hundreds of pages of subsequent public comments on that proposal, and the 2012 Final RADV Methodology. In light of that admission, it is simply not credible that the agency did not also consider, directly or indirectly, the FFS Adjuster Documents. Those documents, after all, contain senior CMS officials' explanation of the significance of the public comments and of the need for the FFS Adjuster that the Final RADV Methodology in fact adopted. It makes no sense to suppose that when CMS was considering whether the Overpayment Rule was consistent with the RADV FFS Adjuster, the agency went back and directly or indirectly considered the substance of dozens of public comments on the subject but not its own prior analyses of these comments. Nor is it credible that, when considering whether the assessment of "overpayments" should take into account and offset the impact of errors in CMS's own data, CMS decisionmakers would not have at least considered the analysis of their internal payment experts. It is particularly hard to believe they

4

would not have considered, directly or indirectly, a presentation by the director of the Division of Payment Validation that explained why such an offset was necessary when determining overpayments in RADV audits—a recommendation that the agency heads adopted.

The government tries to undermine this logic in two ways, but neither is persuasive. First, the government contends that these documents merely contain "the views of certain agency staff," views that "have not been endorsed by CMS." Opposition at 10. Even if this were true—*but see infra* at 7—it would make no difference. The agency need not have formally "endorsed" a document to have considered it. No one thinks CMS endorsed all of the views in the public comments it received concerning the need for the RADV FFS Adjuster, but the government admits (correctly) that it considered those comments in promulgating the Overpayment Rule and that they are therefore part of the administrative record in this case. The same logic applies to the FFS Adjuster Documents, which, even if not formally endorsed, would have been vastly more informative than most of the public comments.

The government's second argument is that, "[i]f the agency wanted the views of its senior staff as to issues involved in the earlier proceeding and their bearing on the later proceeding, it could have just asked them. There is no reason to think that any recourse to out-of-date briefing documents would have been necessary." Opposition at 10-11. This is implausible. No one genuinely interested in understanding what senior staff thought about a complex legal and policy issue would ignore what those staff *wrote in 2012* and instead ask them what they *remembered in 2014*. The government calls these documents "out-of-date," as if to suggest they had somehow become unreliable by 2014; but the fact that they were prepared at the same time that CMS adopted the FFS Adjuster makes them an *especially* reliable record of the senior staff's understanding of that subject. These contemporaneous writings are the source of information

about the FFS Adjuster that any rational decisionmaker would have considered in 2014. But even if the agency had simply asked these senior staff for their views, their views must have taken into account the substance of these documents—so the documents were still at least *indirectly* considered.

B.      **The Exception For Deliberative Materials Does Not Apply**

The government argues that even if CMS did consider the FFS Adjuster Documents in promulgating the Overpayment Rule, they remain outside the record "because they reveal agency deliberations rather than agency decisions." Opposition at 11. But the general rule that deliberative documents are excluded from the record does not apply here.

As United explained in its Motion (at 14), and as the government agrees, deliberative materials normally "are not part of the administrative record because 'the reasonableness of the agency's action is judged in accordance with its stated reasons.'" Opposition at 8 (quoting *In re Subpoena Duces Tecum*, 156 F.3d 1279, 1279 (D.C. Cir. 1998)). That logic does not suggest the FFS Adjuster Documents cannot be considered. The agency action that is being "judged" in this case is the Overpayment Rule, and the FFS Adjuster Documents do not reveal agency deliberations about that action. Considering these documents in no way evades the requirement that the Overpayment Rule be "judged in accordance with [CMS's] stated reasons" for that rule.

In any event, even if a document might qualify as deliberative at one point, "it can lose that status if it is adopted, formally or informally, as the agency position on an issue." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). At that point there is no longer any danger of "confusing the issues and misleading the public by . . . suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Id.* As United's Motion explained (at 15-16), that is what happened here. The FFS Adjuster Documents reflect the position CMS actually adopted: namely, that because CMS

6

uses one documentation standard when calibrating the MA risk adjustment model (diagnosis codes in unaudited FFS claims data) but a different documentation standard in RADV audits (diagnoses in medical records), it must apply an FFS Adjuster before requiring contract-wide repayments in a RADV audit. *See* Final RADV Methodology at 4-5.

