**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITEDHEALTHCARE INSURANCE COMPANY, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>ERIC D. HARGAN, in his official capacity as Acting Secretary of the Department of Health and Human Services, *et al.*,<br><br>    Defendants. | No. 1:16-cv-00157 (RMC) |

*AMICUS CURIAE* **BRIEF OF AMERICA'S HEALTH INSURANCE PLANS
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

David W. Ogden (DC Bar No. 375951)
Brian M. Boynton (DC Bar No. 483187)
Kevin M. Lamb (DC Bar No. 1030783)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C.  20006
Tel.: 202-663-6000
Fax: 202-663-6363
david.ogden@wilmerhale.com

*Counsel for Amicus Curiae America's Health Insurance Plans*

## CORPORATE DISCLOSURE STATEMENT

America's Health Insurance Plans is a national trade association that represents the health insurance community, including, as relevant here, member companies that provide health and supplemental benefits through Medicare and Medicaid.  It has no parent company, and no publicly traded company owns 10 percent or more of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ....................................................................... i

TABLE OF AUTHORITIES ....................................................................................... iii

STATEMENT OF INTEREST OF AMICUS CURIAE ................................................1

INTRODUCTION ....................................................................................................2

BACKGROUND .......................................................................................................4

ARGUMENT ............................................................................................................6

I.    THE STATUTORY ACTUARIAL EQUIVALENCE REQUIREMENT PRECLUDES
      CMS FROM APPLYING A DIFFERENT STANDARD OF ACCURACY FOR MA
      RISK-ADJUSTMENT DATA THAN IT DOES FOR FFS DATA, UNLESS IT
      COMPENSATES FOR THE DIFFERENCE ...................................................................6

      A.    Applying Different Standards of Accuracy Violates Actuarial
            Equivalence ..............................................................................................6

      B.    CMS Itself Recognizes The Need To Apply An FFS Adjuster
            When Auditing MAOs .............................................................................9

II.   THE OVERPAYMENT RULE VIOLATES THE ACTUARIAL EQUIVALENCE
      REQUIREMENT ......................................................................................................11

      A.    The Overpayment Rule Purports To Apply A Different Standard
            Of Accuracy Than CMS Uses For FFS Data Without Applying An
            FFS Adjuster ...........................................................................................11

      B.    The Requirement That MAOs Certify The Accuracy Of Their
            Risk-Adjustment Data Does Not Support The Rule ...............................13

III.  A RULING ON THE STANDARDS GOVERNING RISK ADJUSTMENT IS
      NECESSARY TO SERVE THE MEDICARE BENEFICIARIES DEPENDENT ON THE
      CONTINUED SUCCESS OF MEDICARE ADVANTAGE ..............................................15

CONCLUSION .......................................................................................................17

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Deal v. United States*,
    508 U.S. 129 (1993) .......................................................................................................... 13

*Decker v. Northwest Environmental Defense Center*,
    568 U.S. 597 (2013) .......................................................................................................... 11

*Lengerich v. Department of Interior*,
    454 F.3d 1367 (Fed. Cir. 2006) ......................................................................................... 13

*Motor Vehicle Manufacturers Association of U.S., Inc. v. State Farm Mutual*
    *Automobile Insurance Co.*, 463 U.S. 29 (1983) ................................................................ 13

*Powerex Corp. v. Reliant Energy Services, Inc.*,
    551 U.S. 224 (2007) .......................................................................................................... 12

*United States v. Larionoff*,
    431 U.S. 864 (1977) .......................................................................................................... 11

## STATUTES, RULES, AND ADMINISTRATIVE MATERIALS

5 U.S.C. § 706(2) .......................................................................................................................... 15

42 U.S.C.
    § 1320a-7k(d)(1) ............................................................................................................... 11
    § 1320a-7k(d)(2) ............................................................................................................... 11
    § 1320-7k(d)(4)(B) ............................................................................................................ 11
    § 1320a-7k(d)(4)(C)(i) ...................................................................................................... 11
    § 1395w-23(a)(1)(C)(i) ............................................................................................... 1, 2, 6

42 C.F.R.
    § 422.310(e) ........................................................................................................................ 9
    § 422.311(a) ........................................................................................................................ 9
    § 422.504(*l*) .............................................................................................. 11, 13, 14, 15, 17

74 Fed. Reg. 54,634 (Oct. 22, 2009) .............................................................................................. 9

79 Fed. Reg. 29,844 (May 23, 2014) ............................................................................. 2, 11 12, 13

CMS, Monthly Contract and Enrollment Summary Reports, *available at*
    https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-
    Trends-and-Reports/MCRAdvPartDEnrolData/Monthly-Contract-and-
    Enrollment-Summary-Report.html ...................................................................................... 4

CMS, *Supporting Statement, Part A, Collection of Diagnostic Data from Medicare Advantage Organizations for Risk Adjusted Payments* (2016), *available at* https://www.cms.gov/Regulations-and-Guidance/Legislation/Paperwork ReductionActof1995/PRA-Listing-Items/CMS-10062.html?DLPage= 1&DLEntries=10&DLSort=0&DLSortDir=ascending ...................................................16

