**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITEDHEALTHCARE INSURANCE COMPANY, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 16-cv-157 (RMC) |
| ERIC D. HARGAN, Acting Secretary of Health and Human Services, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR**
**CROSS-MOTION FOR SUMMARY JUDGMENT AND IN**
**OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 4

      A.      Overview of Medicare .......................................................... 4

      B.      Medicare Payment Models .................................................. 5

      C.      Part C Data Submission ...................................................... 8

      D.      Part C Risk Adjustment .................................................... 14

      E.      Data Validation Audits for Part C Risk Adjustment........... 18

      F.      The Affordable Care Act and the Overpayment Rule ......... 21

STANDARD OF REVIEW .............................................................................. 22

ARGUMENT .................................................................................................... 23

I.      The Secretary's interpretation of "overpayment" as including claims for payment
based on diagnoses unsupported by a beneficiary's medical records is reasonable,
and not contrary to any other statute. ................................................................ 24

      A.      The statutory requirement of "actuarial equivalence" between the
payments to Medicare Advantage insurers and the expected costs of
providing traditional Medicare benefits does not preclude the Secretary's
interpretation of "overpayment." ........................................................ 28

      B.      The statutory requirement that the Secretary publish "[t]he average risk
factor" for traditional Medicare beneficiaries, "using the same
methodology as is expected to be applied in making payments" to
Medicare Advantage insurers does not preclude the Secretary's
interpretation of "overpayment." ........................................................ 31

II.     The Secretary's interpretation of "overpayment" is neither arbitrary nor capricious
in light of the pre-existing regulatory scheme. ................................................. 32

      A.      The "accuracy" and "truthfulness" of reported diagnoses depends on their
documentation in a beneficiary's medical records................................ 32

      B.      The administrative record does not support United's claim that the risk
adjustment model systematically underpays insurers, and the Overpayment
Rule is not the cause of any asserted underpayment............................. 36

      C.      The Secretary's audits of risk adjustment data do not render the
Overpayment Rule arbitrary or capricious............................................ 41

III.   The Secretary's interpretation of "identified" lawfully reiterated a pre-existing
       obligation to exercise due diligence.................................................................................. 43

CONCLUSION...................................................................................................................... 45

## TABLE OF AUTHORITIES

**CASES**

*Am. Bioscience, Inc. v. Thompson*,
   269 F.3d 1077 (D.C. Cir. 2001) ........................................................................... 22

*Appalachian Reg'l Healthcare, Inc. v. Shalala*,
   131 F.3d 1050 (D.C. Cir. 1997) ........................................................................... 6

*Arctic Slope Reg'l Corp. v. FERC*,
   832 F.2d 158 (D.C. Cir. 1987) ..................................................................... 28, 37

*Berger v. Xerox Ret. Income Guar. Plan*,
   338 F.3d 755 (7th Cir. 2003) .............................................................................. 29

*Boehringer Ingelheim Pharma GMBH & Co. KG v. U.S. Food & Drug Admin.*,
   195 F. Supp. 3d 366 (D.D.C. 2016) .................................................................... 31

*Chevron U.S.A., Inc. v. Natural Res. Def. Council*,
   467 U.S. 837 (1984) ............................................................................................ 27

*Ctr. for Biological Diversity v. EPA*,
   749 F.3d 1079 (D.C. Cir. 2014) ......................................................................... 37

*Decatur Cnty. Gen. Hosp. v. Johnson*,
   602 F. Supp. 2d 176 (D.D.C. 2009) ..................................................................... 7

*Edsen v. Bank of Boston*,
   229 F.3d 154 (2d Cir. 2000) ............................................................................... 29

*Envt'l Integrity Proj. v. EPA*,
   425 F.3d 992 (D.C. Cir. 2005) ........................................................................... 44

*Ethyl Corp. v. EPA*,
   541 F.2d 1 (D.C. Cir. 1976) ............................................................................... 37

*Harmon v. Thornburgh*,
   878 F.2d 484 (D.C. Cir. 1989) ........................................................................... 45

*James Madison Ltd. v. Ludwig*,
   82 F.3d 1085 (D.C. Cir. 1996) ........................................................................... 22

*Kidney Ctr. of Hollywood v. Shalala*,
   133 F.3d 78 (D.C. Cir. 1998) ............................................................................... 6

*Marshall Cnty. Health Care Auth. v. Shalala*,
   988 F.2d 1221 (D.C. Cir. 1993) ......................................................................... 22

*Matthews v. Leavitt*,
    452 F.3d 145 (2d Cir. 2006) ................................................................. 5

*Mendoza v. Perez*,
    754 F.3d (D.C. Cir. 2014) ................................................................. 26

*Methodist Hosp. of Sacramento v. Shalala*,
    38 F.3d 1225 (D.C. Cir. 1994) ........................................................... 5, 6

*Nat'l Ass'n of Broadcasters v. FCC*,
    789 F.3d 165 (D.C. Cir. 2015) ............................................................ 30

*Ne. Hosp. Corp. v. Sebelius*,
    657 F.3d 1 (D.C. Cir. 2011) ................................................................. 4

*Rempfer v. Sharfstein*,
    583 F.3d 860 (D.C. Cir. 2009) ........................................................ 22, 23

*Stephens v. U.S. Airways Grp., Inc.*,
    644 F.3d 437 (D.C. Cir. 2011) ........................................................ 28, 30

*Telephone & Data Sys., Inc. v. FCC*,
    19 F.3d 42 (D.C. Cir. 1994) ............................................................... 45

*Thomas Jefferson Univ. v. Shalala*,
    512 U.S. 504 (1994) ..................................................................... 32, 35

*United Seniors Ass'n, Inc. v. Shalala*,
    182 F.3d 965 (D.C. Cir. 1999) ............................................................. 7

*United States ex rel. Kane v. Healthfirst, Inc.*,
    120 F. Supp. 3d 370 (S.D.N.Y. 2015) ............................................... 44, 45

*United States ex rel. Swoben v. United Health Ins. Co.*,
    848 F.3d 1161 (9th Cir. 2016) ..................................................... *passim*

*Univ. Med. Ctr. of S. Nev. v. Shalala*,
    173 F.3d 438 (D.C. Cir. 1999) ............................................................ 23

**STATUTES**

5 U.S.C. § 706(2) ............................................................................. 23

29 U.S.C. § 1054(c)(3) ...................................................................... 29

31 U.S.C. § 3729(b)(1)(A) ................................................................. 21

31 U.S.C. § 3729(b)(3) ...................................................................... 21

iv

42 U.S.C. § 1320a-7k(d) .................................................................................... *passim*

42 U.S.C. § 1320a-7k(d)(1) ................................................................................ 21

42 U.S.C. § 1320a-7k(d)(1)(A) .......................................................................... 21

42 U.S.C. § 1320a-7k(d)(2)(A) .......................................................................... 21

42 U.S.C. § 1320a-7k(d)(3) ................................................................................ 21

42 U.S.C. § 1320a-7k(d)(4)(A) .......................................................................... 21

42 U.S.C. § 1320a-7k(d)(4)(B) ................................................................. 21, 25, 27

42 U.S.C. § 1320a-7k(d)(4)(C)(i) ....................................................................... 25

42 U.S.C. § 1395 *et seq.* ....................................................................................... 4

42 U.S.C. §§ 1395c to 1395i-5 ............................................................................. 4

42 U.S.C. § 1395f(b) ............................................................................................. 5

42 U.S.C. §§ 1395j to 1395w-4 ............................................................................ 4

42 U.S.C. § 1395m(*l*) ............................................................................................. 7

42 U.S.C. § 1395w-4(g)(2)(C) .............................................................................. 7

42 U.S.C. § 1395w-4(g)(2)(D) .............................................................................. 7

42 U.S.C. §§ 1395w-21 to 1395w-29 ................................................................... 4

42 U.S.C. § 1395w-21(a)(1)(A) ............................................................................ 4

42 U.S.C. § 1395w-22(a)(1) .................................................................................. 5

42 U.S.C. § 1395w-22(a)(3) .................................................................................. 5

42 U.S.C. § 1395w-23(a)(1)(A) ............................................................................ 7

42 U.S.C. § 1395w-23(a)(1)(C)(i) ........................................................................ 7

42 U.S.C. § 1395w-23(a)(1)(C)(ii) ...................................................................... 34

42 U.S.C. § 1395w-23(a)(3)(C)(1) ........................................................................ 8

42 U.S.C. § 1395w-23(b)(4) ................................................................................ 31

42 U.S.C. § 1395w-23(b)(4)(A) ........................................................................... 32

v

42 U.S.C. § 1395w-23(b)(4)(B) ................................................................... 32

42 U.S.C. § 1395w-23(b)(4)(D) ................................................................... 32

42 U.S.C. § 1395w-113(b)(4) ...................................................................... 29

42 U.S.C. § 1395w-113(b)(5) ...................................................................... 29

42 U.S.C. § 1395w-115 .................................................................................. 8

42 U.S.C. § 1395ww(d)(1) – (4) ................................................................... 6

Social Security Amendments of 1983,
    Pub. L. No. 98–21, 97 Stat. 65 ................................................................. 6

Balanced Budget Act of 1997,
    Pub. L. No. 105-33,111 Stat. 251 .............................................................. 4

Medicare Prescription Drug, Improvement and Modernization Act of 2003,
    Pub. L. No. 108-173, 117 Stat. 2066.......................................................... 5

Health Care and Education Reconciliation Act of 2010,
    Pub. L. No. 111-152, 124 Stat. 1029........................................................ 34

**REGULATIONS**

42 C.F.R. pt. 405, subpts. D, E ..................................................................... 6

42 C.F.R. § 412.60 ........................................................................................ 6

42 C.F.R. § 412.60(c)(1) ............................................................................... 6

42 C.F.R. § 412.60(c)(2) ............................................................................... 6

42 C.F.R. § 422.257(a) .................................................................................. 8

42 C.F.R. § 422.257(d) ................................................................................ 10

42 C.F.R. § 422.257(d)(1).............................................................................10

42 C.F.R. § 422.257(e).................................................................................. 9

42 C.F.R. § 422.310 ................................................................................ 12, 25

42 C.F.R. § 422.310(d) ......................................................................... *passim*

42 C.F.R. § 422.310(d)(1)............................................................................ 19

42 C.F.R. § 422.310(e)................................................................... 3, 13, 32, 35

42 C.F.R. § 422.326 ........................................................................................... 2, 21, 24, 40

42 C.F.R. § 422.326(a) ................................................................................................ 21, 25

42 C.F.R. § 422.326(c) ................................................................................................. *passim*

42 C.F.R. § 422.502(*l*) .................................................................................................... 9, 10

42 C.F.R. § 422.503(b)(4)(vi) ...................................................................................... 39, 45

42 C.F.R. § 422.504(*i*)(4)(v) ............................................................................................. 26

42 C.F.R. § 422.504(*l*) ................................................................................................. *passim*

42 C.F.R. § 422.504(*l*)(2) ................................................................................................ 25

42 C.F.R. § 423.4 ............................................................................................................ 30

42 C.F.R. § 423.30(a) ....................................................................................................... 5

Establishment of the Medicare+Choice Program,
 63 Fed. Reg. 34,968 (June 26, 1998) ............................................................ 4, 5, 8, 9

Medicare+Choice Program,
 65 Fed. Reg. 40,170 (June 29, 2000) ............................................................... *passim*

Establishment of the Medicare Advantage Program,
 69 Fed. Reg. 46,866 (Aug. 3, 2004) ....................................................................... 12

Establishment of the Medicare Advantage Program,
 70 Fed. Reg. 4588 (Jan. 28, 2005) ............................................................. 12, 13, 29

Policy and Technical Changes to the Medicare Advantage Program,
 74 Fed. Reg. 54,634 (Oct. 22, 2009) ......................................................... 18, 19, 41

Policy and Tehnical Changes to the Medicare Advantage Program,
 75 Fed. Reg. 19,678 (Apr. 15, 2010) ............................................................... *passim*

Policy and Technical Changes to the Medicare Advantage Program,
 79 Fed. Reg. 29,844 (May 23, 2014) ............................................................... *passim*

**INTRODUCTION**

Insurers that offer Medicare Advantage (MA) plans get larger payments for covering people with certain diagnosed diseases.  Covering someone with uncomplicated diabetes, for example, will earn the insurer something on the order of $1000 a year more than it would receive for an otherwise identical person without diabetes.  Sometimes insurers report diseases that are not documented in a beneficiary's medical records, and the government pays them on the basis of that reporting.  The central question in this case is whether such a payment—in our example, a payment of roughly $1000 a year for the added cost of covering someone with diabetes, when the beneficiary in question has no documented history of the disease—is an "overpayment" that must be reported and returned if it is identified.  *See* 42 U.S.C. § 1320a-7k(d).  In promulgating the rule challenged here, the Secretary of Health and Human Services said that the submission of such an "invalid" diagnosis would indeed "result in an overpayment."  Policy and Technical Changes to the Medicare Advantage Program ("Overpayment Rule'"), 79 Fed. Reg. 29,844, 29,921 (May 23, 2014) (AR 1313).

