### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITEDHEALTHCARE INSURANCE COMPANY, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 16-cv-157 (RMC) |
| ALEX M. AZAR II, in his official capacity as Secretary of Health and Human Services, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) ) | |

### DEFENDANTS' RULE 60(b) MOTION FOR PARTIAL RECONSIDERATION

In its summary judgment ruling, this Court vacated the 2014 Overpayment Rule on the grounds that the government's refusal to incorporate a Fee-For-Service Adjuster in its definition of overpayment constituted an arbitrary "departure from prior policy that the government fail[ed] adequately to explain."  Mem. Op. at 2.  The Court also held that the Rule relied on an invalid (and procedurally improper) interpretation of the statutory term "identified."  *Id.* at 26–29; *see* 42 U.S.C. § 1320a-7k(d)(2).   The Secretary of Health and Human Services does not seek reconsideration of these holdings, nor reinstatement of the Overpayment Rule.

The Court also held that the Overpayment Rule violated the statutory mandate of "actuarial equivalence" in payments to Medicare Advantage (MA) insurers.  *See* 42 U.S.C. § 1395w-23(a)(1)(C)(i).  The Court concluded that the presence of errors in the Medicare Part A and B diagnosis data informing the Medicare Advantage risk adjustment model, without the application of any adjustment factor to compensate for those errors, meant "that Medicare Advantage insurers will be paid less to provide the same healthcare coverage to their beneficiaries than CMS itself pays for comparable patients" under Medicare Parts A and B

(commonly known as "fee-for-service" or "FFS" Medicare). Mem. Op. at 17. The Court held

that the Overpayment Rule also violated 42 U.S.C. § 1395w-23(b)(4)(D), for similar reasons.

Mem. Op. at 21–22. The Secretary now seeks reconsideration of these holdings, pursuant to

Federal Rule of Civil Procedure 60(b), in light of new information about the effects of errors in

fee-for-service data on the payments made to Medicare Advantage insurers, and in deference to a

rulemaking that is currently addressing this issue.

On October 26, the Center for Program Integrity at the Centers for Medicare & Medicaid

Services (CMS) published an empirical evaluation of the effect of errors in the fee-for-service

diagnosis data on the accuracy of payments made to Medicare Advantage insurers. This study

included the detailed "review of records submitted to support FFS claims data" that the agency

had said it would conduct before calculating the payment adjustment known as the "Fee-for-

Service Adjuster." Notice of Final Payment Error Methodology at 5 ("RADV Methodology")

(AR 5315). The study found that "diagnosis error in FFS claims data does not lead to systematic

payment error" in the Medicare Advantage program.[1] *See also* FFS Adjuster Study at 5 (finding

"that errors in FFS claims data do not have any systematic effect on the risk scores calculated by

the CMS-HCC risk adjustment model, and therefore do not have any systematic effect on the

payments made to MA organizations"). On November 1, CMS published a notice of proposed

rulemaking in which, relying in part on the FFS Adjuster Study, it proposed "not [to] include an

FFS Adjuster" in its methodology for calculating recoupments collected through Risk

---

[1] Ex. A at 6, CMS, *Fee for Service Adjuster and Payment Recovery for Contract Level Risk Adjustment Data Validation Audits* (Oct. 26, 2018) ("FFS Adjuster Study"), *available at* https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/FFS-Adjuster-Excecutive-Summary.pdf.

Adjustment Data Validation (RADV) audits.  Policy and Technical Changes to Medicare

Advantage for 2020 and 2021 Proposed Rule, 83 Fed. Reg. 54,982, 55,041 (Nov. 1, 2018).

On the basis of this new evidence that errors in the underlying diagnosis data do not lead

to systematic underpayment of Medicare Advantage insurers, the Secretary moves this Court to

alter its holding that the Overpayment Rule violated the statutory mandate of "actuarial

equivalence" in payments to Medicare Advantage insurers, 42 U.S.C. § 1395w-23(a)(1)(C)(i), as

well as the requirement that the average risk score for fee-for-service beneficiaries in each

Medicare Advantage payment area be calculated "using the same methodology as is expected to

be applied in making payments under" the Medicare Advantage program, *id.* § 1395w-

23(b)(4)(D).