The government contends otherwise, arguing that including these documents in the record would "mislead the public (and this Court) about the reasoning behind the Secretary's decision to incorporate an FFS Adjuster into the RADV audit methodology." Opposition at 13. This assertion is not credible. The reasoning in the FFS Adjuster Documents perfectly explains CMS's decision to adopt the FFS Adjuster and is perfectly consistent with CMS's short explanation in the Final RADV Methodology itself. Indeed, it is impossible to see how CMS could have adopted the FFS Adjuster for the reasons it gave in the Final RADV Methodology *without* agreeing with the analysis in the FFS Adjuster Documents. If an agency says, "Because the statute forbids vehicles in the park, bicycling is banned," the agency has obviously concluded that bicycles are vehicles. The FFS Adjuster Documents are the equivalent of a document that states expressly, "Under the statute, a bicycle is a vehicle." There is simply no space between the short explanation in the Final RADV Methodology and the more fulsome explanation in the FFS Adjuster Documents in which CMS could have hidden some secret, alternative rationale. Because they accurately reflect the agency's official position, these documents have lost any "deliberative" status they once had.

Finally, there is one more reason that the allegedly deliberative nature of these documents does not warrant their exclusion from the record. As United noted in its Motion (at 16-17), "supplementation, *including with deliberative documents*, may be required upon a prima facie showing that the agency excluded from the record evidence adverse to its position." *Banner*

*Health v. Sebelius*, No. CV 10-01638 (CKK), 2013 WL 11241368, at *6 (D.D.C. July 30, 2013) (emphasis added) (citation omitted). The government's Opposition does not dispute this principle. Nor does it dispute United's conclusion that the FFS Adjuster Documents are adverse to CMS's position on the Overpayment Rule.[1] *See* Motion at 11-14. That is reason enough to supplement the record with these documents.[2]

        **C.**        **The Government's Opposition Itself Illustrates Why The FFS Adjuster Documents Should Be Considered**

Far from demonstrating that the FFS Adjuster Documents should be excluded from the administrative record, the government's Opposition in fact illustrates why those documents merit the Court's careful attention as it considers this case. The Opposition does so by displaying a flawed understanding of why the FFS Adjuster was necessary and of United's related argument against the Overpayment Rule. The FFS Adjuster Documents provide a powerful antidote to that confusion and demonstrate that United's argument is not some foolish assault on common sense, as the Opposition tries to portray it, but rather makes perfect sense in light of how the MA risk adjustment system actually works. *See generally* United S.J. Mem. at 4-12 (providing detailed description of that system).

The Opposition's confusion appears most starkly in its characterization of MA plans' objection to the 2010 Proposed RADV Methodology. The plans' objection was that the risk

---

[1] The only time the government uses the word "adverse" is when noting that the "strong presumption of regularity applies whether or not the plaintiff would seek to characterize the disputed documents as 'adverse' to the agency's position." Opposition at 10. United agrees: Whether the documents are adverse is not relevant to whether the presumption *applies*; it is relevant to whether the presumption has been *overcome*.

[2] Contrary to the government's suggestion, United does not contend that "the release of these documents in FOIA" *alone* "requires their inclusion in the record here." *See* Opposition at 13. United's point is simply that release of these documents under FOIA undermines any potential argument that considering them would "discourage candid discussion within the agency," one of the reasons that deliberative documents are generally not part of the administrative record. *See Lee Mem'l Hosp.*, 109 F. Supp. 3d at 49.

8

adjustment model was calibrated using unaudited FFS claims data that surely contained some unsupported diagnosis codes, but in a RADV audit MA plans were required to show that every diagnosis code for which they received a risk adjustment payment was supported. The Opposition contends that this was an "odd" objection. It was odd, the Opposition says, because the plans "did not seem to be claiming that the risk scores produced by the risk adjustment model were arbitrary and capricious"; instead, they were "suggesting that the risk scores properly calculated the expected medical costs of a beneficiary so long as they were fed unaudited data about his health status, and only went haywire when they were computed using audited (*i.e.*, more accurate) data." Opposition at 4-5. But there was nothing the least bit "odd" about the plans' objection. Contrary to the incredulous tone of the Opposition, calculating risk coefficients using unaudited FFS data and then applying those coefficients exclusively to audited MA data does indeed cause the risk adjustment system to go "haywire." An excellent guide to understanding why that is the case is found in the FFS Adjuster Documents themselves.