GAO, *Medicare Advantage: Fundamental Improvements Needed in CMS's Effort to Recover Substantial Amounts of Improper Payments* (Apr. 2016), *available at* http://www.gao.gov/assets/680/676441.pdf....................................................16

Health Care Finance Administration, *Report to Congress:  Proposed Method of Incorporating Health Status Risk Adjusters into Medicare+Choice Payments* (Mar. 1999), *available at* https://www.cms.gov/Medicare/Health-Plans/ MedicareAdvtgSpecRateStats/Downloads/RTCRiskAdjusters1999.pdf ............6, 8, 12, 16

## DICTIONARIES

American Heritage Dictionary (5th ed. 2017) ...............................................................14

Merriam-Webster Dictionary (online ed. 2017) ...........................................................14

Oxford English Dictionary (3d ed. 2011) .....................................................................14

## OTHER AUTHORITIES

Actuarial Standards Board, Actuarial Standard of Practice No. 45 § 3.2, *available at* http://www.actuarialstandardsboard.org/asops/use-health-status-based-risk-adjustment-methodologies...................................................................................7

American Academy of Actuaries, *Risk Assessment and Risk Adjustment* (May 2010), *available at* https://www.actuary.org/pdf/health/Risk_Adjustment_ Issue_Brief_Final_5-26-10.pdf .......................................................6, 8, 12, 16

AHIP, *Statement for the Record Submitted to the House Ways and Means Committee, Subcommittee on Health* (June 7, 2017), *available at* https://www.ahip.org/wp-content/uploads/2017/06/statement-for-WM-MA-hearing-06-07-17.pdf ..........................................................................................5

AHIP, *Medicare Advantage: Promoting Integrated and Coordinated Care for Medicare Beneficiaries* (June 7, 2017), https://www.ahip.org/ma-promoting-integrated-and-coordinated-care-for-medicare-beneficiaries ...........................4

Chung, Sukyung, et al., *Medicare Annual Preventive Care Visits: Use Increased Among Fee-For-Service Patients, But Many Do Not Participate*, 34 Health Affairs 11 (Jan. 2015) ..........................................................................................5

Huckfeldt, Peter J., et al., *Less Intense Postacute Care, Better Outcomes For Enrollees In Medicare Advantage Than Those In Fee-For-Service,* 36 Health Affairs 91 (Jan. 2017) ............................................................5

Jacobson, Gretchen, et al., *Medicare Advantage 2016 Spotlight: Enrollment Market Update* (May 11, 2016), http://files.kff.org/attachment/Issue-Brief-Medicare-Advantage-2016-Spotlight-Enrollment-Market-Update .....................................4

Johnson, Garret, *Recent Growth In Medicare Advantage Enrollment Associated With Decreased Fee-For-Service Spending In Certain US Counties,* 35 Health Affairs 1707 (Sept. 2016) .........................................................5

Morgan, Paulette C., *Congressional Research Service, Medicare Advantage Risk Adjustment and Risk Adjustment Data Validation Audits* (Mar. 5, 2012), *available at* https://www.everycrsreport.com/files/20120305_R42134_a6e20dc548dd0e22698beb424076ff612a2715b4.pdf ....................................................6, 10

Pope, Gregory C., *Risk Adjustment of Medicare Capitation Payments Using the CMS-HCC Mode,* 25 Health Care Financing Review 119 (Summer 2004), available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/HealthCareFinancingReview/downloads/04summerpg119.pdf.........................7

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

America's Health Insurance Plans ("AHIP") is the national trade association representing the health insurance community.  AHIP's members provide health and supplemental benefits through employer-sponsored coverage, the individual insurance market, and public programs such as Medicare and Medicaid.

AHIP's members include private insurance companies known as Medicare Advantage organizations ("MAOs"), with which the U.S. Centers for Medicare & Medicaid Services ("CMS") contract to provide insurance benefits to Medicare beneficiaries through the Medicare Advantage ("MA") program.  MA plans offer an alternative to the federally administered, traditional Medicare program.  Beneficiaries who opt to receive their Medicare benefits through MAOs are entitled, through their private MA plans, to insurance coverage for at least the same set of services covered by traditional Medicare.  AHIP advocates for public policies that expand access to affordable health coverage to all Americans, including through the MA program.

Eighty-four of AHIP's members offer MA plans.  AHIP is thus well situated (1) to address the requirement that the government's payments to MA plans be calculated in a manner that ensures "actuarial equivalence," 42 U.S.C. § 1395w-23(a)(1)(C)(i); (2) to explain how the 2014 CMS rule at issue in this case (the "Overpayment Rule" or "Rule") violates this statutory command and why the regulatory obligation that MAOs certify the "accuracy" of certain MA data provides no support for the Rule; and (3) to emphasize the strong public interest that will be

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than the amicus, its members, or its counsel made a monetary contribution intended to fund the brief's preparation or submission.  Plaintiff United is not a member of AHIP.  Plaintiffs consent to—while defendants take no position regarding—the filing of this brief.  *See* Fed. R. App. P. 29; D.D.C. L.R. 7(o).

served by a ruling that supplies a clear explanation of the applicable statutory and regulatory standards governing the MA program.