United's argument to the contrary rests on the proposition that the per-disease payments calculated by the Secretary systematically underestimate the costs associated with any given disease.  In our scenario, on United's account, the average marginal cost of covering a patient with diabetes is really $1200 or $1300 a year, but the company is only paid $1000 for each diabetic it insures.  The system nonetheless functions properly, United says, because insurers regularly claim payments for diseases that their beneficiaries appear not to have, and these extra payments compensate for the fact that each individual payment is lower than the expected cost of covering someone with the disease in question.  (How insurers determine the proper number of unsupported claims to submit, United does not say.)  United argues that it is therefore unlawful for the Secretary

to limit insurers to claiming payment for the diseases that are actually recorded in the medical records of their beneficiaries. If insurers are not allowed to submit a substantial proportion of diagnoses not reflected in any medical record, the argument goes, they will necessarily be undercompensated. The submission of invalid diagnoses (and the receipt of payments for them) is not only permitted, United argues—it is, as a practical matter, required.

The Secretary does not recognize the payment system that United describes. Since 1998, Medicare Advantage insurers have been required to certify the "accuracy" and "truthfulness" of the diagnosis data they submit for payment. 42 C.F.R. § 422.504(*l*). The Secretary has always understood a diagnosis to be "accurate" and "truthful" if (and only if) it is substantiated by a medical record. *See United States ex rel. Swoben v. United Health Ins. Co.* ("*Swoben*"), 848 F.3d 1161, 1176 (9th Cir. 2016). The model that calculates per-disease payments has been in place since 2004. Neither the standards for data submission nor the method of calculating per-disease payments has changed in any relevant way since then.

The requirement of medical record documentation—that is, the requirement that diagnoses submitted for payment be substantiated by medical records—appears to be the principal target of United's challenge to the Overpayment Rule, 42 C.F.R. § 422.326. But the insurer has badly missed the mark: the Overpayment Rule did not impose the requirement, and vacating that rule would not lift it. *Compare* Pls.' Br. at 21 (claiming that the Overpayment "Rule requires an MA plan to delete any . . . diagnosis code . . . that the plan knows lacks support in the patient's medical charts") *and id.* at 29 ("Unless an MA plan patient's [diagnosis] can be validated with his or her [medical] charts, under the [Overpayment] Rule it cannot provide the basis for . . . payments.") *with, e.g.*, 2001 Medicare Managed Care Manual ("Manual"), §§ 110.2, 110.4 (AR 5349–50) (interpreting 42 C.F.R. § 422.504(*l*) to obligate insurers "to comply fully with" the Medicare

Advantage "data requirements," which require diagnosis data to "be substantiated by the hospital's medical record"); 2004 Manual, § 111.1, Ex. 30 (AR 5671) (providing that "a medical record must substantiate all diagnostic information provided to CMS"); 2013 Manual, § 40 (AR 5678) ("All diagnosis codes submitted must be documented in the medical record . . . ."). Nothing in the Overpayment Rule affected "the long-standing . . . requirement that a diagnosis submitted to CMS by an MA organization for payment purposes must be supported by medical record documentation." Overpayment Rule, 79 Fed. Reg. at 29,921–22 (AR 1313–14). That requirement is imposed by 42 C.F.R. § 422.504(*l*), which is not being (and could not be) challenged here. *See also* 42 C.F.R. § 422.310(d), (e). It was unaffected by the Overpayment Rule, and therefore cannot support a challenge to that rule.

The requirement that Medicare Advantage insurers "exercise . . . reasonable diligence" in identifying overpayments, 42 C.F.R. § 422.326(c), similarly comports with the statutory scheme and predates the challenged rule. "CMS has long made clear that, under [42 C.F.R.] § 422.504(*l*), Medicare Advantage [insurers] have 'an obligation to undertake "due diligence" to ensure the accuracy . . . and truthfulness' of the [diagnosis] data they submit to CMS and 'will be held responsible for making good faith efforts to certify the accuracy. . . and truthfulness' of these data." *Swoben*, 848 F.3d at 1167 (quoting Medicare+Choice Program ("2000 Rule"), 65 Fed. Reg. 40,170, 40,268 (June 29, 2000) (AR 2006)). The Overpayment Rule's requirement that insurers "exercise . . . reasonable diligence" in identifying overpayments, 42 C.F.R. § 422.326(c), is simply a restatement of their pre-existing obligation to undertake "due diligence" to ensure the "accuracy" and "truthfulness" of the diagnosis data they submit. The Overpayment Rule merely continues the Secretary's established practice, and should be upheld.

## BACKGROUND

### A.    Overview of Medicare

Medicare is a federal health insurance program for the elderly and disabled, *see* 42 U.S.C. § 1395 *et seq.*, which is administered on behalf of the Secretary by the Centers for Medicare & Medicaid Services (CMS).[1]  Part A of the Medicare statute "covers medical services furnished by hospitals and other institutional care providers." *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 2 (D.C. Cir. 2011) (citing 42 U.S.C. §§ 1395c to 1395i-5).  "Health care services covered by Part A include: inpatient hospital care, skilled nursing facility care, home health agency care, and hospice care." Establishment of the Medicare+Choice Program ("1998 Rule"), 63 Fed. Reg. 34,968, 34,968 (June 26, 1998) (AR 1417).  Medicare Part B "is an optional supplemental insurance program that pays for medical items and services not covered by Part A, including outpatient physician services," *Ne. Hosp.*, 657 F.3d at 2, "in both hospital and nonhospital settings," 1998 Rule, 63 Fed. Reg. at 34,968 (AR 1417), as well as "clinical laboratory tests, and durable medical equipment," among other things, *Ne. Hosp.*, 657 F.3d at 2 (citing 42 U.S.C. §§ 1395j to 1395w-4).  First established in 1965, Parts A and B are collectively referred to as "original," "traditional," or—though, as explained below, it is now something of a misnomer—"fee-for-service" (FFS) Medicare.  *See, e.g.*, 42 U.S.C. § 1395w-21(a)(1)(A) (discussing "the original medicare fee-for-service program under parts A and B").  The Secretary will use these terms interchangeably.

Part C of the Medicare statute, 42 U.S.C. §§ 1395w-21 to 1395w-29, enacted as part of the Balanced Budget Act of 1997, Pub. L. No. 105-33, establishes the program now known as Medicare Advantage ("MA")—though often called "Part C"—allowing people to receive their

---

[1] Before July 2001, CMS was known as the Health Care Financing Administration (HCFA).  We refer to both agencies as "CMS."

Medicare benefits through a private health insurance plan.[2]   The introduction of Medicare Advantage was "arguably the most significant change in the Medicare program since its inception in 1965," the "primary goal" of which was "to provide Medicare beneficiaries with a wider range of health plan choices to complement the Original Medicare option."  1998 Rule, 63 Fed. Reg. at 34,968 (AR 1417).  Medicare Advantage insurers "must provide enrollees the benefits and services (other than hospice care) that are available to people . . . under Medicare Parts A and B, *see* 42 U.S.C. § 1395w-22(a)(1), and may also offer supplemental benefits approved by the Secretary of Health and Human Services, *see* 42 U.S.C. § 1395w-22(a)(3)."  *Matthews v. Leavitt*, 452 F.3d 145, 146 n.1 (2d Cir. 2006).

Medicare Part D was enacted in 2003, through the Medicare Prescription Drug Improvement and Modernization Act, Pub. L. No. 108-173, to provide a voluntary prescription drug benefit program to Medicare enrollees.  Under Part D, the Secretary contracts with insurers to administer prescription drug plans.  Individuals entitled to Medicare benefits under Part A or enrolled under Part B (which includes those who choose to receive their benefits through Part C) may enroll in Part D plans.  42 U.S.C. § 1395w–101(a)(3)(A); 42 C.F.R. § 423.30(a).

B.    **Medicare Payment Models**

The Secretary pays differently for each of the four Medicare programs.  Initially, Medicare Part A reimbursements "were based on the 'reasonable costs' of [the] services furnished." *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994) (quoting 42 U.S.C. § 1395f(b) (1988)).  Under this "fee-for-service" regime, "providers were reimbursed for the actual

---

[2] Medicare Advantage was originally called Medicare+Choice, which was abbreviated "M+C." Although we consistently refer to the program as Medicare Advantage, "MA," or "Part C," some record documents retain the older name and abbreviation.

costs that they incurred, provided they fell within certain cost limits." *Id.* But in 1983, "Congress

. . . completely revised the scheme for reimbursing Medicare hospitals." *Id.* (citing Social Security

Amendments of 1983, Pub. L. No. 98-21, § 601, 97 Stat. 65, 149).  Under the current Part A

payment scheme, Medicare reimburses hospitals for inpatient services based on prospectively

determined rates, which are applied to each patient upon discharge, depending on the "diagnosis-

related group" (DRG) to which the patient is assigned.  42 U.S.C. § 1395ww(d)(1)–(4); 42 C.F.R.

§ 412.60; *see Appalachian Reg'l Healthcare, Inc. v. Shalala*, 131 F.3d 1050, 1051 (D.C. Cir. 1997)

("Reimbursement depends on the DRG to which a patient is assigned and the average cost of

treating such a diagnosis, 'regardless of the [actual] number of conditions treated or services

furnished during the patient's stay.'" (quoting 42 C.F.R. § 412.60(c)(2)).  "The classification of a

particular discharge" into the appropriate DRG "is based . . . on the patient's age, sex, principal

diagnosis (that is, the diagnosis established after study to be chiefly responsible for causing the

patient's admission to the hospital), secondary diagnoses, procedures performed, and discharge

status."  42 C.F.R. § 412.60(c)(1).  As one might expect, correctly identifying the principal

diagnosis is essential to the operation of a system based on diagnosis-related groups.  *See* Form

HCFA-1450/UB-92, FL 67 (AR 5462) (instructing Part A providers that "[e]ntering any other

diagnosis [in place of the correct principal diagnosis] may result in incorrect assignment of a DRG

and cause you to be incorrectly paid").

Medicare Part B originally operated on a reasonable cost basis, as well.  "Under the Part B

reimbursement system in place before 1983," "the Secretary paid an independent provider of

outpatient services" or "an outpatient hospital-based provider" 80% of the provider's "reasonable

charge" or "reasonable cost" for providing a given service.  *Kidney Ctr. of Hollywood v. Shalala*,

133 F.3d 78, 81 (D.C. Cir. 1998) (citing 42 C.F.R. pt. 405, subpts. D, E (1982); 47 Fed. Reg. at

6557).  Since that time, however, "[d]octors who provide medical services to Part B beneficiaries" have received "compensation in accordance with fee schedules that limit the amount they may charge and be paid."  *United Seniors Ass'n, Inc. v. Shalala*, 182 F.3d 965, 968 (D.C. Cir. 1999) (citing 42 U.S.C. § 1395w-4(g)(2)(C), (D)).  Payments for most other services provided under Medicare Part B are now also determined by a fee schedule.  *See, e.g.*, *Decatur Cnty. Gen. Hosp. v. Johnson*, 602 F. Supp. 2d 176, 179 (D.D.C. 2009) (discussing 42 U.S.C. § 1395m(*l*), which authorizes the fee schedule for ambulance services).