Granting this motion would have no effect on the status of the Overpayment Rule, which

would remain vacated.  And there are strong prudential reasons to grant it.  The Court's

alternative holding about the "actuarial equivalence" and "same methodology" requirements

spoke to the very questions that CMS is now considering through rulemaking: whether errors in

fee-for-service data reduce payments to Medicare Advantage insurers.  Although the agency has

tentatively concluded that they do not, United should be given a chance "to 'convince the agency

to alter [its] tentative position'" and the agency should be afforded the "'opportunity to correct

its own mistakes and to apply its expertise'" to the question before judicial review of its

determination.  *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012) (quoting *Pub.

Citizen Health Research Grp. v. FDA*, 740 F.2d 21, 30–31 (D.C. Cir. 1984)).  Granting this

motion would continue to give United all of the relief that it has sought here, while preserving

the agency's ability to evaluate the accuracy of its payment model in the first instance through

the rulemaking process.

**BACKGROUND**

A.      **Risk Adjustment in Medicare Advantage**

The Secretary refers the Court to his summary judgment briefing for a detailed explanation of the Medicare Advantage program and the risk adjustment model used to calculate the payments that insurers receive for each Medicare Advantage beneficiary that they cover.  *See* Defs.' Mem. in Support of Their Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J. [Dkt. 57-1]; Defs.' Reply in Support of Their Cross-Mot. for Summ. J. [Dkt. 64].  As most relevant here, the Secretary employs the CMS Hierarchical Condition Category (CMS-HCC) risk adjustment model to calculate demographic and disease coefficients that are then used to compute a "risk score," which compares the risk profile of a given beneficiary to that of an average beneficiary.  For example, in 2014 CMS calculated that a diagnosis of pneumococcal pneumonia predicted medical costs equal to 20.0% of the cost of covering an average beneficiary.  *See* Announcement of 2014 Medicare Advantage Payment Rates at 69 (AR 4897).  In that year, a 72-year-old non-disabled woman who was living independently, and had been diagnosed with pneumococcal pneumonia, was calculated to be 54.8% as costly as an average beneficiary: 34.8% for her demographic factors, *see id.* at 67 (AR 4895), plus 20.0% for her disease.  Medicare Advantage insurers were therefore paid 54.8% of their base rate for covering her.

B.      **Diagnosis Reporting in Medicare Parts A, B, and C**

In order for this system to operate, Medicare Advantage insurers must report the diseases with which their beneficiaries have been diagnosed, just as providers and suppliers do when they submit claims for payment by Medicare Part A or B.  All diagnoses reported to CMS for any Medicare program must be supported by medical record documentation, in compliance with the

4

International Classification of Disease coding guidelines.  45 C.F.R. § 162.1002(a)(1), (b)(1) (adopting "The Official ICD–9–CM Guidelines for Coding and Reporting" as the official methodology for all diagnosis coding for the relevant period); *see* ICD-9-CM Coding Guidelines at 5 (AR 11385) (discussing the requirement of medical record documentation for diagnosis coding).  The ties between diagnoses reported and risk-adjusted payments made to Medicare Advantage insurers are discussed at length in the Secretary's summary judgment briefs, as is the long-standing requirement of medical record documentation for all diagnoses submitted for payment.

Many payments under Medicare Parts A and B also depend on the diagnoses submitted. Payments for Part A beneficiaries are based on the "diagnosis-related group" to which each beneficiary is assigned upon discharge.  42 C.F.R. § 412.60(c); *see* Form HCFA-1450/UB-92, FL 67 (AR 5462) (instructing Part A providers that "[e]ntering any other diagnosis [in place of the correct principal diagnosis] may result in incorrect assignment of a DRG and cause you to be incorrectly paid").  And although the *amount* paid for the outpatient medical services (or durable goods) provided under Part B depends only on the services (or goods) provided and not in any way on the diagnoses submitted, *whether such payments are approved* often depends on the diagnosis.  To be sure, some services covered through Part B, such as routine checkups, do not require any diagnostic information.  But many goods and services must be medically indicated if they are to be covered.  *See* Medicare Program Integrity Manual, § 3.6.2.2 (discussing the requirement that a medical item or service "be reasonable and necessary for diagnosis or treatment of [the] illness or injury in order to be considered for payment"), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/

pim83c03.pdf.  Where Part B coverage of goods or medical services requires the submission of appropriate diagnoses, those goods or services cannot be approved for payment without properly documented diagnosis information.  *See* Medicare Program Integrity Manual, § 3.3.2.1 (explaining that "information submitted by the supplier or provider must corroborate the documentation in the beneficiary's medical documentation" for CMS to "consider coverage and payment for any item or service" provided through Medicare Part A or B)