As the slideshow explains, "CMS uses diagnosis and cost information from FFS claims to assign values to [medical conditions] for MA payment purposes"—in other words, to estimate how much MA plans should be paid for a given diagnosis that their beneficiaries have. Motion Ex. B at 7. But some of the diagnosis codes in this FFS data are unsupported, and the inclusion of these unsupported diagnoses "tends to reduce risk adjustment values." *Id.* That is so because an FFS beneficiary who has a diagnosis code but does not actually have the condition will presumably incur no incremental healthcare costs as result, and will therefore drag down CMS's estimate of the average cost associated with the diagnosis. Slide 8 of the slideshow contains a chart that illustrates this point:

## Why does FFS Diagnosis Error Matter?

|  | Diabetes on Claim? | Diabetes in medical record? | FFS Cost |
|---|---|---|---|
| Beneficiary A | Yes | Yes | $4000 |
| Beneficiary B | Yes | Yes | $4000 |
| Beneficiary C | Yes | Yes | $4000 |
| Beneficiary D | Yes | No | $0 |
|  |  | Total | $12,000 |
|  |  | Diabetes Value for MA payment | $3,000 |

CMS0005888

This example supposes that there are four FFS beneficiaries who have the diagnosis code for diabetes, only three of whom actually have the condition. If the actual per-beneficiary cost associated with diabetes is $4,000, the total cost across the population will be $12,000. But because CMS will estimate the average per-beneficiary cost by dividing that $12,000 by the *four* beneficiaries who have the diagnosis code, it will arrive at an estimate of $3,000—lower than the $4,000 it would have arrived at if it had used audited FFS data.[3] *See also* United S.J. Mem. at 11-12.

---

[3] If an average CMS beneficiary costs CMS $10,000 annually to insure, because CMS's model predicts that the average incremental cost to CMS for a beneficiary with a diabetes diagnosis code is $3,000, CMS's model predicts that a beneficiary with a diabetes code is 30% more costly to insure than an average CMS beneficiary. CMS's model then predicts that an identical beneficiary would likewise be 30% more expensive to insure for an MA plan than an average beneficiary, and increases the plan's payment by 30%. Had CMS used diagnoses from medical

But the lower risk coefficients (and hence lower risk adjustment payments) that are thus the result of calibrating the model with unaudited FFS data are not intrinsically "arbitrary and capricious," to use the Opposition's phrase (at 5).  It is important to recognize, as CMS has, that the risk adjustment system "is intended to be accurate at the group level," not the individual level.  Gregory C. Pope et al., Evaluation of the CMS-HCC Risk Adjustment Model 4 (March 2011), *available at* http://tinyurl.com/popeevaluation.  Therefore, as long as the lower risk adjustment payments result in accurate *total* payments to an MA plan, the system will operate properly.  And the total payments will be accurate provided that (1) the rate of unsupported codes is approximately the same among FFS and MA beneficiaries and (2) the risk adjustment payments are applied to every MA beneficiary who has the code—including an MA beneficiary whose code is not supported by medical records and who does not in fact have the condition.  Sticking with the example from the slideshow, assume that an MA plan's population is identical to the traditional FFS population described in the slide—that is, like CMS, the MA plan also has four beneficiaries with the code for diabetes, only three of whom actually have the condition.  If CMS pays the plan $3,000 for each of the four beneficiaries with the code, the plan will receive a total of $12,000.  That total is an accurate estimate of the plan's costs at the group level, even though $3,000 is not an accurate estimate of any of the *individual's* expected costs (which are $4,000, $4,000, $4,000, and $0).  *See also* United S.J. Mem. at 41 (noting the irrelevance of identifying which specific individuals have unsupported codes).