## INTRODUCTION

The Court should grant Plaintiffs' motion for summary judgment (Dkt. 47) and vacate the Overpayment Rule.  AHIP submits this brief to make clear that the legal issues presented here are central to the operation of the Medicare Advantage program, and to urge the Court, in resolving those issues, to clarify the governing law so that millions of Medicare beneficiaries will receive the benefits Congress intended.

Congress created the MA program to offer Medicare beneficiaries the opportunity to receive high-quality, efficient managed care through private health plans, with cost savings redounding to the benefit of both patients and the federal government.  Approximately 19 million Americans—roughly one-third of all Medicare beneficiaries—receive their health care today under the MA program.  Enrollment has climbed consistently over the last decade as patients enjoy high-quality, efficiently-delivered health care coverage.  Studies show that MA patients have better health outcomes in numerous respects, including lower hospital readmission rates. Additionally, the MA program results in cost savings for traditional Medicare.

For the MA program to function as intended, CMS must make "risk-adjustment" payments to MAOs based on patients' demographic characteristics and health status in a manner that "ensure[s] actuarial equivalence."  42 U.S.C. § 1395w-23(a)(1)(C)(i).  The MA program payment rules, including the risk-adjustment requirements, are complicated.  But the issue in this case is simple.  CMS has chosen to develop a risk-adjustment model to achieve actuarially equivalent payments by using *unsubstantiated* diagnosis codes from traditional fee-for-service ("FFS") Medicare—*i.e.*, FFS diagnosis codes that are not independently verified against the patients' medical charts.  Yet the Overpayment Rule (79 Fed. Reg. 29,844 (May 23, 2014))

applies a different substantiation standard—requiring MAOs to report and return any payments based on diagnosis codes that are not fully substantiated—without making an adjustment of the kind required by the "actuarial equivalence" requirement.  AHIP does not contend that CMS is prohibited from using unsubstantiated FFS data to establish the risk factors:  It is the inconsistent approach—using unsubstantiated data to set the risk factors but insisting that MAOs submit substantiated data—that violates the principle of actuarial equivalence and therefore is arbitrary and capricious and contrary to law.  CMS has never explained how its decision to impose a different and higher substantiation standard on MAOs' data than it imposes on itself in setting the risk factors can possibly satisfy the statutory standard.  That is because there can be no rational explanation.

In response to questions about this issue that were raised in the regulatory process, CMS merely pointed to the fact that MAOs are required to certify the "accuracy" of their risk-adjustment data.  However, that requirement lends no support to the Overpayment Rule.  The Court should hold that the certification regulation can be consistent with the actuarial equivalence requirement—and thus consistent with the governing statute—only if the certification of "accuracy" is understood to mean that to the best of the MAO's knowledge, information, and belief, the rate of errors in its data is commensurate with the error rate of the FFS data on which payment is based.  That is, the term "accuracy" cannot mean error-free as judged against medical charts.  It must mean accurate as compared to the FFS data used in CMS's risk-adjustment model.  CMS's contrary—and wholly unsupported—view should be expressly rejected by this Court to provide certainty on this issue that is foundational to the proper functioning of the MA program.

CMS's failure to adhere to these principles and its arbitrary approach to interpreting the statute threaten the continued success of Medicare Advantage. The Overpayment Rule undercuts this vital program by disregarding a core principle—that the payment system be designed to achieve "actuarial equivalence." The Court should vacate the Rule and, to safeguard the MA program, should take this opportunity to clearly articulate the statutory standards that govern risk-adjusted payments and MAOs' obligations under the program.

## BACKGROUND

The MA program, which promotes cost-saving practices while simultaneously improving health outcomes, is a critical component of our nation's health care system. The number of MA enrollees has steadily climbed over the past decade. *See* Gretchen Jacobson et al., *Medicare Advantage 2016 Spotlight: Enrollment Market Update* 1 (May 11, 2016). From June 2016 to June 2017 alone, membership grew 7.5 percent. *Compare* CMS, *Monthly Contract and Enrollment Summary Report* (July 2017) (approximately 18.6 million MA members), *with* CMS, *Monthly Contract and Enrollment Summary Report* (July 2016) (approximately 17.3 million MA members). As of CMS's October 2017 monthly report, over 18.8 million people, or 32 percent of all Medicare program participants, were enrolled in an MA plan. *See* CMS, *Monthly Contract and Enrollment Summary Report* (Oct. 2017). In addition to being popular with Medicare beneficiaries, the MA program enjoys strong bipartisan congressional support. In advance of CMS's announcement of 2018 MA plan payment rates, more than 320 members of Congress— Democratic and Republican—wrote letters urging the agency to avoid payment cuts and maintain stable coverage options. *See* AHIP, *Medicare Advantage: Promoting Integrated and Coordinated Care for Medicare Beneficiaries* (June 7, 2017). The reason for the MA program's widespread popularity is simple: MA plans deliver better care while decreasing costs and using the cost savings to provide additional services to their members.