Although the Secretary requires the submission of patient diagnoses with any claim for payment under Part B, *see* Form HCFA-1500, Item 21 (AR 5554), the payments depend only on the services (or durable goods) provided and not in any way on the diagnoses submitted.  For that reason, the quality of the Part B diagnosis data is generally understood to be inferior to the Part A diagnosis data.  *See* Gregory C. Pope, *Risk Adjustment of Medicare Capitation Payments Using the CMS-HCC Model* at 129 (Summer 2004) (AR 11867) ("Concern about the quality of diagnostic reporting is the greatest in physician offices, where diagnoses have not heretofore affected payment, and recording of diagnoses is less rigorously practiced than in hospitals.").

Under Part C, Medicare Advantage insurers are not paid by the medical services provided, but instead are paid a pre-determined monthly sum for each person they cover, 42 U.S.C. § 1395w-23(a)(1)(A), based in part upon the characteristics of the particular beneficiary being covered.  By statute, the payment to the insurer depends on "such risk factors" as the age, gender, and "health status" of that individual, "as the Secretary determines to be appropriate."  *Id.* § 1395w-23(a)(1)(C)(i).  It does not depend on the medical services actually provided to the beneficiary.  Instead, under this system of "risk adjustment," insurers are paid the expected cost of providing Medicare benefits to a given beneficiary.  Medicare Advantage insurers therefore get more for

providing benefits to older and sicker people, less for younger and healthier ones.  Adjusting the payments in this way allows the Secretary "to ensure actuarial equivalence" (as the Medicare statute requires) between the average payments that CMS would expect to make on behalf of a given beneficiary under traditional, fee-for-service Medicare, and the payments made to Medicare Advantage insurers for covering an individual with those same characteristics.[3]  *Id.*

###    C.    Part C Data Submission

As noted above, risk adjustment of payments to Medicare Advantage insurers is a statutorily-mandated element of the Part C payment system.  In 1997, Congress directed the Secretary to implement "a risk adjustment methodology that accounts for variations in per capita costs based on health status and other demographic factors" by January 1, 2000.  *Id.* § 1395w-23(a)(3)(C)(1).  The Secretary understood that "[t]he implementation of health-status based risk adjusters" would have "major implications for [Medicare Advantage insurers'] data requirements."  1998 Rule, 63 Fed. Reg. at 35,006 (AR 1420).

The agency accordingly announced that it would require insurers to submit "encounter data"—that is, data from each Medicare Advantage participant's encounters with the medical system, such as hospitalizations, doctor's visits, and so on.  *Id.* at 35,092 (AR 1425) (promulgating 42 C.F.R. § 422.257(a)).  CMS explained that "[t]o calculate payment rates, encounter data are necessary to tie payment to expected patient resource use using diagnosis codes."  *Id.* at 35,006 (AR 1420).  The encounter data collected would "be identical to the data we require of original Medicare providers of similar services," *id.*, and would be submitted using the same standard forms (or their electronic equivalents), *id.* at 35,007 (AR 1421).  Those forms required the identification

---

[3] Under Medicare Part D, the Secretary makes payments so as to achieve "an overall subsidy level of 74.5 percent for basic prescription drug coverage." 42 U.S.C. § 1395w-115.

of the principal diagnosis (*i.e.*, the diagnosis that led to the encounter in question) as well as any secondary diagnoses.  *See* Form HCFA-1450/UB-92, FL 67 (AR 5462) (inpatient hospital services); Form HCFA-1500, Item 21 (AR 5554) (outpatient physician services).  CMS said that "[a]udit of the data" submitted by the insurers would "be necessary to ensure accuracy"; and "any audit efforts" would need to "include medical record review for a portion of the submitted data," so that the diagnoses submitted could be confirmed.  1998 Rule, 63 Fed. Reg. at 35,007 (AR 1421); *see id.* at 35,092 (AR 1425) (promulgating 42 C.F.R. § 422.257(e) (requiring Medicare Advantage insurers "to submit medical records for validation of encounter data")).

The Secretary therefore issued interim final regulations in 1998, requiring each Medicare Advantage insurer to "request payment on document[s] that certify the accuracy and completeness of relevant data as a condition of receiving its . . . payment."  *Id.* at 35,017 (AR 1424); *see id.* at 35,103 (AR 1429) (promulgating 42 C.F.R. § 422.502(*l*) (requiring a certification of "accuracy, completeness, and truthfulness")).  The Secretary explained that, when a Medicare Advantage insurer "submits the data in question to [CMS], it is making a 'claim' for . . . payment in the amount dictated by the data submitted," and that "it is important that when [a Medicare Advantage insurer] is claiming payment . . . in a particular amount based upon information it is submitting to [CMS], it should be willing to certify the accuracy of this information."  *Id.* at 35,017 (AR 1424).  CMS believed "that these certifications" would "help ensure accurate data submissions."  *Id.*

Although this requirement of attestation and certification "of the completeness of the data" submitted and "the accuracy of the coding" proved to be "a contentious issue," the Secretary maintained that it was "essential for guaranteeing the accuracy and completeness of data submitted for payment purposes."  2000 Rule, 65 Fed. Reg. at 40,250–51 (AR 1999–2000).  Nonetheless, CMS acknowledged that Medicare Advantage insurers "cannot reasonably be expected to know

9

that every piece of data is correct," and emphasized that this was not "the standard that [CMS] . . . believe[s] is reasonable to enforce." *Id.* at 40,268 (AR 2006).  Because the Secretary did not intend for "simple mistakes" to "result in sanctions," he modified the Medicare Advantage regulations in the year 2000 to include a "'best knowledge, information, and belief' certification standard." *Id.*; *see id.* at 40,327–28 (AR 2008–09) (revising 42 C.F.R. § 422.502(*l*) to require certification of the "accuracy, completeness, and truthfulness" of the data submitted "based on best knowledge, information, and belief").[4]  The Secretary emphasized that because "encounter data will be used as a factor in calculating payments to" Medicare Advantage insurers, "encounter data . . . represent a 'claim' for payment," and insurers therefore "have an obligation to take steps to ensure the accuracy, completeness, and truthfulness of the encounter data." *Id.* at 40,268 (AR 2006).  He described the "steps" the Medicare Advantage insurers were required to take as performing "due diligence," and made clear that the "'best knowledge, information, and belief' standard" incorporated this responsibility "for making good faith efforts to certify the accuracy, completeness, and truthfulness of [the] encounter data submitted." *Id.*

At the same time, the Secretary promulgated 42 C.F.R. § 422.257(d), which required Medicare Advantage insurers to "submit data that conform to the requirements for equivalent data for Medicare fee-for-service when appropriate, and to all relevant national standards." *Id.* at 40,326 (AR 2007) (promulgating 42 C.F.R. § 422.257(d)(1)).  The Ninth Edition of the Clinical Modification of the International Classification of Diseases (ICD-9-CM) was the chief national standard, "published by the United States Government" and "required for reporting diagnoses and

---

[4] Due to a typographical error, 42 C.F.R. § 422.502(*l*) appears in the Federal Register as 42 C.F.R. § 422.502(1).  This regulatory provision is now codified at 42 C.F.R. § 422.504(*l*).  We refer to it consistently by its current codification, even when record documents use the earlier codification.

diseases to all U.S. Public Health Service and [CMS] programs." ICD-9-CM Preface at 1 (AR 11375). The ICD-9-CM emphasized "[t]he importance of consistent, complete documentation in the medical record," without which accurate diagnosis coding "is a difficult, if not impossible, task." ICD-9-CM Coding Guidelines at 5 (AR 11385). To enable "accurate reporting of . . . diagnosis codes," it advised that the medical record "documentation should describe the patient's condition, using terminology which includes specific diagnoses as well as symptoms, problems, or reasons" that the patient sought medical care. *Id.* at 22 (AR 11402).

This requirement of medical record support for diagnoses submitted by Medicare Advantage insurers was emphasized in guidance and training materials dating from this period. The first edition of the Medicare Managed Care Manual—which insurers agree to comply with as a condition of their participation in the Medicare Advantage program, *see* Standard Contract with Eligible Medicare Advantage Organization, Article II, Section A (AR 11801)—reiterated each insurer's obligation to "make a certification . . . based on best knowledge, information, and belief, that the encounter data the [insurer] submits to CMS are accurate, complete, and truthful." 2001 Manual, § 110.2 (AR 5349). While acknowledging that "the volume and variety of data make some inaccuracies inevitable," the Manual told insurers that "the certification standard" included their "obligation to comply fully with the [Medicare Advantage] program's encounter data requirements." *Id.* (AR 5349–50). One such requirement was that "[e]ncounter data . . . be substantiated by the hospital's medical record." *Id.*, § 110.4 (AR 5350).

In 2003, CMS began to publish a risk adjustment training manual for Medicare Advantage insurers. The manual reminded insurers that they "must submit risk adjustment data that are substantiated by the patient's medical record." 2003 Regional Risk Adjustment Training For Medicare+Choice Organizations, Participant Guide ("Participant Guide") at 4-1 (AR 5821); *see*

*also* Quick Facts, ICD-9-CM, June 2003 (AR 5952) (noting that "[t]he medical record must justify the diagnosis" and "[t]he diagnosis reported must match the coding submitted by the hospital/physician as documented in the medical record").  A Medicare Advantage resource guide from this period repeated the requirement that "a medical record must substantiate all diagnostic information provided to CMS."  2003 Regional Risk Adjustment Training For Medicare+Choice Organizations, Resource Guide ("Resource Guide") at 18 (AR 6488).

In 2004, the Secretary proposed regulations to "reflect[] changes . . . made in the methodology for risk adjusting MA payments, under which [CMS] moved from the collection of extensive encounter data to collecting targeted risk-adjustment data."  Establishment of the Medicare Advantage Program ("2004 Proposed Rule"), 69 Fed. Reg. 46,866, 46,903 (Aug. 3, 2004) (AR 2027).  The language in proposed 42 C.F.R. § 422.310 was "similar to that used in . . . the current MA regulations at § 422.257."  *Id.*  The Secretary explained that CMS had "implemented a streamlined process for MA organizations to submit risk-adjustment data," under which an insurer could either "submit risk-adjustment data that conform to the requirements for equivalent fee-for-service data," as formerly required, or "submit data according to an abbreviated format as specified by" CMS.  *Id.*  "The purpose of the abbreviated format [was] to reduce the data submission burden on MA organizations."  *Id.*  The Secretary added that the "current practice" of CMS was "to collect . . . a sample of medical records, for conducting validation studies of the risk adjustment data CMS receives," and that Medicare Advantage insurers would "still be required to submit a sample of medical records in a manner specified by CMS to support the validation studies."  *Id.*; *id.* at 46,969 (AR 2028) (proposing 42 C.F.R. § 422.310(e)).  *See generally* Establishment of the Medicare Advantage Program ("2005 Rule"), 70 Fed. Reg. 4558, 4661 (Jan. 28, 2005) (AR 2232) (language similar to the above in preamble).  The proposed regulations were

12

finalized in 2005, with the added provision that "[t]here may be penalties for submission of false [risk adjustment] data." *Id.* at 4731 (AR 2233). *See* 42 C.F.R. § 422.310(d), (e).