> C.      **Audits in Medicare Advantage and the Fee-For-Service Adjuster Study**

When CMS announced an audit methodology for the Medicare Advantage program in February 2012, it said that it would incorporate an adjustment factor (known as the "Fee-For-Service Adjuster") that would account for any effect of errors in the Part A and B diagnosis data on the accuracy of payments made to Medicare Advantage insurers.  *See* RADV Methodology (AR 5311).  CMS said that this adjustment would be calculated based on a study that included a detailed "review of records submitted to support FFS claims data."  *Id.* at 5 (AR 5315).  That study was recently published in two parts, which are attached to this motion as Exhibits A and B. The study found "that diagnosis error in FFS claims data does not lead to systematic payment error in the MA program."  FFS Adjuster Study at 6.

"The study began by auditing . . . outpatient claims paid through Medicare Part B in a given year."  83 Fed. Reg. at 55,040.  CMS "reviewed the medical records associated with each claim . . . to determine whether the diagnosis associated with the claim was supported by medical record documentation," and then calculated a "discrepancy rate" for each CMS-HCC diagnosis category.  *Id.*  For example, CMS found that 96 of the 484 claims submitted with a diagnosis of chronic obstructive pulmonary disease were unsupported by medical record documentation, a discrepancy rate of 19.8 percent.  *Id.*  Because "the data set contained extremely small samples"

of many diagnosis categories, CMS calculated three standard discrepancy rates—high, low, and baseline—and assigned each diagnosis category one of the three standard rates, as appropriate. *Id.*

CMS then proceeded to calculate a beneficiary-level discrepancy rate: that is, the probability that a beneficiary had no medical record support for a particular diagnosis in a given year. *Id.* To do this, CMS looked to the number of outpatient claims associated with each diagnosis category for an average beneficiary. The logic of the analysis is that each beneficiary needs only a single instance of medical record support to make a diagnosis valid for a payment year. If a particular disease had an average of three claims associated with it per beneficiary per year, and was assigned to the low discrepancy rate of 20.9%, then CMS reasoned that the diagnosis reported with each of the claims had an approximately 1-in-5 chance of being unsupported, and so the beneficiary had an approximately 1-in-125 chance of having an unsupported diagnosis in that payment year (*i.e.*, 1/5 x 1/5 x 1/5). *Id.*

"For example, metastatic cancer or acute leukemia was assigned the baseline discrepancy rate of 33.8%." *Id.* at 55,040 n.30. Therefore, "each of the seven claims associated with the average beneficiary for whom such a diagnosis was reported had a 66.2% chance of being supported by medical record documentation." *Id.* "If each beneficiary with such a reported diagnosis has 7 claims associated with that diagnosis, and each claim has a 66.2% chance of being supported by medical record documentation, then 99.95% of all beneficiaries will have at least one instance of medical record support, and only 0.05% of beneficiaries will lack any medical record documentation of their reported diagnosis." *Id.*

After calculating the "beneficiary-level discrepancy rate" for each disease category, CMS "ran fifty simulations in which [it] removed diagnoses from a data set of more than 1.4 million

Medicare Part A and B beneficiaries at the beneficiary-level discrepancy rate." *Id.* at 55,040. Because the beneficiary-level discrepancy rate for cancer and acute leukemia was 0.05%, one in each 2,000 of those diagnoses was removed from the original data set for each simulation. *Id.* at 55,040 n.31. The purpose of repeating this exercise fifty times, beginning from the original data set each time, was to minimize any effects from the random selection of which particular instances of a diagnosis to remove. CMS then "used each simulated 'corrected' data set to recalibrate the CMS-HCC risk adjustment model," in the same way that it is periodically recalibrated from new fee-for-service data. *Id.* at 55,040. CMS used the risk coefficients produced by each recalibration from "corrected" data to recalculate the risk scores for "a data set of MA beneficiaries," and then "compared their original risk scores to the risk scores calculated with the recalibrated model," to see how the removal of erroneous diagnoses would affect the risk scores that govern payments to Medicare Advantage insurers. *Id.* at 55,040–41.