If, however, CMS calibrates the risk adjustment model using unaudited FFS data but then makes risk adjustment payments for only those MA beneficiaries whose diagnosis codes are confirmed by medical records, the system will indeed go "haywire."  The plan would then get

---

charts to calculate its coefficients, the incremental upwards adjustment for a beneficiary with diabetes documented on her chart, all else being equal, would have been 40%, not 30%.

paid a total of $9,000 ($3,000 × 3), rather than its total predicted costs of $12,000. That is the scenario that slide 9 further illustrates:

**Why does FFS Diagnosis Error Matter?**

| | Diabetes reported by MA plan? | Diabetes in medical record? | CMS Payment to Plan | Plan Cost | RADV | CMS Payment to Plan |
|---|---|---|---|---|---|---|
| Beneficiary A | Yes | Yes | $3000 | $4000 | | $3000 |
| Beneficiary B | Yes | Yes | $3000 | $4000 | | $3000 |
| Beneficiary C | Yes | Yes | $3000 | $4000 | | $3000 |
| Beneficiary D | Yes | No | $3000 | $0 | ($3000) | $0 |
| Beneficiary E | Yes | No | $3000 | $0 | ($3000) | $0 |
| Total | | | $15,000 | $12,000 | ($6,000) | $9,000 |

This example builds on slide 8. Once again, using unaudited FFS data, CMS has calculated a per-beneficiary payment of $3,000 for diabetes, even though the true per-beneficiary cost is actually $4,000. This slide assumes an MA plan that has five beneficiaries with the code for diabetes, only three of whom actually have the condition. The plan's total expected costs are $12,000 ($4,000 × 3). But if CMS makes risk adjustment payments for only those three MA beneficiaries whose codes are supported, without offsetting for the 1.25 out of 5 beneficiaries in its own population who would likewise have had an unsupported diabetes code,[4] the plan will receive only $9,000—less than the total incremental costs the CMS model predicts. CMS's use

---

[4] Based on the 25% error rate in the FFS data shown in slide 8.

of unaudited FFS data to calibrate the model leads to a lower per-beneficiary payment ($3,000 rather than $4,000), which CMS then applies to fewer MA beneficiaries (those with supported codes). The MA plan is inadequately compensated for the risk it has assumed, and CMS reaps a corresponding windfall.

This dynamic reflects the fundamental nature of insurance risk adjustment. The point is to determine an appropriate payment amount (an insurance premium) by correlating costs to particular proxies (or markers) for risk. The proxies CMS chose to use for risk adjusting MA plan payments are diagnosis codes on claims data. As with any form of insurance, the majority of people with a particular proxy (such as the diagnosis code for diabetes) will incur below-average costs, and their payments will subsidize the minority of people who incur above-average costs. As the government notes (Opposition at 3), the CMS model is designed to yield "output[s]" from a certain type of "inputs"—namely, predictions of future incremental costs (outputs) correlated to diagnosis codes in FFS claims data (inputs). What is truly "odd"—indeed, irrational and contrary to well established actuarial principles—is to create a model that correlates costs to diagnosis codes and then to apply it to MA plans using a different set of data: diagnoses in medical charts. *See* United S.J. Mem. at 32-34, 37-38. Because some portion (perhaps upwards of 20%) of diagnosis codes are not supported by medical charts, the number of people with a code on a claims form that is also documented in a medical chart is necessarily smaller than the number who have just the code. As explained, if the larger number of people with just the code is used to estimate the average incremental cost of a condition, that estimate will be lower: the same total cost across the whole population will be divided by a larger denominator. To take that lower estimate and apply it to only the subset of MA beneficiaries who have both the code and supporting medical records is irrational and will result in inadequate

13

payments.  It would be, as United explained in its summary judgment brief, like calculating a *per capita* food subsidy but paying it on a *per household* basis.  *See id.* at 32-34 & n.11.