For example, MA plans coordinate physician services, hospital care, and prescription drug benefits through an integrated approach, ensuring that beneficiaries receive streamlined treatment in a timely and efficient manner.  *See* AHIP, *Statement for the Record Submitted to the House Ways and Means Committee, Subcommittee on Health* 2 (June 7, 2017).  MA plans also focus on preventing illness, managing chronic conditions, and employing best practices to improve health status.  One study found that MA plans' rates of annual preventive care visits was 20 percent higher than FFS rates.  *See* Sukyung Chung et al., *Medicare Annual Preventive Care Visits: Use Increased Among Fee-For-Service Patients, But Many Do Not Participate*, 34 Health Aff. 11, 16 (Jan. 2015).  Another revealed that following a hospital discharge, MA patients "exhibited better outcomes than their FFS Medicare counterparts, including lower rates of hospital readmission and higher rates of return to the community."  Peter J. Huckfeldt et al., *Less Intense Postacute Care, Better Outcomes For Enrollees In Medicare Advantage Than Those In Fee-For-Service*, 36 Health Aff. 91, 91 (Jan. 2017).  Researchers have found that the MA program has spillover effects for FFS spending:  In counties with high baseline MA penetration rates, each 10-percentage-point increase in MA penetration was associated with a decrease in per-patient annual FFS spending.  *See* Garret Johnson, *Recent Growth In Medicare Advantage Enrollment Associated With Decreased Fee-For-Service Spending In Certain US Counties*, 35 Health Aff. 1707, App. Ex. 5a (Sept. 2016).  Given the significant contributions of the MA program, its continued success is important to the health care system as a whole.

**ARGUMENT**

I.   **THE STATUTORY ACTUARIAL EQUIVALENCE REQUIREMENT PRECLUDES CMS FROM APPLYING A DIFFERENT STANDARD OF ACCURACY FOR MA RISK-ADJUSTMENT DATA THAN IT DOES FOR FFS DATA, UNLESS IT COMPENSATES FOR THE DIFFERENCE**

A.   **Applying Different Standards Of Accuracy Violates Actuarial Equivalence**

CMS is required by statute to "adjust the payment amount" to MAOs "for such risk factors as age, disability status, gender, institutional status, and such other factors as the Secretary determines to be appropriate, including adjustment for health status …, *so as to ensure actuarial equivalence*." 42 U.S.C. § 1395w-23(a)(1)(C)(i) (emphasis added).   Risk adjustment ensures that MA plans have the resources to provide coverage to their populations, and it eliminates structural incentives that may favor enrollment of certain individuals, thus furthering the goal of broad MA plan availability to all otherwise eligible Americans.   *See* American Academy of Actuaries, *Risk Assessment and Risk Adjustment* 1 (May 2010) ("*AAA Risk Adjustment*") ("A well-designed risk-adjustment system is one that properly aligns incentives, limits gaming, and protects risk-bearing entities (e.g., insurers, health plans)."); Health Care Financing Administration, *Report to Congress:  Proposed Method of Incorporating Health Status Risk Adjusters into Medicare+Choice Payments*, App. 4, at 5 (Mar. 1999) ("*HCFA 1999 Report*") ("A key goal of the risk adjustment process is to more equitably match financial reimbursement with financial liability within an insurance system."); Paulette C. Morgan, *Congressional Research Service, Medicare Advantage Risk Adjustment and Risk Adjustment Data Validation Audits* 1 (Mar. 5, 2012) ("*CRS Medicare Advantage Risk Adjustment*") ("In the simplest case, assume that on average the costs of providing a package of health care benefits to women are $100 more than the cost of providing the same set of benefits to men.  In this hypothetical situation, if a payer, such as Medicare, paid the same amount to insurers for

covering both men and women, insurers would have a strong financial incentive to enroll men and avoid enrolling women.").

Generally accepted actuarial principles require consistency between the way a risk-adjustment model is developed and how it is used. The Actuarial Standards Board's Actuarial Standards of Practice provide guidelines for an actuarial review of risk-adjustment models. The Standards provide that "[t]he type of input data that is used in the application of risk adjustment should be reasonably consistent with the type of data used to develop the model." Actuarial Standard of Practice No. 45 § 3.2.

CMS has elected to calculate risk-adjustment payments using unsubstantiated FFS diagnosis codes to determine the expected additional costs of providing coverage to a beneficiary with a particular medical condition. Thus, a not-insignificant portion of the FFS diagnosis codes used by CMS to calculate risk factors are unsupported by an underlying medical chart. *See* Gregory C. Pope, *Risk Adjustment of Medicare Capitation Payments Using the CMS-HCC Model*, Health Care Fin. Rev., Summer 2004, at 129 ("Concern about the quality of diagnostic reporting is the greatest in physician offices, where diagnoses have not heretofore affected payment, and recording of diagnoses is less rigorously practiced than in hospitals"). But CMS does *not* audit these diagnosis codes to verify that they have support in the patients' medical records. *See* AR 5315. CMS's risk model thus incorporates a baseline rate of undocumented diagnoses from FFS providers into its estimate of each risk factor.