The agency's move from mandating full encounter data to accepting more limited risk adjustment data did not affect the requirement that all diagnoses submitted for payment be supported by medical record documentation, which the agency's guidance and training materials continued to emphasize. The 2004 edition of the Medicare Managed Care Manual said that "a medical record must substantiate all diagnostic information provided to CMS." 2004 Manual, § 111.1, Ex. 30 (AR 5671); *see also id.*, § 111.4 (Feb. 20, 2004) (AR 5604) (explaining that an insurers' decision to use non-standard data sources does not affect its obligation to "ensure that the diagnosis reported to CMS is recorded in the beneficiary's medical record for the data collection period or that the medical record documents the clinical evidence of that specific diagnosis for the data collection period"). The 2004 and 2006 editions of the Participant Guide both reminded insurers that "[t]he source medical record documentation that supports each coded diagnosis must be obtainable and demonstrate adherence to official coding guidelines." 2004 Participant Guide at 5-2 (AR 7235); 2006 Participant Guide at 5-2 (AR 8702). Guidance from 2012 continued to emphasize that "[d]iagnoses must be supported by appropriate medical record documentation." 2012 Regional Technical Assistance, Risk Adjustment Participant Guide at 2-5 (Aug. 7, 2012) (AR 10899). And the 2013 edition of the Medicare Managed Care Manual, which included the most substantial revision of the risk adjustment chapter since 2004, retained the instruction that "[a]ll diagnosis codes submitted must be documented in the medical record." 2013 Manual, § 40 (AR 5678). It has been clear since the beginning of the Medicare Advantage program, and remains clear today, that all diagnoses submitted by insurers as claims for payment must be supported by medical record documentation. *See Swoben*, 848 F.3d at 1176.

13

D.      Part C Risk Adjustment

Although the submission of accurate diagnosis data substantiated by medical records is necessary for CMS to perform risk adjustment based in part on "health status" under 42 U.S.C. § 1395w-23(a)(1)(C)(i), it is not sufficient.  A risk adjustment model is required to translate the diagnosis data into expected costs of coverage.

Since January 2004, the Secretary has used the CMS Hierarchical Condition Category (CMS-HCC) risk adjustment model to perform that conversion.   CMS-HCC is a complex regression model built to estimate the costs associated with certain characteristics of Medicare beneficiaries.  The inputs to the model are data from individuals who receive their benefits through the traditional, fee-for-service Medicare system.  *See* Advance Notice of Methodological Changes for 2014 ("2014 Advance Notice") at 17 (AR 4768).  Its outputs are a set of multipliers—that is, "coefficients"—that "represent the marginal (additional) cost" of each medical "condition or demographic factor (e.g., age/sex group, Medicaid status, disability status)."  2013 Manual, § 70.1 (AR 5684).  The coefficients are added together to form a "risk score," and then computed against a base payment rate (which varies depending on geography and the bid submitted by the insurer, among other things).  The model is adjusted on a regular basis, and so the coefficients can change from year to year,[5] but the basic design of the model has been constant since 2004.[6]

To understand the operation of the risk adjustment model, imagine a 72-year-old woman living independently, without a disability.  In 2014, these "demographic" characteristics—*i.e.*, her

[5] When coefficients are updated, they are put out for public comment, and are not finalized until the conclusion of that statutorily-mandated notice and comment period.  *See, e.g.*, Announcement of 2004 Medicare+Choice Payment Rates ("2004 Announcement") at 27–33 (AR 3948–54); 2014 Announcement at 67–73 (AR 4895–901).

[6] For a more complete description of the model, *see* Pope, Risk Adjustment of Medicare Capitation Payments at 119 (AR 11857).

age, sex, and institutional and disability statuses—were assigned a coefficient of 0.348.  2014 Announcement at 67 (AR 4895).  If this woman had no diagnosed diseases, a Medicare Advantage insurer would therefore be paid 34.8% of its base rate (which is keyed to the average beneficiary) for covering her.  If our imagined beneficiary had diabetes without complications, another 0.118 would be added to her score, which would become 0.466 (0.348 + 0.118).  *Id.*  The risk adjustment model would now calculate her to be 46.6% as costly as the average beneficiary, and an MA insurer would therefore be paid 46.6% of its base rate for covering her.  A diagnosis of multiple sclerosis would add another 0.556 to her risk score, for a total of 1.022: that is, 0.348 for demographics, plus 0.118 for diabetes without complications, plus 0.556 for multiple sclerosis.  *Id.* at 68 (AR 4896).  She would now be estimated to be 102.2% as costly as the average beneficiary, and an MA insurer would therefore receive 102.2% of its base rate for covering her.  When a Medicare Advantage insurer reports to CMS a relevant diagnosis for a covered beneficiary, that reported diagnosis directly increases the amount that CMS pays the insurer for providing coverage.  *See* 2000 Rule, 65 Fed. Reg. at 40,268 (AR 2006) (explaining that the submission of diagnosis data represents a claim for payment).

The risk adjustment model depends on a complex multivariate regression to produce these coefficients.  CMS calculates them "by regressing the total expenditure for Medicare Parts A and B benefits for each beneficiary onto their demographic factors and condition categories, as indicated by their diagnoses."  2013 Manual, § 70.1 (AR 5684).  In plain English, this regression takes the expenditures for a traditional, fee-for-service Medicare beneficiary from one year and maps them onto her demographic factors, as well as her medical diagnoses from the previous year, in order to see how those diagnoses and demographics predict medical costs.  *See, e.g.*, 2014

15

Advance Notice at 17 (AR 4768) (explaining that "2010 diagnoses were used to predict 2011 expenditures").

To see how this works, take the same hypothetical beneficiary from our last example: a 72-year-old woman living independently, without a disability, who has multiple sclerosis and diabetes without complications. Now suppose that she elects traditional, fee-for-service Medicare, and therefore becomes part of the data set used to build the Part C risk adjustment model, rather than having that model applied to her. Suppose further that "the total expenditure for Medicare Parts A and B benefits," 2013 Manual, § 70.1 (AR 5684), for this beneficiary in the index year is $10,000. The regression model attempts to answer the following questions: What portion of that $10,000 expenditure was attributable to this beneficiary's age and sex? What portion to her diabetes? And what portion to her multiple sclerosis?

Crucially, at the level of the individual beneficiary, these questions are unknowable. All we can say for certain is that this woman was of a certain age, had certain diseases, and incurred certain medical costs. Another 72-year-old woman living independently without a disability might have diabetes without complications and cirrhosis of the liver and incur $8,000 of traditional Medicare expenses; a third might have diabetes without complications and chronic hepatitis, and incur expenses of $15,000. A fourth might have the exact same diagnoses and characteristics as our hypothetical beneficiary, but different costs—say, $30,000 of Medicare expenses. And of course, beneficiaries with different demographic characteristics will share certain diagnoses. An 81-year-old man could have inflammatory bowel disease and diabetes without complications, and $20,000 of expenses; an 89-year-old man could have diabetes without complications and schizophrenia, and $11,000 of expenses—and so on, and so on. These are the data on which the Medicare Advantage risk adjustment model is based: millions of traditional, fee-for-service

16

beneficiaries with demographic characteristics, reported diagnoses, and Medicare expenses. From that data, the model estimates the marginal cost of each disease and cluster of demographic characteristics. The model is told what Medicare spent on a beneficiary and, eventually, the model tells the agency what fraction of that cost should be assigned to each of the beneficiary's characteristics. By mapping known expenditures in this way, the model calculates the expected cost of each medical condition and demographic factor.

From this description it should be clear that, before the model is run, the marginal cost of each disease is unknown. Although United makes repeated use of a hypothetical example in which the marginal cost of providing coverage to an individual with diabetes is somehow known in advance to be $4000 per year, *see* Pls.' Br. at 11–12, 25–26, 29–31, the entire point of using a regression model is that, without such a model, it would be impossible to determine the average cost associated with a given disease. All we would know is that beneficiaries with the disease in question were responsible for widely disparate expenditures, and had a confounding variation of other diseases and demographic conditions, as in the examples above.

Moreover, it is very hard to tell how an inaccurate diagnosis would affect the model's estimate of marginal costs. Suppose that our hypothetical beneficiary—the 72-year-old woman with diabetes and multiple sclerosis, who had $10,000 of expenditures—was misdiagnosed. Suppose that, although she was recorded as having diabetes and multiple sclerosis, she in fact had only multiple sclerosis. How would this erroneous diagnosis affect the model's calculation of marginal costs? We know that the model would be dividing $10,000 across three factors— demographic group, diabetes, and multiple sclerosis—when it should only have been splitting those costs between demographics and multiple sclerosis (because our hypothetical beneficiary does not actually have diabetes). The inclusion of the erroneous diagnosis would cause the model

to assign to diabetes some portion of the cost actually due to demographics, and some portion of the cost actually due to multiple sclerosis. But what would follow from this error is very hard to say. Would diabetes appear more expensive than it really is, because costs had been improperly assigned to it? (And, by the same token, would multiple sclerosis and demographics appear less expensive than they should have?) Or would diabetes instead appear less expensive than it really is, perhaps because the costs mis-assigned to it here were smaller than the costs properly assigned elsewhere, bringing down the average marginal cost? What would be the cumulative effect of such errors on the model as a whole? Despite United's insistence to the contrary, these questions do not have simple answers.

### E.    Data Validation Audits for Part C Risk Adjustment

As early as 1999, CMS was undertaking "payment validation activity" that was "intended to improve the accuracy of the risk adjustment data . . . submitted to CMS for payment." Policy and Technical Changes to the Medicare Advantage Program ("2009 Proposed Rule"), 74 Fed. Reg. 54,634, 54,674 (Oct. 22, 2009) (AR 2409). These "risk adjustment data validation (RADV) audits" sought "to confirm the presence of risk adjustment conditions (that is, diagnoses [relevant to risk adjustment]) as reported by MA organizations for their enrollees and confirmed via medical record documentation." *Id.*; *see* Policy and Technical Changes to the Medicare Advantage Program ("2010 Rule"), 75 Fed. Reg. 19,678, 19,746 (AR 2823) (Apr. 15, 2010) (noting that "the process of independently reviewing medical records to validate risk adjustment data submitted by MA organizations for payment purposes has been established and operational for more than 10 years"). "Under RADV, the payment error testing . . . . is aimed at validating that a particular Medicare beneficiary indeed has the medical condition for which the MA organization has been paid." 2010 Rule, 75 Fed. Reg. at 19,748 (AR 2825). This validation of reported diagnoses "that

result in additional payment" is achieved by confirming "the existence of clear, unambiguous diagnostic information in a beneficiary's medical record" that "provides the written support for the diagnosis that was made." *Id.* at 19749 (AR 2826).

Because the data submitted by Medicare Advantage insurers "according to an abbreviated format . . . specified by" the Secretary, 42 C.F.R. § 422.310(d)(1), "is self-reported by the [insurer] and does not go through a validation review before being incorporated into a given beneficiary's risk-profile," the Secretary has concentrated its audit activity on that self-reported data, 2009 Proposed Rule, 74 Fed. Reg. at 54,674 (AR 2409). "Since there is an incentive for MA organizations to potentially over-report diagnoses so that they can increase their payment, [the Secretary] audits plan-submitted diagnosis data to ensure they are supported by medical record documentation." *Id.* When he does so, "[v]erifiable medical record documentation is the key to accurate payment and successful data validation." *Id.*

In 2008, the Secretary announced that he would begin to use statistical sampling and extrapolation to "generate[] statistically valid plan-level payment error estimates for those plans selected for review" in a RADV audit. 2009 Announcement at 22 (AR 4277). (Prior to that time, CMS had identified erroneous diagnosis codes for particular beneficiaries, but had not attempted to generate a payment error rate for entire Medicare Advantage contracts.) A methodology for this statistical sampling was proposed in December 2010, *see* Notice of Payment Error Calculation Methodology (AR 5020), and finalized in February 2012, *see* Notice of Final Payment Error Methodology ("RADV Methodology") (AR 5311). Under this methodology, the Secretary chooses a contract to audit, selects a sample of beneficiaries associated with that contract, and examines their medical records. He determines whether any diagnoses claimed by the insurer are unsubstantiated in the sample beneficiaries' medical records and, if some diagnoses are

19

unsubstantiated, calculates an error rate that compares the risk scores claimed for the sample beneficiaries to the risk scores supported by their medical records.  After accounting for statistical uncertainty—and giving the insurer the benefit of the doubt within the range of that uncertainty— this error rate is then extrapolated to the contract as a whole.  An extrapolated error rate of 5%, for example, suggests that the Secretary paid 5% too much to cover the Medicare Advantage beneficiaries on that contract.