CMS "found that the difference between the risk scores was very small, and that the recalibrated risk scores tended to be slightly lower than the original risk scores." *Id.* at 55,041. CMS therefore "concluded that diagnosis error in FFS claims data does not lead to systematic payment error in the MA program." *Id.*; *see* Ex. A, FFS Adjuster Study & Ex. B, CMS, *Fee for Service Adjuster and Payment Recovery for Contract Level Risk Adjustment Data Validation Audits - Technical Appendix* (Oct. 26, 2018) ("FFS Adjuster Technical Appendix"), *available at* https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/FFS-Adjuster-Technical-Appendix.pdf.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 60(b) permits a court to grant relief from an order or judgment on the basis of "newly discovered evidence" or "any other reason that justifies relief," so long as the motion is "made within a reasonable time," and "no more than a year after the entry of judgment" in the case of newly discovered evidence.  Fed. R. Civ. P. 60(b)(2) & (6), (c)(1).  The district court "is vested with a large measure of discretion in deciding whether to grant a Rule 60(b) motion."  *Bain v. MJJ Productions, Inc.*, 751 F.3d 642, 646 (D.C. Cir. 2014) (quoting *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1138 (D.C. Cir. 1988)); *accord Computer Prof'ls for Soc. Responsibility v. U.S. Secret Serv.*, 72 F.3d 897, 903 (D.C. Cir. 1996); *Randall v. Merrill Lynch*, 820 F.2d 1317, 1320 (D.C. Cir. 1987); *Fraenkel v. Islamic Republic of Iran*, 326 F.R.D. 341, 344 (D.D.C. 2018) (Collyer, J.) ("Whether a party should be granted relief under Rule 60(b) is a matter left to the district court's discretion. . . ."). "Rule 60(b) 'was intended to preserve the delicate balance between the sanctity of final judgments . . . and the incessant command of a court's conscience that justice be done in light of all the facts.'"  *Randall*, 820 F.2d at 1321 (quoting *Good Luck Nursing Home v. Harris*, 636 F.2d 572, 577 (D.C. Cir. 1980) (alteration in original)).

Although motions for relief under Rule 60(b) do not toll a party's time to appeal, neither does a notice of appeal divest the district court of authority to indicate that it would grant such a motion.  "Rather, when both a Rule 60(b) motion and an appeal are pending simultaneously . . . . the District Court may consider the 60(b) motion and, if the District Court indicates that it will grant relief, the appellant may move the appellate court for a remand in order that relief may be granted."  *Hoai v. Vo*, 935 F.2d 308, 312 (D.C. Cir. 1991).

**ARGUMENT**

**A.      The recent FFS Adjuster Study provides new evidence that Medicare Advantage insurers are not systematically underpaid.**

In its summary judgment opinion, this Court concluded that, under the Overpayment Rule, "Medicare Advantage insurers will be paid less to provide the same healthcare coverage to their beneficiaries than CMS itself pays for comparable patients" under Medicare Parts A and B. Mem. Op. at 17.  The Court described such an underpayment as the "inevitable" consequence of the errors present in the Medicare Part A and B diagnosis data.  *Id.* at 17, 20; *see id.* at 20 (concluding that, under the Overpayment Rule, "the 'expected' value of payments from CMS for healthcare costs under Medicare Advantage plans will be lower than the 'expected' payments CMS itself will make under traditional Medicare").  The Court's conclusion that Medicare Advantage insurers would "inevitably" be underpaid due to the effects of erroneous diagnoses in the Medicare Part A and B data was the basis for its finding that the Overpayment Rule violated the statutory requirement of actuarial equivalence in payments to Medicare Advantage insurers, 42 U.S.C. § 1395w-23(a)(1)(C)(i), as well as the requirement that the average risk score for fee-for-service beneficiaries in each Medicare Advantage payment area be calculated "using the same methodology as is expected to be applied in making payments under" the Medicare Advantage program, *id.* § 1395w-23(b)(4)(D).  Mem. Op. at 17–22.

However, the Fee-For-Service Adjuster study recently published by CMS indicates that errors in the Medicare Part A and B diagnosis data have no significant effect—and no systematic negative effect at all—on the payments made to Medicare Advantage insurers.  On the basis of this study, the government moves the Court to alter its holding that the Overpayment Rule violated the "actuarial equivalence" and "same methodology" requirements codified in 42

U.S.C. § 1395w-23(a)(1)(C)(i) and (b)(4)(D).  As an empirical matter, the agency has now found

that the underpayment this Court believed would be "inevitable" does not in fact occur.