The American Academy of Actuaries, a neutral expert body, made precisely this point in its comments on the Proposed RADV Methodology.  *See* Reply Ex. A.[5]  "An underlying principle of risk-adjustment systems," the Academy explained, "is that there needs to be consistency in the way the model was developed and how it is used."  *Id.* at 1.  The proposed RADV methodology violated that principle because it entailed taking "risk-adjustment factors [that] were developed with FFS data that . . . were not validated or audited for accuracy" and then "apply[ing] those factors only to MA data that are validated."  *Id.* at 1-2.  The Academy explained that a risk factor (*i.e.*, risk coefficient) calculated on the basis of unaudited FFS data will be "understated relative to the factor that would have resulted from using only substantiated diagnoses, because the lower-cost patients"—that is, beneficiaries with the code but not the condition (and therefore not the costs)—"would have lowered the average spending amounts among those identified as [having the condition] in the FFS data."  *Id.* at 2.  In light of those "understated" risk coefficients, for "total payments" to "be adequate," the coefficients must be "applied to similarly non-validated [MA] data."  *Id.*  By contrast, if "that same factor is applied only to those with substantiated data . . . the total payments could be too low."  *Id.*  In other words, payment amounts calculated using unverified FFS diagnosis codes should likewise be applied to unverified MA diagnosis codes.  In short, the Academy shared the same not-at-all "odd" theory as the MA plans—and the same theory expressed in the FFS Adjuster Documents: that applying the risk adjustment coefficients yielded by CMS's model only to diagnoses that are

---

[5] Unlike the FFS Adjuster Documents, this letter from the American Academy of Actuaries was included by CMS in its designation of the administrative record in this case.

14

documented in medical charts would indeed cause payment calculations to go "haywire." Opposition at 5.

The FFS Adjuster Documents likewise illustrate the Opposition's misunderstanding of the parallel objection to the Overpayment Rule. The Opposition says United and other "commenters' theory appeared to be that the published risk scores accurately calculated the expected medical costs of a Medicare Advantage beneficiary so long as no one examined the accuracy of the diagnoses assigned to her, but became unreliable the moment any attempt at verification was made." Opposition at 6. This is a misreading of United's position. United's argument is that risk coefficients calculated on the basis of unaudited FFS data produce unreliable results at the group level when they are applied only to audited MA data. Put another way, CMS cannot determine the amount of the risk payments by looking at unverified diagnosis codes in the FFS data but then make those payments only for verified diagnosis codes in the MA data. By treating any payment to an MA plan for an unsupported diagnosis code as an overpayment, the Overpayment Rule violates this principle. *See generally* United S.J. Mem. at 29-42.

The Opposition's confused understanding of the objections to the proposed RADV methodology and the Overpayment Rule strengthens the case for including the FFS Adjuster Documents in the administrative record. That confusion suggests that CMS did not consider all the relevant factors when promulgating the Overpayment Rule. The FFS Adjuster Documents provide key "background information" on that issue. *See Lee Mem'l Hosp.*, 109 F. Supp. 3d at 47 (noting that one "unusual circumstance" that can justify supplementation is where "background information" is needed "to determine whether the agency considered all the relevant factors") (citation omitted). And the Opposition's misunderstanding of United's

arguments further confirms that the FFS Adjuster Documents are adverse to CMS's decision to adopt the Overpayment Rule. Given their adverse nature, they should be added to the record even if they are deliberative. *See Banner Health*, 2013 WL 11241368, at \*6 ("This consideration [*i.e.*, the adverse nature of a draft document] alone calls for supplementation of the record . . . .").

## CONCLUSION

It is worth reiterating two things the Opposition does *not* say. It does not say that the analysis contained in the FFS Adjuster Documents is wrong or flawed in any way. And it does not say that heads of HHS or CMS actually disagree with that analysis—only that they have not "endorsed" it, at least "publicly." The Opposition does not say these things because it cannot: the analysis is sound. Yet when United presents the same analysis, the government characterizes it as odd, overly simplified, or illogical. The government should not be permitted to criticize United's argument as misguided while at the same time excluding from the record documents prepared by senior CMS staff that unquestionably *support* United's argument. Simple fairness requires supplementation of the record here.

October 23, 2017

Respectfully submitted,

/s/ *Daniel Meron*
Daniel Meron (D.C. Bar No. 450419)
Benjamin W. Snyder (D.C. Bar No. 1020481)
Graham E. Phillips (D.C. Bar No. 1035549)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
daniel.meron@lw.com

*Attorneys for Plaintiffs*