AHIP does not contend that CMS is foreclosed from relying on unsubstantiated FFS data to set the risk factors. Indeed, there appear to be powerful reasons of efficiency and resource conservation that justify that choice. But having developed a model based on unsubstantiated diagnosis codes, CMS is required to apply its risk factors to determine risk-adjustment payments

to MAOs *using the same standard* for MA plans, unless it makes an adjustment that compensates

for the effects of any differences.  That is, the risk-adjustment system requires CMS to determine

risk-adjustment payments using the diagnosis codes MAOs submit for each of their enrollees,

without requiring MAOs to substantiate those codes in underlying medical charts.  Plaintiffs'

example involving the calculation of a risk factor for diabetes illustrates the point.  *See* United

Br. 11-12.  In the example, the risk factor for diabetes is calculated based on data showing an

increased expenditure of $3,000 per individual coded as diabetic whereas using audited FFS data

would have raised the estimate to $4,000 per patient.  Applying the risk factor calculated based

on the estimate of $3,000 in increased spending per patient to *audited* MA data would not fairly

and adequately compensate the MAO for covering the expected health care costs of $4,000 per

patient.  That under-compensation, unless adjusted, would result in a lack of "actuarial

equivalence."[2]

In the absence of an adjustment, actuarial equivalence is properly achieved by using MA

data with characteristics similar to the FFS data used to set the risk scores.  Unless an MAO's

data has an error rate that exceeds that of FFS data, there is no overpayment to the MAO, and the

statutory objective will be achieved.

---

[2] For the reasons Plaintiffs explain, the relative under-compensation of MAOs for
patients with a particular health condition leads to discrepant treatment of identical patients in
FFS Medicare and MA.  *See* United Br. 22-28.  In addition, this relative under-compensation
makes patients with the condition costlier for the MAO to insure relative to the average Medicare
beneficiary, thereby disrupting actuarial equivalence among MA members posing different levels
of risk.  "A well-designed risk-adjustment system is one that properly aligns incentives, limits
gaming, and protects risk-bearing entities (e.g., insurers, health plans)."  *AAA Risk Adjustment* 1.
Systematic under-compensation for particular health conditions undermines each of these goals.

### B.     CMS Itself Recognizes The Need To Apply An FFS Adjuster When Auditing MAOs

CMS performs a limited number of annual audits of MAOs known as Risk Adjustment Data Validation ("RADV") audits.  *See* 42 C.F.R. §§ 422.310(e), 422.311(a).  "RADV audits determine whether the diagnosis codes submitted by MA[Os] can be validated by supporting medical record documentation."  AR 5311.  To conduct a RADV audit for a particular MAO, CMS selects a sample of enrollees and requires the MAO to submit medical records to support the diagnosis codes that contributed to the sampled beneficiaries' risk scores for the payment year at issue.  AR 5312-5313.  CMS then determines whether the diagnosis codes are supported by the medical records and calculates corrected risk scores and risk-adjustment payments for the sampled beneficiaries based exclusively on codes deemed to have sufficient support.  *See* AR 5313.  Finally, CMS extrapolates its findings of "enrollee-level" payment errors to derive a "payment error estimate" for the entire contract.  AR 5314.

When CMS first began conducting RADV audits, it calculated error rates only for the sampled enrollees and required an audited MAO to return only the "relatively small" amount of payments based on unsupported diagnosis codes for the sampled beneficiaries.  74 Fed. Reg. 54,634, 54,674 (Oct. 22, 2009).  In 2008, CMS "announced its plans to make *contract-level* payment adjustments using payment error findings from a sample of enrollees from each of the selected contracts"—"a major change to [its] RADV audit approach."  *Id.* (emphasis added).  In 2010, CMS published a proposed methodology for extrapolating from its findings of enrollee-level payment errors to the contract level and indicated that MAOs would be required to repay the estimated contract-level payment error.  *See* AR 5022.  The proposed methodology, however, did not account for CMS's reliance on unaudited FFS data to calculate the risk factors used to determine risk-adjustment payments in the first instance.