When the RADV audit sampling methodology was proposed, some commenters argued that it would be unfair for the Secretary to recover the full amount suggested by this error rate without accounting for the "FFS [*i.e.*, fee-for-service] medical record documentation error rates." AHIP Comment at 27 (AR 2744).  Their theory was that, because the traditional Medicare data on which the risk adjustment model relied was unaudited, that data contained errors, and those errors made the model's coefficients inaccurate.  The Secretary decided that there "may be potential merit in further refining the error rate calculation" and said that he was "currently studying this issue." 2010 Rule, 75 Fed. Reg. at 19,749 (AR 2826).  Ultimately, the Secretary agreed to study the issue further and, when that study concluded, to publish an adjustment factor that would "account[] for the fact that the documentation standard used in RADV audits to determine a contract's payment error (medical records) is different from the documentation standard used to develop the Part C risk-adjustment model (FFS claims)."   RADV Methodology at 4–5 (AR 5314–15).   That forthcoming adjustment factor became known as the "FFS Adjuster."  *Id.* at 4 (AR 5314).  The Secretary did not explain how he expected to calculate this FFS Adjuster, saying only that it would "be calculated . . . based on a RADV-like review of records submitted to support FFS claims data." *Id.* at 5 (AR 5315).  Since the Secretary made these statements in February 2012, he has said nothing more about the FFS Adjuster.

### F.      The Affordable Care Act and the Overpayment Rule

The Patient Protection and Affordable Care Act, which was enacted in March 2010, contained a provision regarding the "[r]eporting and returning of overpayments."  42 U.S.C. § 1320a-7k(d).  Any Medicare Advantage insurer that "has received an overpayment," *id.* § 1320a-7k(d)(1), must "report and return the overpayment," *id.* § 1320a-7k(d)(1)(A), no later than "60 days after the date on which the overpayment was identified," *id.* § 1320a-7k(d)(2)(A).  (If the insurer fails to do so, the overpayment becomes an "obligation" for the purposes of the False Claims Act, 31 U.S.C. § 3729(b)(3).  42 U.S.C. § 1320a-7k(d)(3).)  "Overpayment" means "any funds that a person receives or retains under" the Medicare statute "to which the person, after applicable reconciliation, is not entitled."  *Id.* § 1320a-7k(d)(4)(B).  For the purposes of the overpayment provision, the terms "knowing" and "knowingly" were given their definitions in the False Claims Act, *id.* § 1320a-7k(d)(4)(A), where they include actual knowledge of something as well as deliberate ignorance or reckless disregard of its truth or falsity, 31 U.S.C. § 3729(b)(1)(A). But those terms were not used in the overpayment provision.

In May 2014, the Secretary promulgated the Overpayment Rule, 42 C.F.R. § 422.326, which echoed the statutory definition of overpayment.  *Compare* 42 U.S.C. § 1320a-7k(d)(4)(B) *with* 42 C.F.R. § 422.326(a) ("*Overpayment* means any funds that an MA organization has received or retained under Title XVIII of the Act to which the MA organization, after applicable reconciliation, is not entitled under such title.").  The preamble to the Rule noted the "long-standing . . . requirement that a diagnosis submitted . . . by an MA organization for payment purposes must be supported by medical record documentation."  Overpayment Rule, 79 Fed. Reg. at 29,921–22 (AR 1313–14); *see id.* at 29,923 (AR 1315) ("CMS has required for many years that diagnoses that MA organizations submit for payment be supported by medical record documentation.").

21

Because of this requirement, which was not altered by the Overpayment Rule, the submission of an "invalid" diagnosis (i.e., one unsupported by the beneficiary's medical records) would "result in an overpayment." *Id.* at 29,921 (AR 1313). The requirement of medical record documentation was reiterated over the objection of insurers who believed that "an overpayment cannot exist for a particular MA contract unless CMS' payments as a whole to the MA organization pursuant to the contract are inaccurate in light of an appropriate FFS Adjuster applied to the entire contract." *Id.*

The Overpayment Rule also said that an "MA organization has identified an overpayment when the MA organization has determined, or should have determined through the exercise of reasonable diligence, that the MA organization has received an overpayment." *Id.* at 29,958 (AR 1350) (promulgating 42 C.F.R. § 422.326(c)). The preamble explained that "MA organizations . . . are responsible for ensuring that payment data they submit to CMS are accurate, truthful, and complete (based on best knowledge, information, and belief), and are expected to have effective and appropriate payment evaluation procedures and effective compliance programs as a way to avoid receiving or retaining overpayments." *Id.* at 29,923 (AR 1315). "Thus, at a minimum, reasonable diligence would include proactive compliance activities conducted in good faith by qualified individuals to monitor for the receipt of overpayments." *Id.*

## STANDARD OF REVIEW

"[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "The entire case on review is a question of law," and the "complaint, properly read . . . presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); *accord Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009); *Univ. Med. Ctr. of S.*

*Nev. v. Shalala*, 173 F.3d 438, 440 n. 3 (D.C. Cir. 1999); *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996).  The district court's review "is based on the agency record and limited to determining whether the agency acted arbitrarily or capriciously," *Rempfer*, 583 F.3d at 865, or in violation of another standard set out in 5 U.S.C. § 706(2).

## ARGUMENT

To resolve United's challenge to the Overpayment Rule, it is essential to understand what the Rule did, and what it did not do.  The Overpayment Rule did not alter the long-standing requirement that diagnoses submitted for payment by Medicare Advantage insurers be supported by medical record documentation.  It did not affect the Part C risk adjustment model in any way.  It did not change the RADV audit process.  The Overpayment Rule simply mapped elements of the existing Part C payment scheme onto a statutory category—overpayments—which includes a deadline by which such payments must be returned.  It did not change the terms under which Medicare Advantage insurers were entitled to claim payment in the first place.

Nonetheless, United has taken the Overpayment Rule as an opportunity to attack a fundamental feature of the Part C payment scheme: that Medicare Advantage insurers can only claim payment for diseases with which their beneficiaries have actually been diagnosed, as demonstrated by their medical records.  This requirement of medical record documentation dates to the beginning of the Medicare Advantage program, as the administrative record demonstrates. *See, e.g.*, 2001 Manual, § 110.4 (AR 5350) (explaining that diagnosis data must "be substantiated by the hospital's medical record"); 2004 Manual, § 111.1, Ex. 30 (AR 5671) (providing that "a medical record must substantiate all diagnostic information provided to CMS"); 2013 Manual, § 40 (AR 5678) ("All diagnosis codes submitted must be documented in the medical record . . . .").  As United accurately told the Ninth Circuit, "CMS regulations deem a diagnosis code proper if it

23

is supported by a . . . medical record." *Swoben*, 848 F.3d at 1176 (quoting Joint Answering Br. at 36). Conversely, if the diagnosis is not supported by a medical record, it is not proper. That has been the rule for nearly twenty years.

But United has concocted an alternative history, in which payment on the basis of unsubstantiated diagnoses is an essential premise of everything the Secretary has done to implement the Medicare Advantage program, which the Overpayment Rule would now abruptly and arbitrarily abandon. United frames its case as a request that this Court return the system of Part C risk adjustment to a status quo that has never existed. Indeed, it appears that United is not really concerned with the Overpayment Rule at all. What United wants is not the vacatur of 42 C.F.R. § 422.326, which it barely mentions in its brief, but something far more wide-reaching: a judicial declaration that Medicare Advantage insurers can lawfully claim payments for the costs associated with diseases that their beneficiaries do not have. United is not entitled to that declaration, any more than insurers are entitled to those payments.

I.     **The Secretary's interpretation of "overpayment" as including claims for payment based on diagnoses unsupported by a beneficiary's medical records is reasonable, and not contrary to any other statute.**

When a Medicare Advantage insurer is paid for the added cost of covering someone with a particular disease, but the beneficiary in question does not have any documented history of that disease, is the payment an "overpayment" that must be reported and returned if it is identified? *See* 42 U.S.C. § 1320a-7k(d). The Secretary has determined that it is: the preamble to the Overpayment Rule challenged here says that the submission of "a risk adjustment diagnosis that . . . does not have supporting medical record documentation would result in an overpayment." 79 Fed. Reg. at 29,921 (AR 1313). This interpretation is perfectly reasonable. The Medicare statute defines "overpayment" to mean "any funds that a person receives or retains under subchapter

24

XVIII . . . of this chapter"—that is, the Medicare statute—"to which the person . . . is not entitled." 42 U.S.C. § 1320a-7k(d)(4)(B).  A "person" includes a Medicare Advantage insurer.  *Id.* § 1320a-7k(d)(4)(C)(i).   The Secretary has interpreted "funds" to mean "any payment" that a Medicare Advantage insurer "has received that is based on data submitted by the [insurer] to CMS for payment purposes."  42 C.F.R. § 422.326(a).  United does not contest that definition.  The only question, then, is whether insurers are statutorily "entitled," 42 U.S.C. § 1320a-7k(d)(4)(B), to payment for the marginal cost (or any portion thereof) associated with diseases of which their beneficiaries have no documented history in the relevant year.

They are not, and never have been.  Although the Overpayment Rule did not interpret "entitled," the preamble designated such payments as "overpayments" because, as the Ninth Circuit has noted, "CMS requires medical diagnosis codes to be supported by a medical record" when they are submitted for payment by Medicare Advantage insurers.  *Swoben*, 848 F.3d at 1176.

The Secretary's regulations provide that, "[a]s a condition for receiving a monthly payment" through Medicare Advantage, participating insurers "must . . . certif[y] (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of relevant data." 42 C.F.R. § 422.504(*l*).  There is no dispute that risk adjustment data, including the diagnoses reported for particular beneficiaries, are "relevant data" within the meaning of this regulation.  *Id.* § 422.504(*l*)(2) (requiring certification of data submitted under 42 C.F.R. § 422.310, which governs risk adjustment data).  From the beginning of the Medicare Advantage program, the Secretary has made it clear that the "accuracy" and "truthfulness" of diagnosis data submitted for payment depends on the reported diagnoses being documented in a beneficiary's medical record.[7]

---

[7] United may not use this lawsuit as a vehicle to challenge 42 C.F.R. § 422.504(*l*), or the long-standing requirement of medical record documentation that it incorporates, because any such

In 2001, the Medicare Managed Care Manual interpreted 42 C.F.R. § 422.504(*l*) to obligate insurers "to comply fully with" the Medicare Advantage "data requirements," including the requirement that risk adjustment data "be substantiated by the hospital's medical record." 2001 Manual, §§ 110.2, 110.4 (AR 5349–50). This requirement has appeared in every subsequent edition of the Manual, which insurers agree to comply with as a condition of their participation in the Medicare Advantage program. Standard Contract with Eligible Medicare Advantage Organization, Article II, Section A (AR 11801); *see also* 42 C.F.R. § 422.504(*i*)(4)(v). *See* 2004 Manual, § 111.1, Ex. 30 (AR 5671) (providing that "a medical record must substantiate all diagnostic information provided to CMS"); 2013 Manual, § 40 (AR 5678) ("All diagnosis codes submitted must be documented in the medical record . . . .").

CMS training materials have also consistently noted the requirement of medical record documentation for all reported diagnoses. *See* 2003 Participant Guide at 4-1 (AR 5821) (MA insurers "must submit risk adjustment data that are substantiated by the patient's medical record."); 2003 Resource Guide at 18 (AR 6488) (explaining that "a medical record must substantiate all diagnostic information provided to CMS"); 2004 Participant Guide at 5-2 (AR 7235) ("The source medical record documentation that supports each coded diagnosis must be obtainable and demonstrate adherence to official coding guidelines."); 2006 Participant Guide at 5-2 (AR 8702) (same); 2012 Participant Guide at 2-5 (AR 10899) ("Diagnoses must be supported by appropriate medical record documentation.").