> **B.      The agency's related rulemaking counsels against judicial review of the actuarial equivalence question at this time.**

That the agency's finding is provisional, pending public comment, *see* 83 Fed. Reg. at

55,041, provides another strong reason for this Court to refrain from ruling on the question of

"actuarial equivalence" (and the "same methodology" challenge, which the Court found to be

closely related) at this juncture.  The D.C. Circuit has repeatedly emphasized the importance of

allowing an administrative agency "an opportunity to correct its own mistakes and to apply its

expertise" before its conclusions are subjected to judicial review.  *Am. Petroleum Inst.*, 683 F.3d

at 387 (quoting *Pub. Citizen*, 740 F.2d at 30).

CMS is currently deliberating over the question of whether errors in the fee-for-service

claims data affect the accuracy of its Medicare Advantage risk adjustment model in a way that

implicates the statutory requirement of actuarial equivalence—the very question that is before

this Court.  The "agency's interest in crystallizing its policy before that policy is subjected to

judicial review and the court's interests in avoiding unnecessary adjudication and in deciding

issues in a concrete setting" would therefore both be well served by refraining from deciding the

question of actuarial equivalence (and the closely related "same methodology" challenge) at this

time.  *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999) (quoting

*Eagle-Picher Indus. v. EPA*, 759 F.2d 905, 915 (D.C. Cir. 1985)).  United should instead be

afforded the opportunity to "convince the agency to alter [its] tentative position" as expressed in

the FFS Adjuster Study, and the agency should be given a chance "to correct its own mistakes

and to apply its expertise" before the conclusions of that study are subjected to judicial review. *Am. Petroleum Inst.*, 683 F.3d at 387 (quoting *Pub. Citizen*, 740 F.2d at 30–31).[2]

In sum, the findings of the FFS Adjuster Study are new evidence that the Court's conclusion about the effect of errors in the Medicare Part A and B diagnosis data on the payments made to Medicare Advantage insurers was incorrect, and the provisional nature of those findings provides a strong prudential reason for the Court to refrain from deciding the issue at this time—especially where other legal grounds are available to provide United with complete relief.

C.   **The Court's actuarial equivalence holding appears to rest in part on certain mistaken assumptions about the Medicare program.**

In addition to the new evidence discussed above, the Secretary respectfully seeks to clarify certain issues that may have contributed to the Court's conclusion that the Overpayment Rule violated the "actuarial equivalence" and "same methodology" requirements codified in 42 U.S.C. § 1395w-23(a)(1)(C)(i) and (b)(4)(D).  First, the Court suggested that the Overpayment Rule reduced payments to Medicare Advantage insurers on the basis of "audited" diagnosis data, in contrast to the "unaudited" data submitted by providers and suppliers through Medicare Part A and B.  *See, e.g.*, Mem. Op. at 20 (contrasting the "proactive [compliance] obligation" imposed on Medicare Advantage insurers by the Overpayment Rule with the fact that "CMS does not audit or engage in similar self-examination for accuracy of its own records").

---

[2] Although the Secretary did not argue that the actuarial equivalence challenge was unripe at the time it was presented to this Court, before the publication of the notice of proposed rulemaking and the associated FFS Adjuster Study, the D.C. Circuit's jurisprudence on prudential ripeness should nonetheless guide the Court's exercise of its discretion in considering this motion pursuant to Rule 60(b).

To be clear, although the Overpayment Rule required certain compliance efforts, it did not require Medicare Advantage insurers to audit every diagnosis code prior to submission for payment.  In RADV audits, the diagnosis data is truly audited: for every diagnosis reported, auditors examine the underlying medical records and either verify the diagnosis or disqualify it. Nothing analogous was mandated by the Overpayment Rule, which merely required that any inaccuracies "identified" by an insurer be reported, and that any payments associated with those "identified" inaccuracies be returned.  Although United has suggested that the Overpayment Rule "impos[ed] a 100% accuracy requirement on their records," and "obligated the insurance companies who provide Medicare Advantage insurance to validate independently the underlying medical records that support diagnosis codes submitted by health care providers," that is not true. Mem. Op. at 2, 8 (summarizing United's arguments).  The Overpayment Rule required the return of "identified" overpayments and the use of compliance programs designed to reduce the incidence of overpayments, but it did not require perfection in Medicare Advantage diagnosis data.

This Court has ruled (and for the purposes of this motion, the Secretary does not contest) that an inaccurate diagnosis is only "identified" when the insurer has actual knowledge of it, or acts in deliberate ignorance of (or with reckless disregard for) the accuracy of the diagnosis on which its claim for payment is based.  *Id.* at 27.  This standard is far from requiring that all Medicare Advantage diagnosis data be "audited," or perfectly accurate in every respect.