Many commenters, including AHIP, raised concerns about CMS's failure to account for

the errors in the FFS data used to calculate the risk model, explaining how the proposal would

lead to under-compensating MAOs for MA beneficiaries with greater health risks.  *See, e.g.*, AR

5269; AR 5053-5057.  Perhaps most notably, the American Academy of Actuaries pointed out

that this risk model was developed from unaudited FFS data and that requiring MAO diagnosis

codes to be validated would therefore be inconsistent with the model and could create

"systematic underpayment."  AR 5236; *see also CRS Medicare Advantage Risk Adjustment* 16-

17.  The comments from the American Academy of Actuaries explained:

> Our primary concern with the proposed audit process is that it creates an
> inconsistency between how the risk-adjustment factors were developed and how
> they now would be applied.  An underlying principle of risk-adjustment systems
> is that there needs to be consistency in the way the model was developed and how
> it is used.  The CMS-HCC risk-adjustment factors were developed with FFS data
> that, to the best of our knowledge, were not validated or audited for accuracy.
> The proposed audit process, however, effectively would apply those factors only
> to MA data that are validated.  In other words, the data used in the RADV audit to
> determine a plan's payment error are fundamentally and materially different from
> the data used to develop the risk-adjustment model.
>
> If, as a result of the RADV audit, for example, certain lower-cost enrollees no
> longer are considered diabetic but would have been considered diabetic in the FFS
> data used to develop the risk scores, then the payment for diabetic members in the
> payment year could be inadequate.  In this example, the risk score factor
> associated with diabetes would be understated relative to the factor that would
> have resulted from using only substantiated diagnoses, because the lower-cost
> patients would have lowered the average spending amounts among those
> identified as diabetics in the FFS data.  When that factor is applied to similarly
> non-validated data, the total payments for those with diabetes would be adequate.
> *When that same factor is applied only to those with substantiated data, however,
> the total payments could be too low.*

AR 5235-5236 (emphasis added).

CMS acknowledged the problem and responded in its Final Notice by announcing that it

would use an "FFS Adjuster" to account for the inconsistency.  AR 5314.  CMS explained that

the FFS Adjuster would work "as an offset to the preliminary recovery amount" determined in a

RADV audit.  AR 5314.  The FFS Adjuster would thereby "account[] for the fact that the documentation standard used in RADV audits to determine a contract's payment error (medical records) is different from the documentation standard used to develop the Part C risk-adjustment model (FFS claims)."  AR 5314-5315.  The amount of this adjustment is to "be calculated by CMS based on a RADV-like review of records submitted to support FFS claims data."  AR 5315.

## II.    THE OVERPAYMENT RULE VIOLATES THE ACTUARIAL EQUIVALENCE REQUIREMENT

"It is a basic tenet [of administrative law] that 'regulations, in order to be valid, must be consistent with the statute under which they are promulgated.'"  *Decker v. Northwest Envtl. Def. Ctr.*, 568 U.S. 597, 609 (2013) (quoting *United States v. Larionoff*, 431 U.S. 864, 873 (1977)).  The Overpayment Rule, however, defines an "overpayment" in the context of risk-adjustment payments contrary to the statutory actuarial equivalence requirement.  Moreover, when this objection was raised in comments on the agency's proposed rule, CMS's primary response was to simply disagree and to point to another regulation—a certification requirement in 42 C.F.R. § 422.504(*l*)—which does not (and indeed could not) justify violating the governing statute.[3]

### A.     The Overpayment Rule Purports To Apply A Different Standard Of Accuracy Than CMS Uses For FFS Data Without Applying An FFS Adjuster

Under the 2010 amendments to the Medicare statute, an MAO is obligated to "return [an] overpayment to the Secretary" within "60 days after the date on which the overpayment was identified."  42 U.S.C. § 1320a-7k(d)(1)-(2), (d)(4)(C)(i).  Congress defined an "overpayment" as "any funds" to which an MAO "is not entitled" under the Medicare statute.  *Id.* § 1320a-

---

[3] CMS also stated that no FFS Adjuster was required because of the "long-standing risk adjustment data requirement that a diagnosis submitted to CMS by an MA[O] for payment purposes must be supported by medical record documentation."  79 Fed. Reg. at 29,921-29,922.  But for the reasons Plaintiffs explain, that is not a justification for violating the actuarial equivalence requirement.  *See* United Br. 41-42.

7k(d)(4)(B).  In the context of risk-adjustment payments, the actuarial equivalence requirement determines what MAOs are "entitled" to under the statute, as explained above.

The Overpayment Rule violates the principle of actuarial equivalence by purporting to apply a different standard than CMS applies for FFS data used to calculate risk factors.  As this Court correctly stated in a prior opinion, "[u]nder the CMS Rule, *any* inadequately documented diagnostic code not supported by underlying medical documentation will result in an overpayment."  MTD Order 6 (Dkt. 25) (emphasis added).  CMS took the same position in the rulemaking itself:  "[A] risk adjustment diagnosis [code] that has been submitted for payment but is found to be invalid because it does not have supporting medical record documentation would result in an overpayment."  79 Fed. Reg. at 29,921.  But for the reasons set forth above, because of the way in which CMS has elected to calculate risk-adjustment payments, submission of an "inadequately documented diagnosis code" would *not necessarily* result in an overpayment from the standpoint of actuarial equivalence.  To the contrary, imposing a different standard than CMS uses for FFS data could result in CMS systematically *underpaying* MAOs for insuring riskier patients, violating the statutory actuarial equivalence requirement.[4]  CMS cannot interpret the statutory requirement of actuarial equivalence one way for CMS audits and another way for the Overpayment Rule.  *See Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("[I]dentical words and phrases within the same statute should normally be given the same