---

challenge is barred by the six-year limitations period imposed by the Administrative Procedure Act. *See, e.g., Mendoza v. Perez*, 754 F.3d 1102, 1018 (D.C. Cir. 2014). The Secretary's reiteration of that requirement in issuing the Overpayment Rule did not reopen that limitations period. *Id.*

And the ICD-9-CM system of diagnosis coding, compliance with which is "required for reporting diagnoses and diseases to all . . . [CMS] programs," ICD-9-CM Preface at 1 (AR 11375), includes medical record documentation for all reported diagnoses, ICD-9-CM Coding Guidelines at 5, 22 (AR 11385, 11402); *see also* Pope, *Risk Adjustment of Medicare Capitation Payments* at 129 (AR 11867) ("The auditing standard that CMS has promulgated for reporting of physician office diagnoses is that a physician has established the diagnosis in the medical record, and that medical coders have recorded it in accordance with ICD-9-CM rules. . . . CMS will require [insurers] to demonstrate that a diagnosis is present in the medical record . . . and has been coded according to ICD-9-CM."). These "statements by CMS are authoritative . . . because they provided clear guidance to Medicare Advantage organizations . . . regarding their obligations under § 422.504(*l*)." *Swoben*, 848 F.3d at 1177.

The Secretary's conclusion that insurers are "not entitled," 42 U.S.C. § 1320a-7k(d)(4)(B), to receive payment for reporting diagnoses that are not documented in their beneficiaries' medical records—and that any such payments are therefore "overpayments," *id.*— is consistent with the "long-standing" regulatory "requirement that a diagnosis submitted to CMS by" a Medicare Advantage insurer "for payment purposes must be supported by medical record documentation." Overpayment Rule, 79 Fed. Reg. at 29921–22 (AR 1313–14); *see Swoben*, 848 F.3d at 1176. This interpretation is, at a minimum, "a permissible construction of" 42 U.S.C. § 1320a-7k(d)(4)(B), and it is therefore controlling. *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984).

A.     **The statutory requirement of "actuarial equivalence" between the payments to Medicare Advantage insurers and the expected costs of providing traditional Medicare benefits does not preclude the Secretary's interpretation of "overpayment."**

United argues that the Secretary's interpretation of "overpayment" is contrary to the statutory requirement that the Secretary "adjust the . . . amount" of the monthly payments to Medicare Advantage insurers to account "for such risk factors . . . as the Secretary determines to be appropriate," such as the "age, disability status, gender, institutional status, and . . . health status" of each beneficiary being covered, "so as to ensure actuarial equivalence."   42 U.S.C. § 1395w-23(a)(1)(C)(i).   The Secretary may develop an adjustment methodology "as he determines to be appropriate," *id.*, a statutory phrase that Congress uses to "trumpet[]," in "sweeping terms," the breadth of its grant of discretionary power.  *Arctic Slope Reg'l Corp. v. FERC*, 832 F.2d 158, 164 (D.C. Cir. 1987).   United thus bears a heavy burden to show that, in developing a risk adjustment model, the Secretary exceeded the broad range of authority that Congress has afforded him.

United fails in this attempt.  The Secretary has, in his broad discretion, designed the Part C risk adjustment model "to ensure actuarial equivalence" by paying Medicare Advantage insurers a sum equal to the cost that CMS would expect to bear in providing traditional Medicare benefits to a given beneficiary.  Indeed, that is what "actuarial equivalence" means in this context: an equivalence between an expected cost, on the one hand, and a known payment, on the other, achieved through the application of actuarial principles.

Congress has used the phrase in other contexts, with evidently similar meanings.  The Employee Retirement Income Security Act (ERISA) provides that, if a private pension plan "allows retirees to select a lump-sum payment in lieu of an annuity," then "the lump sum payment

28

'shall be the actuarial equivalent' of the annual benefit." *Stephens v. U.S. Airways Grp., Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (quoting 29 U.S.C. § 1054(c)(3)).  "Although ERISA does not further define actuarial equivalence," the D.C. Circuit has "assume[d]" that "Congress intended that term of art to have its established meaning"—namely, that "[t]wo modes of payment are actuarially equivalent when their present values are equal under a given set of actuarial assumptions." *Id.*; *see also Berger v. Xerox Ret. Income Guar. Plan*, 338 F.3d 755, 759 (7th Cir. 2003) ("The basic tradeoff involved in determining actuarial equivalence between a lump sum and an accrued pension benefit is between a present and a future value . . . ."); *Edsen v. Bank of Boston*, 229 F.3d 154, 163 (2d Cir. 2000) (noting that ERISA requires a lump sum payment to "be worth at least as much as th[e] annuity").

Actuarial equivalence also appears in Part D of the Medicare statute, which defines "creditable prescription drug coverage" to include a wide range of coverage options, "but only if the coverage meets the requirement of paragraph (5)," entitled "Actuarial equivalence requirement." 42 U.S.C. § 1395w-113(b)(4), (5).  That paragraph provides that "[c]overage meets the requirement . . . only if [it] is determined . . . to provide coverage of the cost of prescription drugs the actuarial value of which . . . to the individual equals or exceeds the actuarial value of standard prescription drug coverage." *Id.* § 1395w-113(b)(5).  The Secretary has said that, in this context and "[i]n very general terms, actuarial equivalence refers to a determination that, in the aggregate, the dollar value of drug coverage for a set of beneficiaries under one plan can be shown to be equal to the dollar value for those same beneficiaries under another plan."  Medicare Prescription Drug Benefit, 70 Fed. Reg. 4194, 4199 (Jan. 28, 2005).  In Part D, then, Congress used actuarial equivalence to compare the expected value to the beneficiary (or, seen differently, the expected cost to the insurer) of different benefit plans.

29

From these statutory provisions, we can see that when Congress instructs an agency "to ensure actuarial equivalence," 42 U.S.C. § 1395w-23(a)(1)(C)(i), it means to equate either an expected value with a known value (as in the case of an annuity and a lump sum payment) or two expected values (as in the case of benefit plans).  Two quantities are "actuarially equivalent when their present values are equal under a given set of actuarial assumptions." *Stephens*, 644 F.3d at 440.  Or, as the Secretary's Part D regulations put it, "actuarial equivalence" is "a state of equivalent value demonstrated through the use of generally accepted actuarial principles and in accordance with . . . CMS actuarial guidelines."  42 C.F.R. § 423.4.  In the context of Part C, and in the exercise of the Secretary's broad discretion, the risk adjustment model seeks to "ensure actuarial equivalence" between the fixed payments made to Medicare Advantage insurers and the expected cost of providing traditional Medicare benefits to a given beneficiary by "adjust[ing] the payment amount . . . for such risk factors . . . as the Secretary determines to be appropriate, including adjustment for health status."  42 U.S.C. § 1395w-23(a)(1)(C)(i).

The Secretary's interpretation of the statutory mandate "to ensure actuarial equivalence" gives "that term of art . . . its established meaning." *Stephens*, 644 F.3d at 440.  And nothing in that definition or the larger statutory scheme precludes the Secretary's interpretation of "overpayment": equating payments to insurers with costs avoided by the agency does not imply that the agency must pay for the expected costs associated with a disease that is unlikely to require treatment (because the beneficiary in question has no documented history of that disease in the relevant year).  There is no credible argument that the statutory text of the "actuarial equivalence" requirement prohibits the Secretary's interpretation of "overpayment."

Although framed in statutory terms, United's argument from "actuarial equivalence" is instead best understood as a claim that the agency has acted arbitrarily and capriciously, because

the Secretary's implementation of "actuarial equivalence" (and not the statutory text itself) purportedly precludes his interpretation of "overpayment."   This Court must "defer to the [agency's] . . . implementation" of its statutory mandates if that implementation is "reasonable"— *i.e.*, not arbitrary or capricious.   *Nat'l Ass'n of Broadcasters v. FCC*, 789 F.3d 165, 179–80 (D.C. Cir. 2015); *see also Boehringer Ingelheim Pharma GMBH & Co. KG v. U.S. Food & Drug Admin.*, 195 F. Supp. 3d 366, 380 (D.D.C. 2016) (finding the agency's "interpretation of the statutory requirements" to be "reasonable," and concluding that "the agency's implementation of the statutory scheme . . . is reasonable as well").   We will return to United's arbitrary and capricious arguments after demonstrating that the second statutory provision on which the insurer relies also permits the Secretary's interpretation of "overpayment."

> **B.     The statutory requirement that the Secretary publish "[t]he average risk factor" for traditional Medicare beneficiaries, "using the same methodology as is expected to be applied in making payments" to Medicare Advantage insurers does not preclude the Secretary's interpretation of "overpayment."**

Congress has commanded the "Secretary, through the Chief Actuary of the Centers for Medicare & Medicaid Services" to annually "provide for the computation and publication" of "[t]he average risk factor for the . . . population" covered by "the original medicare fee-for-service program under parts A and B . . . using the same methodology as is expected to be applied in making payments under [Medicare Advantage]." 42 U.S.C. § 1395w-23(b)(4).   In plain terms, the Secretary must publish county-by-county data for traditional Medicare beneficiaries every year, calculating the average risk score for those beneficiaries based on diagnoses reported by hospitals and "other sites of service, using the same methodology" employed to calculate the risk scores of Medicare Advantage beneficiaries.   *Id.* § 1395w-23(b)(4)(D).   The purpose of this calculation is to allow the Secretary to adjust the county-by-county per capita expenditures for traditional

31

Medicare beneficiaries, *see id.* § 1395w-23(b)(4)(A), (B), to account for variations in the risk profile of a given county's beneficiaries, so as to determine the average cost in each county of providing traditional Medicare benefits to someone with average risk factors.  The Secretary publishes this data every year, as the statute requires, using the same risk adjustment methodology discussed above.[8]  The statutory requirement to make this publication does not in any way preclude—or even have much to do with—the Secretary's interpretation of "overpayment." Again, United's reliance on this statutory provision is best understood as an argument that the definition of overpayment is arbitrary and capricious in light of the way that the statutory requirement to compute and publish this data has been implemented.  We therefore turn to United's arbitrary and capricious arguments.

## II.    The Secretary's interpretation of "overpayment" is neither arbitrary nor capricious in light of the pre-existing regulatory scheme.

### A.    The "accuracy" and "truthfulness" of reported diagnoses depends on their documentation in a beneficiary's medical records.

The Secretary has clearly and consistently interpreted 42 C.F.R. § 422.504(*l*) to require medical record documentation if a reported diagnosis is to be "accurate" and "truthful."  *See also* 42 C.F.R. § 422.310(d), (e).  This interpretation "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation."  *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).  As the Ninth Circuit has recognized, it is not.  *Swoben*, 848 F.3d at 1176.

United nonetheless contends that the terms "accuracy" and "truthfulness" have never been given their plain meaning.  Instead, United explains, CMS has always understood "accuracy" to

---

[8]  Data from 2008 through 2015 are available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/FFS-Data.html.  To see the most recent data, open the zip folder called "FFS Data 2015," then open the Excel spreadsheet titled "Medicare FFS County 2018 Web."

mean "*relative* accuracy" (presumably "truthfulness" has also meant "*relative* truthfulness") such that an insurer's risk adjustment "data are accurate if the proportion of unsupported codes in its data is no greater than" the proportion in the data collected for traditional, fee-for-service Medicare beneficiaries. Pls.' Br. at 39; *see also* AHIP Br. at 3 (arguing that "the term 'accuracy' cannot mean error-free as judged against medical charts"). But United cannot identify a single instance in which the Secretary told insurers that it would be "accurate" or "truthful" to report diagnoses that were not reflected in their beneficiaries' medical records.