Second, the Court suggests that "CMS pays for all diagnostic codes, erroneous or not, submitted to traditional Medicare."  *Id.* at 20.  Respectfully, the Secretary disagrees with this conclusion as a matter of law.  CMS does not pay for diagnostic codes under either Part A or Part B.  Under Medicare Part A, the diagnosis code submitted plays a role in the assignment of each

patient to a "diagnosis-related group" or "DRG," which in turn determines how much a provider

is paid for treating that patient.  *See* 42 C.F.R. § 412.60(c).  Medicare Administrative Contractors

(MACs) are empowered to review the accuracy of the DRGs assigned, and can refuse payment

for DRGs assigned on the basis of diagnoses unsupported by medical record documentation.  *See*

Medicare Program Integrity Manual, § 3.3.2.1 (explaining that "information submitted by the

supplier or provider must corroborate the documentation in the beneficiary's medical

documentation" for CMS to "consider coverage and payment for any item or service" provided

through Medicare Part A or B).  Under Medicare Part B, the diagnosis code submitted often

plays a role in the determination of whether a particular medical service or durable good is

medically necessary (and therefore compensable), and MACs are again empowered to police

fraud by reviewing the accuracy of those diagnoses.  *See* 42 U.S.C. § 1395*u*(p)(1) ("Each request

for payment . . . for an item or service furnished by a physician or practitioner . . . shall include

the appropriate diagnosis code (or codes) as established by the Secretary for such item or

service."); 42 C.F.R. § 424.32(a)(2) ("A claim for physician services . . . must include

appropriate diagnostic coding for those services. . . ."); Medicare Program Integrity Manual,

§ 3.3.2.1; *id.* § 3.4.1.3 (When conducting a "review to address potential abuse or overutilization,

MACs . . . should require that diagnosis codes be submitted with each claim for the targeted

service. . . .").  But reported diagnostic codes do not lead directly to additional payments in either

Part A or Part B, as they do in Medicare Advantage.

   Third, the Court relies on a two-page letter by the American Academy of Actuaries,

submitted in response to CMS's proposed methodology for conducting Risk Adjustment Data

Validation audits.  In particular, the Court cites this letter in support of its conclusion that "[t]he

use of unaudited CMS data, with its known and unknown errors, to set the rates by which

Medicare Advantage insurers are paid and then the use of audited data to define 'overpayments' will lead to this result" in which Medicare Advantage insurers are underpaid.  Mem. Op. at 19. But the letter from the American Academy of Actuaries is far less definitive, saying only that the Risk Adjustment Data Validation audit methodology discussed there "may create systematic underpayment," AR 5236, not that it inevitably would.  In any event, the Risk Adjustment Data Validation audits (which are the subject of the letter from the American Academy of Actuaries) are a true audit of the accuracy of each diagnosis code submitted for payment within the audit sample.  As explained above, the Overpayment Rule did not impose a requirement of auditing or perfect accuracy on all Medicare Advantage diagnoses.  Even if the American Academy of Actuaries was right to be concerned that audited data could be incompatible with the Medicare Advantage risk adjustment model, the Overpayment Rule did not impose a requirement that all diagnosis data be audited.  As interpreted by this Court, it simply created a system for reporting and returning payments associated with inaccurate diagnoses that had been "identified."

## CONCLUSION

For the reasons stated above, the Secretary respectfully moves this Court to alter its conclusion "that Medicare Advantage insurers will be paid less to provide the same healthcare coverage to their beneficiaries than CMS itself pays for comparable patients" under Medicare Parts A and B.  Mem. Op. at 17.  That conclusion is not necessary to support the Court's judgment.  The government also asks that this Court alter its related holdings that the Overpayment Rule violated the "actuarial equivalence" and "same methodology" requirements codified in 42 U.S.C. § 1395w-23(a)(1)(C)(i) and (b)(4)(D).  This relief would not prejudice United (as the Overpayment Rule would remain vacated) and would ensure that the agency was able to engage in an orderly rulemaking process to evaluate the accuracy of its payment model.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ERIC R. WOMACK
Assistant Branch Director
Federal Programs Branch

  /s/ *James Bickford*
JAMES BICKFORD
New York Bar No. 5163498
Trial Attorney, Federal Programs Branch
Civil Division, U.S. Department of Justice
1110 L Street, NW
Washington, DC 20530
(202) 305-7632
James.Bickford@usdoj.gov

Dated: November 5, 2018                    *Counsel for Defendant*