---

[4] In theory, CMS could correct this problem by revising the risk model using audited FFS data, but the volume of encounter data makes large-scale auditing impractical.  *See* AR 5274.  "A well-designed risk-adjustment system" must not only properly align incentives and reduce risk selection; it must use methods that "can be implemented at a reasonable cost."  *AAA Risk Adjustment* 8.  Practicality and reasonable cost thus impose independent limitations on the "actuarial soundness" of the risk model.  *HCFA 1999 Report*, App. 4, at 6 ("The risk adjustment mechanism should not be so complex that implementation is extremely cumbersome, thereby adding significant cost to the system.").  *See infra* pp. 16-17.

meaning."); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983) ("[A]n agency changing its course must supply a reasoned analysis[.]").

### B.      The Requirement That MAOs Certify The Accuracy Of Their Risk-Adjustment Data Does Not Support The Rule

During the rulemaking process, commenters specifically asked CMS to clarify that an overpayment cannot arise until an appropriate adjuster (as in the RADV context) is applied.  *See, e.g.*, 79 Fed. Reg. at 29,921.  But the agency "disagree[d]" with these comments, stating that "[o]ur RADV methodology does not change our existing contractual requirement that MA organizations must certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the risk adjustment data they submit to CMS."  *Id.*  CMS appears to be relying on 42 C.F.R. § 422.504(*l*), which requires MAOs to annually "certif[y] (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness" of their risk-adjustment data.  That provision, however, provides no support for CMS's position. CMS's conclusion that any diagnosis code with inadequate medical documentation is not "accura[te]" within the meaning of § 422.504(*l*) is incorrect for at least two reasons.

*First*, in light of CMS's decision to use unaudited FFS data to calculate risk factors, the statutory context compels the conclusion that the only reasonable interpretation of "accuracy" in 42 C.F.R. § 422.504(*l*) is that it means accuracy as compared to the FFS data, not accuracy measured against medical charts.  Courts "construe a regulation in the same manner as [they] construe a statute," *Lengerich v. Dep't of Interior*, 454 F.3d 1367, 1370 (Fed. Cir. 2006), and it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used," *Deal v. United States*, 508 U.S. 129, 132 (1993).  Context is especially important for interpreting "accuracy" because the word can have different meanings in different

settings.  Dictionaries offer two somewhat inconsistent definitions:  error-free and errors within an acceptable standard.  *See, e.g.*, American Heritage Dictionary (5th ed. 2017) ("accurate" means "errorless" or "[d]eviating only slightly or within acceptable limits *from a standard*" (emphasis added)); Oxford English Dictionary (3d ed. 2011) ("exact" or "conforming … with a given standard"); Merriam-Webster Dictionary (online ed. 2017) ("free from error" or "conforming … to a standard").

As a result of CMS's use of unaudited FFS data to calculate risk factors, the statutory context here forecloses the "error-free" meaning.  As explained above, CMS cannot impose a standard for MAO risk-adjustment payments that differs from the standard it uses for FFS data in developing the risk-adjustment model and still achieve actuarial equivalence.  Because CMS has designed that model without auditing diagnosis codes known to have errors, requiring MAOs to certify that their diagnosis codes are error-free as judged against medical charts would apply a different substantiation standard for payment purposes, resulting in systemic underpayments and violating actuarial equivalence.  In view of the standard CMS accepts for FFS data, the Agency cannot interpret "accurate," as used in 42 C.FR. § 422.504(*l*), to require MAOs to submit only substantiated data.  CMS is consequently incorrect that a diagnosis code with inadequate medical documentation is not "accura[te]" for purposes of 42 C.F.R. § 422.504(*l*).  For the certification regulation to be consistent with actuarial equivalence—and thus consistent with the governing statute—a certification of "accuracy" must be understood to mean that to the best of the MAO's knowledge, information, and belief, the rate of errors in its data is commensurate with the error rate of the FFS data on which payment is based, consistent with the approach CMS acknowledges is required in RADV audits.

*Second*, CMS has for nearly a decade defined "accuracy" in the context of coding to mean accurate as compared to FFS coding.  In April 2009, CMS responded to a comment inquiring about how it understood the term "inaccurate coding" by adopting a standard linked to FFS coding:  "MA organizations are coding 'accurately' when they are coding in a manner similar to fee-for-service coding used on the beneficiaries to whom MA plan enrollees are being compared."  AR 4335.  CMS cannot define "accurately" in comparison to FFS coding in 2009 and then, without providing any notice to regulated parties or any explanation, insist that the term "accuracy" in 42 C.F.R. § 422.504(*l*) must be understood to mean error-free as judged against medical charts, even though that is not the standard CMS applied to FFS data.  Rather, following the agency's own guidance, in light of CMS's use of unaudited FFS data, a certification of "accuracy" in § 422.504(*l*) can only mean that the rate of errors in an MAO's diagnostic code data is (to the best of its knowledge, information, and belief) "similar to" the error rate of the FFS data on which payment is based.  AR 4335.