United points instead to statements the Secretary made in applying a statutory adjustment to the Part C payment model. Beginning in 2008, Congress required the Secretary to "ensure" that Part C risk adjustment "reflects differences in coding patterns between Medicare Advantage plans and providers under part A and B to the extent that the Secretary has identified such differences." 120 Stat. at 51. The Secretary did not identify any such differences in preparing for the 2008 or 2009 payment years. But the Secretary identified differences in advance of 2010, and concluded that "coding pattern differences between MA and FFS are having a notable impact on payment," 2010 Announcement at 29 (AR 4334), even though he did not "assume that the coding pattern differences" were "the result of improper coding," *id.* at 30 (AR 4335). Instead, the Secretary allowed that Medicare Advantage insurers could simply be coding more vigorously, because each relevant diagnosis they reported was worth money to them. Asymptomatic diseases would be unlikely to impose any additional costs, for example—but if such diseases could be diagnosed, they would be a source of additional payments to insurers.

Having identified a difference in coding patterns, the Secretary deflated the risk scores of all Part C beneficiaries by a flat 3.41% for 2010.[9]   2010 Announcement at 29 (AR 4334).  Insurers protested that their diagnosis coding was accurate (in the absolute and not the relative sense of the term).  In response, the Secretary said that, even if the insurers' coding was accurate, "MA plans must code the way Medicare Part A and B providers do in order for risk adjustments to be valid," *id.* at 30 (AR 4335)—meaning that MA plans would collect too much money if they aggressively searched for and claimed payment on the basis of diagnoses that would never have come to the attention of someone treating traditional Medicare beneficiaries.

United now points to this statement and says it implies that, if Medicare Part A and B providers sometimes report diagnoses that are unsubstantiated in their beneficiaries' medical records (which would not earn them any additional payments), then Medicare Advantage insurers must also be allowed to report diagnoses unsupported by any medical record documentation (and collect additional payments for those unsubstantiated diagnoses).  *See* Pls.' Br. at 3.  United goes on to argue that not only must insurers be allowed to claim payment for reporting unsubstantiated diagnoses, in fact "unverified diagnosis codes," and not diagnoses substantiated by a beneficiary's medical records, are the very basis for the Part C risk adjustment system.  *Id.* at 32.  To address

---

[9] Congress directed the Secretary to continue to do so in "each subsequent year," with an adjustment that was "updated as appropriate," and provided that "the adjustment factor . . . for 2014" would be "not less than the adjustment factor applied for 2010, plus 1.5 percentage points" and, "for each of years 2015 through 2018, not less than the adjustment factor applied for the previous year, plus 0.25 percentage points; and for 2019 and each subsequent year, not less than 5.9 percent."  Pub. L. No. 111-152, § 1102(e), 124 Stat. 1029, 1046 (codified at 42 U.S.C. § 1395w-23(a)(1)(C)(ii)).  Despite these adjustments, the Government Accountability Office believes that "CMS's adjustment to risk scores for 2010 through 2012 to account for diagnostic coding differences was too low," and that Medicare Advantage insurers therefore "received excess payments of between $3.2 billion and $5.1 billion over the 3-year period."  U.S. Gov't Accountability Office, Substantial Excess Payments Underscore Need for CMS to Improve Accuracy of Risk Score Adjustments at 9 (Jan. 2013) (AR 12051).

that argument completely will require a discussion of United's claim that the coefficients calculated by the CMS-HCC risk adjustment model are inaccurate, which is taken up below.

For the time being, it is sufficient to note that the Secretary's varied comments about the purpose of the coding difference adjuster, made in an effort to explain why insurers' search for every supportable diagnosis would lead to overpayment, did not implicitly revise 42 C.F.R. § 422.504(*l*), as United appears to suggest. As discussed at length above, the Secretary has always understood a certification of the "accuracy" and "truthfulness" of risk adjustment data to require that any reported diagnosis be substantiated by a beneficiary's medical record. *See also* 42 C.F.R. § 422.310(d), (e). United has not come close to showing that the Secretary's comments about the coding difference adjuster render this interpretation—under which "accuracy" means "accuracy" and not "*relative* accuracy"—"plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ.*, 512 U.S. at 512. The Secretary's understanding of 42 C.F.R. § 422.504(*l*) must therefore be given "controlling weight." *Id.*

The Overpayment Rule did not (as United suggests) impose a new, disruptive requirement that, for the first time, diagnoses would have to be substantiated by medical records. It simply maintained the pre-existing documentation requirement that had been in place for over a decade, which was the necessary consequence of an insurer's obligation under 42 C.F.R. § 422.504(*l*) to certify the "accuracy" and "truthfulness" of the diagnosis data on which it claimed payment. For the Secretary to leave undisturbed the "long-standing . . . requirement that a diagnosis submitted . . . by an MA organization for payment purposes must be supported by medical record documentation," 79 Fed. Reg. at 29,921–22 (AR 1313–14), was neither arbitrary nor capricious.[10]

---

[10] For similar reasons, the Secretary's statements when announcing the CMS-HCC model do not render the Overpayment Rule arbitrary or capricious. United argues that, "[u]nder the

**B.** **The administrative record does not support United's claim that the risk adjustment model systematically underpays insurers, and the Overpayment Rule is not the cause of any asserted underpayment.**

Although United disputes the Secretary's long-standing interpretation of 42 C.F.R. § 422.504(*l*)—a challenge that must fail, for the reasons explained above—the heart of its case rests on actuarial principles rather than textual interpretation. United argues that, having built a risk adjustment model upon unaudited data from traditional Medicare beneficiaries, the Secretary cannot then require that the diagnoses reported by Medicare Advantage insurers be documented in their beneficiaries' medical records—at least, not without violating fundamental principles of actuarial science.

There are two things to say about this argument before explaining why it is wrong. First, the argument has essentially nothing to do with the Overpayment Rule, which did not alter either the Part C risk adjustment model or the requirement of medical record documentation for diagnoses on which insurers claim payment. If United believes that the risk adjustment coefficients calculated by the CMS-HCC model do not compensate it for the costs of providing Medicare benefits, it can challenge the calculation of those coefficients. But the accuracy or inaccuracy of the risk adjustment coefficients is not a function of the Overpayment Rule.

Second, this argument is a claim that the Secretary has improperly implemented a risk adjustment model that is his to design "as [he] determines to be appropriate," and which he "may

---

Overpayment Rule, CMS no longer determines the status of each variable in . . . a risk score using the same definition it used in estimating the model." Pls.' Br. at 37–38. But, as the Secretary has explained, the Overpayment Rule did not alter the way in which risk coefficients are assigned to Medicare Advantage beneficiaries. And in any case, these coefficients are calculated exactly as intended at the time the risk adjustment model was built. *See* Pope, *Risk Adjustment of Medicare Capitation Payments* at 129 (AR 11867) ("CMS will require [insurers] to demonstrate that a diagnosis is present in the medical record . . . and has been coded according to ICD-9-CM.").

36

add to" or "modify" if he concludes that "such changes will improve the determination of actuarial equivalence."   42 U.S.C. § 1395w-23(a)(1)(C)(i).   As noted above, this statutory phrasing "trumpet[s]" the breadth of the discretion that Congress has granted to the Secretary to develop and implement a risk adjustment model.  *Arctic Slope Reg'l Corp.*, 832 F.2d at 164.   Risk adjustment is, moreover, a matter of economic modelling, a technical expertise in which CMS has invested deeply.   Judicial review of such matters is especially deferential.  *Ctr. for Biological Diversity v. EPA*, 749 F.3d 1079, 1087–88 (D.C. Cir. 2014) (collecting cases).   The Secretary's risk adjustment model easily satisfies the "minimal standards of rationality" by which this Court must judge it.  *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) ("We must look at the decision not as the . . . statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.").

United's argument about the adequacy of the risk adjustment coefficients begins from the premise that the risk adjustment model is built on unaudited data about traditional, fee-for-service Medicare beneficiaries, which must contain errors (because it is unaudited).   This is true, as far as it goes.   United then asks the Court to imagine the effect that these data errors will have on the overall risk adjustment model.   United suggests that, if the marginal cost associated with a diagnosis of diabetes is really $4000 a year, and some traditional Medicare beneficiaries who do not have diabetes are nonetheless recorded as having the disease, then that marginal cost will appear lower than it should be: a pool of four beneficiaries, only three of whom actually had diabetes, would seem to have diabetes-associated costs of only $3000 a year, United says, rather than $4000.   United refers to the misdiagnosed individual as a "zero-cost" beneficiary, and suggests that the solution to this problem of underpayment—what keeps the whole system in

37

balance—is for Medicare Advantage insurers to claim payment for unsubstantiated diagnoses. If an insurer also had a pool of four beneficiaries diagnosed with diabetes, only three of whom actually had a documented history of the disease, United says, then it would be paid the $12,000 that it was properly owed (4 x $3000, instead of 3 x $4000).

United's simplistic scenario badly mis-describes the risk adjustment system that it purports to analyze. As explained above, CMS calculates the coefficients used to determine Medicare Advantage payments "by regressing the total expenditure for Medicare Parts A and B benefits for each beneficiary onto their demographic factors and condition categories, as indicated by their diagnoses." 2013 Manual, § 70.1 (AR 5684). United's "zero-cost" beneficiary—the one who does not actually have diabetes—would almost certainly have received some medical care in a particular year, and CMS would therefore have some "total expenditure" for providing her with "Medicare Parts A and B benefits." The regression model is designed to allocate that cost across her demographic factors (age, sex, and so on) and relevant diagnosed diseases. Including an erroneous diagnosis would mean that the expenditures for that beneficiary would be mis-assigned—costs would be attributed to the erroneous diagnosis that should instead have been attributed to other diseases, or to demographic categories. (By the same token, failing to include a relevant diagnosis would cause the mis-assignment of costs properly attributable to that disease.) How will this mis-attribution affect the model's calculation of marginal costs? It is very hard to say, and United neither explains why it believes that the effect of mis-assigning known costs would be to deflate coefficients across the board, nor offers any proof that erroneous diagnosis data for traditional Medicare beneficiaries would in fact cause Part C risk adjustment coefficients to be deflated in this way—rather than raising one coefficient while lowering another, or shifting the weight of the model from diagnoses to demographic factors, or vice versa.

38

Moreover, the solution that United suggests—allowing Medicare Advantage insurers to claim payment for diagnoses that are not recorded in the medical records of their beneficiaries—is both utterly impracticable and unrelated to the problem at hand.  How is an insurer supposed to know how many erroneous diagnosis codes to report?  Diagnosis-based risk adjustment has been operating on the current model since 2004, and has been calibrated on fee-for-service data that entire time.  If the system functions in the way that United describes, the insurer presumably has years of experience implementing internal processes to ensure that just the right number of invalid diagnosis codes is submitted to CMS for payment—not too many, but not too few.  *Cf.* 42 C.F.R. § 422.503(b)(4)(vi) (requiring the Secretary "[t]o adopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS' program requirements").  How exactly does that work?  Are coders instructed to submit an invalid diagnosis for every third, or sixth, or ninth beneficiary?  How is a system premised on the reporting of erroneous data supposed to ensure that the correct number of errors is generated?  It is no answer to say that Medicare Advantage insurers blindly relay whatever faulty diagnosis data they receive, because those insurers "have an obligation to undertake 'due diligence' to ensure the accuracy . . . and truthfulness" of the risk adjustment data "submitted to [CMS]."  *Swoben*, 848 F.3d at 1169 (quoting 2000 Rule, 65 Fed. Reg. at 40,268 (AR 2006) (second alteration in *Swoben*)). If the system is, as United argues, premised on the submission of erroneous data, then insurers must certify that the correct number of errors have been submitted.