For these reasons, the agency's primary articulated justification for why the Overpayment Rule is consistent with the statutory actuarial equivalence requirement fails.  Section 422.504(*l*) demands certification of only the accuracy of MA data compared to FFS data, consistent with actuarial equivalence.  The Overpayment Rule is accordingly unlawful and must be set aside.  *See* 5 U.S.C. § 706(2).

## III.   A RULING ON THE STANDARDS GOVERNING RISK ADJUSTMENT IS NECESSARY TO SERVE THE MEDICARE BENEFICIARIES DEPENDENT ON THE CONTINUED SUCCESS OF MEDICARE ADVANTAGE

Plaintiffs' challenge to the Overpayment Rule requires this Court to resolve a fundamental dispute between the government and insurers regarding the standards applicable to the risk-adjustment system enacted by Congress.  That system is critical to the continued operation of the MA program, which provides affordable, high-quality care to roughly a third of

Medicare beneficiaries.  Although the Rule is unlawful for many reasons, merely vacating and remanding for further consideration by CMS is unlikely to resolve the core issues in this case, and it risks needless delay—as illustrated by CMS's failure to this day to calculate and publish "[t]he actual amount" of the FFS Adjuster it announced on February 24, 2012.  AR 5315.[5]  To safeguard the continued vitality of the MA program and the interests of beneficiaries Congress meant to serve through the program, AHIP therefore urges this Court not only to vacate the Rule but also to expressly adopt the statutory reasoning offered here.  Only through a clear ruling on these issues can the MA program, and the millions of Medicare beneficiaries who depend on it, have necessary certainty regarding the standards that govern risk-adjustment payments.

Risk adjustment is required in order to compensate MAOs fairly and adequately for their enrollees; it should not be so cumbersome that it is impractical.  *See AAA Risk Adjustment* 8; *HCFA 1999 Report*, App. 4, at 6.  Even assuming it were possible to audit all MA risk-adjustment data to ensure that they were error-free as compared to medical charts, doing so in the context of millions of diagnosis codes would be cost-prohibitive.  One CMS estimate has found that, on average, almost six separate "significant" diagnoses were submitted for each patient through the Risk Adjustment Processing System.  *See* CMS, *Supporting Statement, Part A, Collection of Diagnostic Data from Medicare Advantage Organizations for Risk Adjusted Payments* 8 (2016).  When multiplied by the approximately 18.8 million MA beneficiaries, the contemplated review that would be required to ensure that the data were error free as compared to medical charts would necessitate looking at over 100 million patient diagnoses annually.  The

---

[5] In connection with a report issued by the Government Accountability Office ("GAO") in April 2016, CMS stated that it would "solicit public comments from stakeholders regarding the FFS adjuster in 2016."  GAO, *Medicare Advantage:  Fundamental Improvements Needed in CMS's Effort to Recover Substantial Amounts of Improper Payments* 9 n.23 (Apr. 2016).  But contrary to its assurance to GAO, CMS has not done so.

financial and operational implications for MAOs, hospitals, physicians, and other providers who collect, process, and review this data would be staggering.  That is not a workable system.

Given the size and growth of the MA program and its importance to the health care sector at large, there is a pressing need to provide certainty regarding the rights and responsibilities of MAOs under the risk-adjustment framework.  The uncertainty the Overpayment Rule has created endangers MAOs' ability to continue to offer high-quality, cost-effective coverage, and it thus imperils the overriding public interest in not disrupting the provision of health care to millions of Americans.  There is only one legal interpretation that makes sense in the context of the risk-adjustment system Congress enacted.  The Court should therefore resolve the legal questions at issue in this case in a way that addresses the statutory framework and ensures the proper functioning of the MA risk-adjustment payment system for many years to come.

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiff's motion for summary judgment to clarify that: (1) because CMS uses unsubstantiated FFS data to calculate risk factors, requiring MAOs to audit provider-reported diagnosis codes against medical charts and return any payment based on an unsupported diagnosis code would violate the actuarial equivalence requirement unless CMS applied an FFS Adjuster; and (2) the obligation under 42 C.F.R. § 422.504(*l*) that an MAO certify the "accuracy" of its risk-adjustment data requires a certification only that—to the best of the MAO's knowledge, information, and belief—the rate of errors in its data is commensurate with the error rate of the FFS data on which payment is based, consistent with the approach CMS acknowledges is required in RADV audits.

Dated:  October 25, 2017

Respectfully submitted,

/s/  David W. Ogden
David W. Ogden (DC Bar No. 375951)
Brian M. Boynton (DC Bar No. 483187)
Kevin M. Lamb (DC Bar No. 1030783)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C.  20006
Tel.: 202-663-6000
Fax: 202-663-6363
david.ogden@wilmerhale.com

*Counsel for Amicus Curiae America's Health Insurance Plans*