Not that the proportion of erroneous codes in the fee-for-service data is the proper measure of anything.  The only question relevant to United's payments is whether the risk coefficients published by the Secretary accurately predict the average marginal cost of providing Medicare benefits to an individual with a given disease profile and set of demographic characteristics.  If the

model accurately predicts relative costs, on average and on the whole, then there is nothing to correct for. It simply does not matter how many erroneous diagnoses went into the production of accurate coefficients. If, on the other hand, the risk coefficients did not accurately predict the average marginal cost of providing Medicare benefits—perhaps they *all* really are too low, as United suggests and its amicus explicitly argues (though it is hard to see how that could be possible in a model designed to allocate a set of known costs)—then the problem would be that the coefficients were inaccurate. If that is the case, they should be corrected. But there is no reason to think that a certain proportion of unsupported diagnosis codes in the fee-for-service data produce coefficients so precisely deflated that, by reporting an equal proportion of unsupported Medicare Advantage diagnoses, insurers can guarantee that they are compensated properly.

And in any event, this analysis of the risk adjustment model is ultimately immaterial to the case at hand. United has challenged the Overpayment Rule, 42 C.F.R. § 422.326. Whether the Part C risk adjustment coefficients are accurate or inaccurate, they were not affected by the Overpayment Rule. Nor did the Overpayment Rule alter the standards with which Medicare Advantage insurers must comply when submitting diagnosis codes. *See Swoben*, 848 F.3d at 1176 (noting that "CMS requires medical diagnosis codes to be supported by a medical record"); 2013 Manual, § 40 (AR 5678) ("All diagnosis codes submitted must be documented in the medical record . . . ."). If United believes that the risk adjustment coefficients undercompensate it given the requirements of "accuracy" and "truthfulness" in the reporting of diagnosis data, 42 C.F.R. § 422.504(*l*), then it can bring a challenge to the calculation of those coefficients. Or, if United instead believes that the requirements of "accuracy" and "truthfulness" are incompatible with the way that the risk adjustment coefficients are calculated, it can petition the Secretary to alter 42

C.F.R. § 422.504(*l*), which imposes those requirements, and file suit if he refuses to do so.[11]  But

it cannot do what it is attempting here, and object to the Overpayment Rule's categorization of

payments to which insurers have never been entitled as "overpayments" within the meaning of 42

U.S.C. § 1320a-7k(d), on the grounds that insurers should always have been entitled to claim

payment on the basis of diagnoses that are not reflected in their beneficiaries' medical records.

    C.    **The Secretary's audits of risk adjustment data do not render the Overpayment Rule arbitrary or capricious.**

Finally, United argues that the Overpayment Rule is inconsistent with the Secretary's

audits of risk adjustment data.  Those RADV audits, which began in 1999, are "intended to

improve the accuracy of the risk adjustment data . . . being submitted to CMS for payment," by

"confirm[ing] the presence of risk adjustment conditions (that is, diagnoses . . .) . . . via medical

record documentation."  2009 Proposed Rule, 74 Fed. Reg. at 54,674 (AR 2409).  This validation

of reported diagnoses "that result in additional payment" is achieved by confirming "the existence

of clear, unambiguous diagnostic information in a beneficiary's medical record" that "provides the

written support for the diagnosis that was made."  2010 Rule, 75 Fed. Reg. at 19,749 (AR 2826);

*see also* Pope, *Risk Adjustment of Medicare Capitation Payments* at 129 (AR 11867).  Medicare

Advantage insurers are "required to submit a sample of medical records for the validation of risk

adjustment data."  42 C.F.R. § 422.310(d).

When the Secretary announced his intention to begin extrapolating contract-level payment

error rates from statistically valid samples of RADV audit data, some commenters argued that it

would be unfair for the Secretary to recover the full amount indicated by his audits without

---

[11] As noted above, however, United cannot *in this lawsuit* challenge 42 C.F.R. § 422.504(*l*), or the long-standing requirement of medical record documentation that that regulation incorporates, because such a challenge is long since time-barred.  *See supra* n.7.

accounting for the "FFS medical record documentation error rates."  AHIP Comment at 27 (AR 2744).  Their theory about the presence of unsubstantiated diagnoses in the fee-for-service data closely resembled United's argument discussed above.  Some insurers suggested that the process of extrapolation would exacerbate the payment distortions supposedly caused by those erroneous diagnosis codes.  *See, e.g.*, Comment of Lovelace Health System at 4–5 (AR 2604–05).  The Secretary concluded that there "may be potential merit in further refining the [RADV] error rate calculation" and said that he was "currently studying this issue."  2010 Rule, 75 Fed. Reg. at 19,749 (AR 2826).  He agreed to study the issue further, and publish an adjustment factor that would "account[] for the fact that the documentation standard used in RADV audits to determine a contract's payment error (medical records) is different from the documentation standard used to develop the Part C risk-adjustment model (FFS claims)."  RADV Methodology at 4–5 (AR 5314–15).  The Secretary said that this FFS Adjuster would "be calculated . . . based on a RADV-like review of records submitted to support FFS claims data."  *Id.* at 5 (AR 5315).

United argues that the Overpayment Rule is inconsistent with the Secretary's announcement that an FFS Adjuster would be applied to RADV audit recoveries.  But, as explained at length above, the Overpayment Rule did not alter the terms on which Medicare Advantage insurers are entitled to claim payment.  United's quarrel is, again, not with the Overpayment Rule at all, but rather with the idea that there could be any rational basis on which to apply the FFS Adjuster only to contracts subject to RADV audits.  But the commenters who suggested that the Secretary adopt a fee-for-service adjuster did not frame their proposal as an adjustment to the entire payment system, but rather as an adjustment to the amounts to be recovered by RADV audits.  Some suggested that the mechanics of extrapolating a contract-level error rate made such a RADV-specific adjustment advisable.  *See, e.g.*, Comment of Lovelace Health System at 4–5 (AR 2604–

05).  But the obligation of Medicare Advantage insurers to report accurate data is not limited to any sample, and so this rationale for a RADV adjustment simply has nothing to do with that obligation.  The Overpayment Rule thus simply noted that the "RADV methodology does not change [the] existing contractual requirement that MA [insurers] must certify (based on best knowledge, information, and belief) the accuracy . . . and truthfulness of the risk adjustment data they submit to CMS."  Overpayment Rule, 79 Fed. Reg. at 29,921 (AR 1313).  In making that announcement, the Secretary did not abandon *sub silentio* the "long-standing . . . requirement that a diagnosis submitted . . . by an MA organization for payment purposes must be supported by medical record documentation."  *Id.* at 29,921–22 (AR 1313–14).  United's argument from the FFS Adjuster is simply another fruitless attack on that well-established requirement.

### III.   The Secretary's interpretation of "identified" lawfully reiterated a pre-existing obligation to exercise due diligence.

Under the Medicare statute, "overpayments" that have been "identified" must be "reported and returned."   42 U.S.C. § 1320a-7k(d).   The Overpayment Rule defines an "identified overpayment" as existing whenever a Medicare Advantage insurer "should have determined through the exercise of reasonable diligence, that [it] has received an overpayment." 42 C.F.R. § 422.326(c).   United objects to this provision on two grounds—first, that it is an untenable interpretation of the statutory language, and second, that it was not a logical outgrowth of the proposed rule.

In fact, this provision merely reiterates an obligation to which Medicare Advantage insurers have been subject since at least the year 2000.  As the Ninth Circuit put it, "CMS has long made clear that, under [42 C.F.R.] § 422.504(*l*), Medicare Advantage organizations have 'an obligation to undertake "due diligence" to ensure the accuracy, completeness, and truthfulness' of the

[diagnosis] data they submit to CMS and 'will be held responsible for making good faith efforts to certify the accuracy, completeness, and truthfulness' of these data." *Swoben*, 848 F.3d at 1167 (quoting 2000 Rule, 65 Fed. Reg. at 40268 (AR 2006)); *see id.* at 1174. Although these "statements by CMS in 2000 regarding due diligence and good faith . . . . are authoritative . . . because they provided clear guidance to Medicare Advantage organizations . . . regarding their obligations under 42 C.F.R. § 422.504(*l*)," *id.* at 1177, the terms "due diligence" and "reasonable diligence" had never been incorporated into regulatory text.

The Overpayment Rule incorporated the pre-existing duty of Medicare Advantage insurers to undertake due diligence to ensure the accuracy and truthfulness of their claims for payment, *see* 2000 Rule, 65 Fed. Reg. at 40268 (AR 2006), by requiring the "exercise of reasonable diligence" in identifying overpayments. 42 C.F.R. § 422.326(c). This requirement is indistinguishable from the earlier obligation: there is no meaningful difference between "reasonable diligence" and "due diligence." And the reiteration of a lawful, existing obligation cannot be "a surprise switcheroo" that causes a logical outgrowth problem. *Envt'l Integrity Proj. v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005). Moreover, as one court has recognized, when Congress enacted 42 U.S.C. § 1320a-7k(d), it intended "to subject willful ignorance of Medi[care] overpayments to the [False Claims Act's] stringent penalty scheme." *United States ex rel. Kane v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 391 (S.D.N.Y. 2015). The obligation to "exercise . . . reasonable diligence" in identifying overpayments prevents such willful ignorance (or reckless disregard), but no more. (It does not, as United claims, create a negligence standard.) The final rule's requirement of reasonable diligence is therefore a logical outgrowth of—indeed, a near-synonym for—the "reckless disregard or deliberate ignorance" standard that appeared in the proposed rule. 79 Fed. Reg. at 2055 (proposing 42 C.F.R. § 422.326(c)).

As the Secretary explained in the preamble to the Overpayment Rule, "MA organizations . . . are expected to have effective and appropriate payment evaluation procedures and effective compliance programs as a way to avoid receiving or retaining overpayments." 79 Fed. Reg. at 29923 (AR 1315); *see* 42 C.F.R. § 422.503(b)(4)(vi) (Medicare Advantage insurers must "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS' program requirements."). "Thus, at a minimum, reasonable diligence would include proactive compliance activities conducted in good faith by qualified individuals to monitor for the receipt of overpayments." Overpayment Rule, 79 Fed. Reg. at 29923 (AR 1315). Failure to comply with this regulatory requirement might well demonstrate deliberate ignorance or reckless disregard of the existence of overpayments. And, "[i]n certain circumstances, . . . reasonable diligence might [also] require an investigation conducted in good faith and in a timely manner by qualified individuals in response to credible information of a potential overpayment." *Id.* Failure to undertake a good faith investigation in those circumstances would surely constitute "willful ignorance of Medi[care] overpayments," which Congress intended to subject "to the [False Claims Act's] stringent penalty scheme." *Kane*, 120 F. Supp. 3d at 391. In sum, 42 C.F.R. § 422.326(c) merely reiterated existing obligations, and is consistent with congressional intent.[12]

## CONCLUSION

The Overpayment Rule should be upheld in its entirety.

---

[12] If the Court finds 42 C.F.R. § 422.326(c) to be invalid—which it should not, for the reasons discussed above—it should sever that provision and uphold the remainder of the Overpayment Rule. This would not be a case in which "the invalid portion cannot be severed from the rest of the rule," *Harmon v. Thornburgh*, 878 F.2d 484, 495 (D.C. Cir. 1989), nor one in which the there was "substantial doubt that a partial affirmance would comport with the [agency's] intent," *Telephone & Data Sys., Inc. v. FCC*, 19 F.3d 42, 50 (D.C. Cir. 1994).

Respectfully submitted,

CHAD A. READLER
Principal Deputy Assistant Attorney General

OF COUNSEL:

BRIAN R. STIMSON
Acting General Counsel

JESSIE K. LIU
United States Attorney

JANICE L. HOFFMAN
Associate General Counsel

JOEL McELVAIN
Assistant Director, Federal Programs Branch

  /s/ *James Bickford*

SUSAN MAXSON LYONS
Deputy General Counsel for
    Litigation

JAMES BICKFORD
New York Bar No. 5163498
Trial Attorney, Federal Programs Branch
Civil Division, U.S. Department of Justice
20 Massachusetts Ave., NW
Washington, DC 20530
(202) 305-7632
James.Bickford@usdoj.gov

SCOTT SASJACK
Attorney
U.S. Department of Health and
    Human Services

Dated: December 4, 2017

*Counsel for Defendants*

46